**UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE**

|  |  |  |
|---|---|---|
| **CLEVELAND-CLIFFS INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Court No. 22-00257** |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S AND PLAINTIFF-INTERVENORS'
## MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of this Court, Plaintiff Cleveland-Cliffs Inc.
and Plaintiff-Intervenors Nucor Corporation, Steel Dynamics, Inc., and United States
Steel Corporation hereby move for judgment on the agency record in this appeal, which
challenges the final negative determinations of the United States International Trade
Commission ("Commission") in the five-year reviews of cold-rolled steel flat products
from Brazil. *See Cold-Rolled Steel Flat Products from Brazil, China, India, Japan, South
Korea, and the United Kingdom*, Inv. Nos. 701-TA-540-543 and 731-TA-1283-1287 and
1290 (Review), USITC Pub. 5339 (August 2022) ("*Views*"). The Commission's negative
determinations for Brazil were published in the *Federal Register* at 87 Fed. Reg. 49,886
(August 12, 2022).

As discussed in detail in the attached memorandum of law in support of this
motion, Plaintiff and Plaintiff-Intervenors respectfully request that the Court find that the
Commission majority's negative determinations for Brazil are unsupported by substantial
evidence on the record and otherwise not in accordance with law. Plaintiff and Plaintiff-

Intervenors further request that the Court remand the Commission's final negative determinations for Brazil to the Commission for disposition consistent with the Court's opinion.

Respectfully submitted,

/s/ Stephen P. Vaughn
Stephen P. Vaughn, Esq.
Neal J. Reynolds, Esq.
Barbara Medrado, Esq.

**KING & SPALDING LLP**
1700 Pennsylvania Ave., NW
Washington, DC 20006
(202) 737-0500

*Counsel to Cleveland-Cliffs Inc.*

/s/ Alan H. Price
Alan H. Price, Esq.
Christopher B. Weld, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Nucor Corporation*

/s/ Roger B. Schagrin
Roger B. Schagrin, Esq.
Jeffrey D. Gerrish, Esq.

**SCHAGRIN ASSOCIATES**
900 Seventh Street, NW
Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel to Steel Dynamics, Inc.*

*/s/ Thomas M. Beline*
Thomas M. Beline, Esq.
Sarah E. Shulman, Esq.

**CASSIDY LEVY KENT (USA) LLP**
900 19th Street, NW
Suite 400
Washington, DC 20006
(202) 567-2316

*Counsel to United States Steel Corporation*

March 15, 2023

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE**

|  |  |  |
|---|---|---|
| **CLEVELAND-CLIFFS INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Court No. 22-00257** |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>ORDER</u>

Upon consideration of the Rule 56.2 Motion For Judgment Upon The Agency Record of Plaintiff Cleveland-Cliffs Inc. and Plaintiff-Intervenors Nucor Corporation, Steel Dynamics, Inc., and United States Steel Corporation, and upon consideration of all other papers and filings in this proceeding, it is hereby

ORDERED that the motion is granted; and it is further

ORDERED that this case is remanded to the U.S. International Trade Commission ("Commission") with instructions to reconsider its final determinations for Brazil and issue a revised decision that is consistent with the Court's opinion; and it is further

ORDERED that the Commission issue its revised determinations for Brazil within 60 days of the date of this order.

_____
Judge Gary S. Katzmann
U.S. Court of International Trade

Dated: _____

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| CLEVELAND-CLIFFS INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Court No. 22-00257 |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFF AND PLAINTIFF-INTERVENORS' MEMORANDUM
OF LAW IN SUPPORT OF THEIR RULE 56.2 MOTION FOR
JUDGMENT UPON THE AGENCY RECORD**


Stephen P. Vaughn, Esq.
Neal J. Reynolds, Esq.
Barbara Medrado, Esq.

**KING & SPALDING LLP**
1700 Pennsylvania Ave., NW
Washington, DC 20006
(202) 737-0500

*Counsel to Cleveland-Cliffs Inc.*

Alan H. Price, Esq.
Christopher B. Weld, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Nucor Corporation*

March 15, 2023


Roger B. Schagrin, Esq.
Jeffrey D. Gerrish, Esq.

**SCHAGRIN ASSOCIATES**
900 Seventh Street, NW
Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel to Steel Dynamics, Inc.*

Thomas M. Beline, Esq.
Sarah E. Shulman, Esq.

**CASSIDY LEVY KENT (USA) LLP**
900 19th Street, NW
Suite 400
Washington, DC 20006
(202) 567-2316

*Counsel to United States Steel Corporation*

# **TABLE OF CONTENTS**

I.    STATEMENT PURSUANT TO RULE 56.2 ............................................................2

    A.    Administrative Determination Sought to Be Reviewed..........................................2

    B.    Issues Presented and Summary Of Argument ........................................................3

II.   PROCEDURAL HISTORY AND STATEMENT OF FACTS...........................................7

    A.    The Original Investigation and The Orders ...........................................................7

    B.    The Five-Year Reviews of Cold-Rolled Steel Orders .............................................8

III.  STANDARD OF REVIEW ............................................................................................15

IV.   ARGUMENT.................................................................................................................17

    A.    The Commission Majority's Conditions-of-Competition Analysis For
             Brazil Was Not In Accordance with Law and Unsupported by Substantial
             Evidence.................................................................................................................17

    B.    The Commission Majority's Determination Not to Cumulate the Subject
             Imports from Brazil Relied on Impermissibly Circular Analysis.........................18

    C.    The Commission Majority Failed to Adequately Address the
             Overwhelming Evidence Cited By the Dissent Showing That The
             Brazilian Imports and The Other Subject Imports Would Compete Under
             the Same Conditions of Competition....................................................................32

    D.    In Its Conditions of Competition Analysis, The Commission Majority
             Failed to Address the Domestic Parties' Arguments That the Commission
             Could Not Presume That the Biden Administration Would Keep the Brazil
             Quota in Place .....................................................................................................36

    E.    The Commission's Conditions of Competition Analysis Was Not
             Consistent with Its Prior Decisions Addressing the Impact of Section 232
             On the Volume and Pricing of Subject Imports.....................................................37

V.    Conclusion and Prayer for Relief..................................................................................41

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allegheny Ludlum Corp. v. United States,*
30 C.I.T. 1995, 475 F. Supp. 2d 1370 (Ct. Int'l Trade 2006).........................................*passim*

*Allentown Mack Sales & Service, v. NLRB,*
522 U.S. 359 (1998)........................................................................................................17, 32

*Altx, Inc. v. United States,*
370 F.3d 1108 (Fed. Cir. 2004)............................................................................................15

*Altx, Inc. v. United States,*
26 C.I.T. 1425 (Ct. Int'l Trade 2002) ..................................................................................17

*Altx, Inc. v. United States,*
25 C.I.T. 1100, 167 F. Supp. 2d 1353 (Ct. Int'l Trade 2001)............................................5, 32

*Anshan Iron & Steel Co., Ltd. v. United States,*
28 C.I.T. 1728, 358 F. Supp. 2d 1236 (Ct. Int'l Trade 2004).................................................15

*Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc.,*
419 U.S. 281 (1974)........................................................................................................31, 32

*Burlington Truck Lines. v. United States,*
371 U.S. 156 (1962)........................................................................................................17, 31

*Consol. Edison Co. v. NLRB,*
305 U.S. 197 (1938)..............................................................................................................16

*Crosthwait v. Fed. Commc'ns Comm'n,*
189 U.S. App. D.C. 392, 584 F.2d 550 (D.C. Cir. 1978) ....................................................37

*DAK Americas LLC v. United States,*
456 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) ...............................................................*passim*

*Greater Boston Television Corp. v. FCC,*
444 F.2d 841 (D.C. Cir. 1970)....................................................................................31, 35, 37

*Herbert Harvey, Inc. v. NLRB,* 137 U.S. App. D.C. 282, 292, 424 F.2d 770, 780
(D.C. Cir. 1969) ………………………… .....................………………………………38

*Jilin Henghe Pharmaceutical Co. v. United States,*
28 C.I.T. 969, 342 F. Supp. 2d 1301 (Ct. Int'l Trade 2004), *vacated and
remanded,* 123 Fed. Appx. 402 (Fed. Circuit 2005)..............................................................15

*Neenah Foundry Co. v. United States,*
  25 C.I.T. 702, 155 F. Supp. 2d 766 (Ct. Int'l Trade 2001) ............................................. *passim*

*Nippon Steel Corp. v. United States,*
  27 C.I.T. 1856, 301 F. Supp. 2d 1355 (Ct. Int'l Trade 2003) ................................................5, 16

*Nucor Corporation v. United States,*
  33 C.I.T. 157, 605 F. Supp. 2d 1361 (Ct. Int'l Trade 2009) ........................................... *passim*

*Rhone-Poulenc, Inc. v. United States,*
  20 C.I.T. 573, 927 F. Supp. 451 (Ct. Int'l Trade 1996) ..........................................................15

*Suramerica de Aleaciones Laminadas, C.A. v. United States,*
  17 C.I.T. 146, 818 F. Supp. 348 (Ct. Int'l Trade 1993), *aff'd,* 44 F.3d 978
  (Fed. Cir. 1994) ....................................................................................................................16

*Suramerica de Aleaciones Laminadas, C.A v. United States,*
  44 F.3d 978 (Fed. Cir. 1994) ................................................................................................16

*Timken Co. v. United States,*
  12 C.I.T 955, 699 F. Supp. 300 (Ct. Int'l Trade 1988), *aff'd* 894 F. 2d 385
  (Fed. Cir. 1990) ....................................................................................................................16

*U.S. Steel Group v. United State*s,
  25 C.I.T. 1046, 162 F. Supp. 2d 676 (Ct. Int'l Trade 2001) ......................................17, 31, 37

*Usinor v. United States,*
  26 C.I.T. 767 (Ct. Int'l Trade 2002) ..........................................................................6, 15, 38, 41

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)...............................................................................................15, 16

19 U.S.C. §1675a(a)....................................................................................................................19

19 U.S.C. §1675a(a)(1)................................................................................................................19

19 U.S.C. §1675a(a)(7)..............................................................................................19, 20, 23

19 U.S.C. §1677f(i)(3)(B)..................................................................................................5, 17, 37

19 U.S.C. § 2411 *et seq.*............................................................................................................38

**Congressional Reports**

H.R. Rep. No. 725, 98th Cong. (1984) ....................................................................................21, 23

H.R. Rep. No. 40, 100th Cong., part 1 (1987) ........................................................................21, 23

*Statement of Administrative Action for the Uruguay Round Amendments Act*,
H.R. Rep. No. 316, 103rd Cong., 2d Sess., Vol. I (1994).........................................................19

**Other Authorities**

*Certain Cold-Rolled Steel Flat Products from Japan and the People's Republic of*
*China:  Antidumping Duty Orders*:  81 Fed. Reg. 45956 (July 14, 2016)................................8

*Certain Cold-Rolled Steel Flat Products from the People's Republic of China:*
*Countervailing Duty Order:*  81 Fed. Reg. 45960 (July 14, 2016)...........................................8

*Certain Cold-Rolled Steel Flat Products from Brazil, India, the Republic of*
*Korea, and the United Kingdom:  Amended Final Affirmative Determinations*
*for Brazil and the United Kingom and Antidumping Duty Orders:* 81 Fed.
Reg. 64432 (September 20, 2016) .............................................................................................8

*Certain Cold-Rolled Steel Flat Products from Brazil, India, and the Republic of*
*Korea:  Amended Final Affirmative Determination and Countervailing Duty*
*Order (the Republic of Korea) and Countervailing Duty Orders (Brazil and*
*India):* 81 Fed. Reg. 64436 (September 20, 2016) ...................................................................8

*Carbon and Certain Alloy Steel Wire Rod from Brazil, Indonesia, Mexico,*
*Moldova, and Trinidad and Tobago,*
Inv. Nos. 701-TA-417 and 731-TA-953, 957-959, and 961 (Third Review),
USITC Pub. 5100 (Aug. 2020) ...............................................................................................39

*Certain Cold-Rolled Steel Flat Products from Brazil, India, Korea, Russia, and*
*the United Kingdom,*
Inv. Nos. 701-TA-540, 542-544 & 731-TA-1283, 1285, 1287 & 1289-90
(Final) USITC 4637, (September 2016) ....................................................................................7

*Certain Cold-Rolled Steel Flat Products from Japan and the People's Republic of*
*China,*
Inv. Nos. 701-TA-541 & 731-TA-1284 & 1286 (Final), USITC 4619 (July
2016) .........................................................................................................................................7

*Certain Corrosion-Resistant Steel Products from China, India, Italy, South Korea*
*and Taiwan,*
Inv. Nos. 701-TA-534-537 & 731-TA-1274-1278 (Review), USITC Pub.
5337 (Aug. 2022)......................................................................................................................6

*Clad Steel Plate from Japan,*
Inv. Nos. 731-TA-739 (Fourth Review), USITC Pub. 4851 (Dec. 2018) ...............................38

*Cold-Rolled Steel Flat Products from Brazil, China, India, Japan, South Korea,*
*and the United Kingdom,*
Inv. Nos, 701-TA-540-543 and 731-TA-1283-1287 and 1290 (Review), 87
Fed. Reg. 49,886 (August 12, 2022)........................................................................................2

*Cold-Rolled Steel Flat Products from Brazil, China, India, Japan, South Korea, and the United Kingdom*,
Inv. Nos, 701-TA-540-543 and 731-TA-1283-1287 and 1290 (Review),
USITC Pub. 5339 (August 2022)......................................................................... *passim*

*Non-Oriented Electrical Steel from China, Germany, Japan, Korea, Sweden, and Taiwan*,
Inv. Nos. 701-TA-506 and 508 and 731-TA-1238-1243 (Review), USITC
Pub. 5140 (Dec. 2020) ....................................................................................6, 38

*Stainless Steel Bar from Brazil, India, Japan, and Spain*,
Inv. Nos. 731-TA-678, 679, 681, and 682 (Fourth Review), USITC Pub. 4820
(Sept. 2018)...................................................................................................40, 41

*Tin- and Chromium-Coated Steel Sheet from Japan*,
Inv. Nos. 731-TA-860 (Third Review), USITC Pub. 4795 (June 2018) ...........................6, 39

On behalf of Plaintiff Cleveland-Cliffs, Inc. ("Cleveland-Cliffs"), and Plaintiff-Intervenors Nucor Corporation, Steel Dynamics, Inc., and United States Steel Corporation (the "Domestic Industry"), domestic producers of cold-rolled steel, we hereby submit the Domestic Industry's Memorandum of Law in support of its Motion for Judgment on the Agency Record, in accordance with Rule 56.2(c) of the Rules of the United States Court of International Trade (the "Court").

As discussed below, the negative determinations of the U.S. International Trade Commission (the "Commission") for cold-rolled steel flat products ("cold-rolled steel") from Brazil were not supported by substantial evidence and otherwise not in accordance with law.[1] First, the Commission majority's determination not to cumulate the subject imports of cold-rolled steel from Brazil with imports of cold-rolled steel from the other subject countries was inconsistent with this Court's prior decisions concerning  the legal limitations that govern the Commission's discretion not to cumulate subject imports from an individual country in a five-year review.  Indeed, in its determination, the Commission majority entirely failed to explain why it chose not to comply with these legal limitations.

Moreover, in its analysis, the Commission majority ignored critical facts on the record relating to its cumulation decision for Brazil, thereby rendering the Commission's determinations for Brazil unsupported by substantial evidence.  Finally, although the Commission's decision not to cumulate Brazil with the other subject imports was inconsistent with its prior decisions involving the imposition of trade measures on the subject imports under Section 232 of the Trade Expansion Act of 1962 ("Section 232"), the Commission failed to explain why it departed from

---

[1] The Commission's decision on this issue was a divided one, with three members of the Commission choosing not to cumulate the Brazilian imports with the other subject imports and issuing a negative determination for Brazil and two members of the Commission cumulating the Brazilian imports and issuing an affirmative determination for Brazil.

the practice set forth in these decisions.

Given these issues, we respectfully request that the Court find that the Commission's negative determinations for Brazil were unsupported by substantial evidence and otherwise not in accordance with law. We also respectfully request that the Court remand the Commission's negative determinations for Brazil to the Commission with instructions to address the issues raised in this brief and issue revised determinations for Brazil in accordance with the Court's instructions.

These issues are discussed in detail below.

## I.      STATEMENT PURSUANT TO RULE 56.2

### A.   Administrative Determination Sought to Be Reviewed

Plaintiff and Plaintiff-Intervenors seek review of the Commission's negative final determinations for imports of cold-rolled steel from Brazil, which were issued in connection with the Commission's five-year reviews of the antidumping and countervailing duty orders on cold-rolled steel imports from Brazil and five other subject countries. *See Cold-Rolled Steel Flat Products from Brazil, China, India, Japan, South Korea, and the United Kingdom*, Inv. Nos, 701-TA-540-543 and 731-TA-1283-1287 and 1290 (Review), USITC Pub. 5339 (August 2022) ("*Views*"), PRD 300.[2]  The Commission's negative determinations for Brazil were published in the Federal Register on August 12, 2022. *Cold-Rolled Steel Flat Products from Brazil, China, India, Japan, South Korea, and the United Kingdom*, Inv. Nos, 701-TA-540-543 and 731-TA-1283-1287 and 1290 (Review), 87 Fed. Reg. 49,886 (August 12, 2022).

---

[2] Throughout this brief, we cite to documents in the Commission's public record as "PRD ___" and the documents in the Commission's confidential record as "CRD ___."

### B.   Issues Presented and Summary Of Argument

This appeal presents the Court with the following issues:

1) Whether the Commission majority's decision not to cumulate the subject imports of cold-rolled steel from Brazil with imports of cold-rolled steel from the other subject countries was in accordance with law and supported by substantial evidence when the Commission relied on an impermissibly "circular analysis" in finding that the subject imports from Brazil were likely to compete under different conditions of competition than imports of cold-rolled steel from the other subject countries.

The Commission majority committed legal error when it concluded that the subject imports of cold-rolled steel from Brazil and imports from the other five subject countries would compete under different conditions of competition upon revocation of the orders and, on that basis, chose not to cumulate the Brazilian imports. *Views* at 42-45, PRD 300. In making this finding, the Commission majority relied heavily on the fact that, under Section 232, the Brazilian imports of cold-rolled steel were subject to an annual import quota of 57,251 short tons, which meant that the "subject imports other countries {were} in a position to compete for much larger volumes of sales than any of the subject producers in Brazil…" *Views* at 42-44, PRD 300. According to the Commission majority, this quota represented a significant difference in the likely conditions of competition for the subject imports from Brazil, even though all of the subject imports were subject to measures under Section 232 *and* even though imports of cold-rolled steel from Korea were subject to a similar import quota under Section 232. *Id*.

The Commission majority committed legal error by focusing exclusively, or almost exclusively, on a comparison of the likely volumes of the Brazilian imports and the other subject imports in its "conditions of competition" analysis. The Court of International Trade has made clear that the Commission should not engage in "an impermissible circular {likely injury} analysis" by basing its "conditions of competition" analysis solely on the likely volumes of the subject imports. *Neenah Foundry Co. v. United States*, 25 C.I.T. 702, 155 F. Supp. 2d 766, 771-

77 (Ct. Int'l Trade 2001); *see also Allegheny Ludlum Corp. v. United States*, 30 C.I.T 1995, 475 F. Supp. 2d 1370, 1378-79 (Ct. Int'l Trade 2006); *Nucor Corporation v. United States*, 33 C.I.T. 157, 605 F. Supp. 2d 1361, 1370, n. 12 (Ct. Int'l Trade 2009).  As the Court's decisions on this issue make clear, the Commission majority's assessment of the likely volumes of subject imports properly belongs in its likely volume and likely injury analysis and cannot be the justification for not cumulating the subject imports from any particular country.  *Id*.  Unfortunately, the Commission majority performed this very type of impermissible "circular" analysis for Brazil and failed to provide a legally sufficient explanation for doing so.

Given the clear statements of the Court on this issue, the Commission majority's finding that the subject imports from Brazil and the other subject imports were likely to compete under different conditions of competition if the orders were revoked is not in accordance with law and should be remanded to the Commission.

2) Whether the Commission majority's decision not to cumulate the subject imports of cold-rolled steel from Brazil with imports of cold-rolled steel from the other subject countries was in accordance with law and supported by substantial evidence given that the Commission majority failed to directly address compelling evidence submitted by the domestic parties showing that the Commission could not, and should not, assume that the Section 232 quota on imports from Brazil would remain in place in their existing form for the reasonably foreseeable future.

The Commission majority also failed to adequately address the Domestic Industry's argument that there was strong evidence that the Biden Administration would not keep the Brazil quota in place for the reasonably foreseeable future.  During the reviews, the Domestic Industry provided strong evidence to the Commission showing that the government of Brazil was pressuring the Biden Administration to change Brazil's Section 232 quota to allow more Brazilian imports into the United States.  The Domestic Industry also submitted strong evidence showing that the Biden Administration had significantly revised the Section 232 tariffs for other trading partners, including the European Union, the United Kingdom, and Japan.  This evidence

demonstrated that the Commission could not reasonably conclude that the Brazil quota would remain in place, in its existing form, for the reasonably foreseeable future.

The Commission majority ignored this evidence. Rather than directly addressing this evidence, the Commission majority simply asserted that there was "nothing in the record" to suggest that the Section 232 quota on Brazilian imports would be terminated or revised in the reasonably foreseeable future, noting only that the Biden Administration had not announced that it intended to consider revising the quota. *Views* at 56 & 72, PRD 300. By essentially ignoring the compelling evidence submitted by the domestic parties on this issue, the Commission majority failed to take into account critical facts on the record, thereby rendering its analysis of the issue unsupported by substantial evidence. *See, e.g., Nippon Steel Corp. v. United States*, 27 C.I.T. 1856, 301 F. Supp. 2d 1355, 1364 (Ct. Int'l Trade 2003).

Moreover, by failing to directly address the evidence offered by the domestic producers, the Commission majority failed to address a significant argument raised by the parties, violating one of its fundamental obligations under the statute. 19 U.S.C. §1677f(i)(3)(B) ("the Commission shall include in a final determination of injury an explanation of the basis for its determination that addresses relevant arguments that are made by interested parties who are parties to the investigation or review (as the case may be). . . ."); *see also Altx, Inc. v. United States*, 25 C.I.T. 1100, 167 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 2001). Given these failures, the Commission majority's analysis of this issue should be remanded.

3) Whether the Commission majority's decision not to cumulate the subject imports of cold-rolled steel from Brazil with imports of cold-rolled steel from the other subject countries was in accordance with law and supported by substantial evidence given that it was inconsistent with the Commission's prior decisions relating to the Section 232 trade measures.

The Commission majority's decision not to cumulate the Brazilian imports was also inconsistent with its prior decisions relating to the likely impact of the Section 232 measures on

subject imports, including its decisions in *Tin- and Chromium-Coated Steel Sheet from Japan*,[3] *Certain Corrosion-Resistant Steel Products from China, India, Italy, South Korea and Taiwan,*[4] and *Non-Oriented Electrical Steel from China, Germany, Japan, Korea, Sweden, and Taiwan.*[5] In these and similar decisions, the Commission had consistently found that the imposition of trade measures under Section 232 on subject imports, including the imposition of Section 232 quotas, did not warrant a decision not to cumulate the subject imports from an individual country.

The Commission majority failed, however, to explain why it took a different approach for Brazil in the cold-rolled five-year reviews. Given this failure, the Court should remand the Commission majority's determination for explanation of this departure from its prior practice. *See, e.g., DAK Americas LLC v. United States*, 456 F. Supp. 3d 1340, 1354 (Ct. Int'l Trade 2020) (*quoting Usinor v. United States*, 26 C.I.T. 767, 792 (Ct. Int'l Trade 2002) ("{I}f there are distinguishing factors between the prior determinations in question and the instant case, the burden is on the Commission to reasonably address them.")

Each of these issues renders the Commission's negative determination for Brazil unsupported by substantial evidence and not in accordance with law. Accordingly, this case should be remanded to the Commission.

---

[3] *Tin- and Chromium-Coated Steel Sheet from Japan,* Inv. Nos. 731-TA-860 (Third Review), USITC Pub. 4795 (June 2018) at 21.

[4] *Certain Corrosion-Resistant Steel Products from China, India, Italy, South Korea and Taiwan,* Inv. Nos. 701-TA-534-537 & 731-TA-1274-1278 (Review), USITC Pub. 5337 (Aug. 2022) at 51 ("CORE Views").

[5] *Non-Oriented Electrical Steel from China, Germany, Japan, Korea, Sweden, and Taiwan,* Inv. Nos. 701-TA-506 and 508 and 731-TA-1238-1243 (Review), USITC Pub. 5140 (Dec. 2020) at 33 n. 189.

II.     **PROCEDURAL HISTORY AND STATEMENT OF FACTS**

A.   **The Original Investigation and The Orders**

On July 28, 2015, AK Steel Corporation, ArcelorMittal USA LLC,[6] Nucor Corporation, Steel Dynamics Inc., and United States Steel Corporation filed antidumping and countervailing duty petitions on cold-rolled steel imports from Brazil, China, India, Japan, South Korea, the Netherlands, Russia, and the United Kingdom. *Certain Cold-Rolled Steel Flat Products from Japan and the People's Republic of China*, Inv. Nos. 701-TA-541 & 731-TA-1284 & 1286 (Final), USITC 4619 (July 2016) ("*Japan and China Views*") at 3.[7]

In July and September 2016, the Commission determined that the domestic cold-rolled steel industry was materially injured or threatened with material injury by reason of the subject imports of cold-rolled steel from Brazil, China, India, Japan, Korea, and the United Kingdom. *Japan and China Views* at 3; *Certain Cold-Rolled Steel Flat Products from Brazil, India, Korea, Russia, and the United Kingdom*, Inv. Nos. 701-TA-540, 542-544 & 731-TA-1283, 1285, 1287 & 1289-90 (Final) USITC 4637, (September 2016) ("*Brazil Views")* at 3.  Importantly, the Commission cumulated the subject imports of cold-rolled steel from Brazil with the subject imports from China, India, Japan, Korea, and the United Kingdom, finding that the evidence showed that there was a reasonable overlap of competition between the domestic like product and the subject imports from all six countries.  *Brazil Views* at 15-16; *Japan and China Views* at 12-19.

---

[6] AK Steel Corporation and ArcelorMittal USA were acquired by Cleveland-Cliffs in 2020. Accordingly, Cleveland-Cliffs is the successor-in-interest to these two producers.

[7] During the investigations, the Commission found that the subject imports of cold-rolled steel from the Netherlands and Russia were negligible and therefore terminated the investigations for the subject imports from these two countries. *Brazil Views* at 4-14.

Accordingly, in July and September 2016, the Department of Commerce published antidumping and/or countervailing duty orders on the subject imports from Brazil and the other five subject countries.[8]

### B.   The Five-Year Reviews of Cold-Rolled Steel Orders

On June 1, 2021, the Commission instituted its first five-year reviews of the antidumping and countervailing duty orders on cold-rolled steel from Brazil, China, India, Japan, South Korea, and the United Kingdom.  *Views* at 4, PRD 300.  During the reviews, the Domestic Industry demonstrated, and the Commission agreed, that the record evidence showed that subject imports of cold-rolled steel from Brazil would likely have a discernible adverse impact on the domestic industry and that they would be likely to compete with each other and the domestic like product upon revocation.  *Views* at 17-18, PRD 300.

In particular, the Commission unanimously found that the subject imports from Brazil would have a discernible adverse impact on the domestic industry upon revocation of the Brazilian order, and that subject imports from Brazil would likely compete with the domestic like product and the other subject imports after revocation.  *Views* at 20-23 & 36-41, PRD 300. In its discernible adverse impact analysis for Brazil, the Commission found that:

- Brazil had excess capacity in 2021 and could export enough cold-rolled steel in 2021 to fill its quota under Section 232.

- The volume of the subject imports of cold-rolled steel from Brazil increased from 32,953 short tons to 240,796 short tons during the original period of investigation and their market share increased from 0.1 to 0.8 percent of apparent consumption.

---

[8] Commerce published antidumping orders on all six subject countries and countervailing duty orders on Brazil, China, India, and South Korea.  81 Fed. Reg. 45956 (July 14, 2016); 81 Fed. Reg. 45960 (July 14, 2016); 81 Fed. Reg. 64432 (September 20, 2016); and 81 Fed. Reg. 64436 (September 20, 2016).

- Although the Brazilian imports were subject to a quota of 57,251 short tons under Section 232, they did not come close to filling the quota in 2021 and Brazilian producers had the ability to increase their exports to the United States.

- Brazil was the fifteenth largest exporter of cold-rolled steel in the world in 2021.

- The Brazilian imports undersold the domestic industry in most instances during the period of investigation. *Views* at 20-23, PRD 300.

Given these facts, all of the Commissioners found that, if the order on Brazil were revoked, the imports from Brazil would have a discernible adverse impact on the domestic industry. *Views* at 23, PRD 300.

The Commission also found that there was likely to be a reasonable overlap of competition between the imports from Brazil, the other subject imports and the domestic like product. *Views* at 36-41, PRD 300. In this regard, the Commission found that:

- Most domestic producers, importers and purchasers reported that the domestic like product and the subject imports, including those from Brazil, were "always" or "frequently" interchangeable.

- The domestic like product and the subject imports, including those from Brazil, would likely be sold in similar channels of distribution.

- The domestic like product and the subject imports, including those from Brazil, were sold in overlapping geographic markets in the United States.

- The domestic like product and the subject imports, including those from Brazil, would likely be simultaneously present in the market if the orders were revoked.

*Views* at 36-41, PRD 300. Accordingly, the Commission found that imports from all of the subject countries, including Brazil, would compete with one another and the domestic like product in the market upon revocation. *Views* at 36-41, PRD 300.

Finally, the Domestic Industry demonstrated that the record showed that imports from the subject countries, including those from Brazil, would compete with each other and the domestic like product under the same conditions of competition. *Views* at 17-18, PRD 300. Accordingly,

they argued that subject imports from all six countries, including Brazil, should be cumulated

and that the Commission should find that the cumulated subject imports would cause material

injury to the domestic industry upon revocation of the orders.  *Views* at 17-18 & 67, PRD 300.

Despite finding that the Brazilian imports would have a discernible adverse impact on the

domestic industry and that they would compete with the domestic like product and the other

subject imports upon revocation, the Commission majority -- consisting of Chairman Johanson

and Commissioners Karpel and Kearns -- chose not to cumulate subject imports from Brazil with

the other subject imports, relying on the finding that the Brazilian imports and the other subject

imports would allegedly compete under different conditions of competition upon revocation of

the orders. *Views* at 20-23, 36-41, & 42-45, PRD 300.  In reaching this decision, these

Commissioners relied on the fact that the quota imposed on the cold-rolled steel imports from

Brazil under Section 232 was "only" 57,251 short tons.  *Views* at 43, PRD 300.  According to the

Commission majority, this meant that imports of cold-rolled steel from the other subject

countries were "in a position to compete for much larger volumes of sales than any of the subject

producers in Brazil which must share the quota limits." *Views* at 44, PRD 300.

As a result, they found that the Brazilian imports would compete under different

conditions of competition than other subject imports, even though imports from Korea were also

subject to a quota under Section 232 and the other subject imports were subject to other trade

measures under Section 232, including tariffs and tariff rate quotas ("TRQ's").  In its discussion,

the Commission majority distinguished the Korean quota from the Brazilian quota by pointing

out that the annual quota limit for Korea (which was 141,018 short tons) was larger than the

annual quota limit for Brazil (57,218 short tons). *Views* at 43, PRD 300.

In its likely injury analysis for Brazil,[9] the Commission majority further emphasized that that "nothing in the record of these reviews indicates that the section 232 trade action, an absolute quota, as it relates to imports of CRS {i.e., cold-rolled steel} from Brazil will be terminated in the reasonably foreseeable future." *Views* at 72 (emphasis added), PRD 300.  They stated that "{t}he quota ha{d} been in place" since March 2018 and that "there has been no announcement by the Administration that it is considering revising or removing the quota on Brazil in the reasonably foreseeable future." *Id.*  As a result, they concluded that "the Section 232 trade action, as currently structured and enforced, likely will continue through the reasonably foreseeable future." *Id.*

After deciding not to cumulate the subject imports from Brazil with the imports from the other subject countries, the Commission majority chose to cumulate imports from all five of the other subject countries. *Views* at 45, PRD 300.  It also found that the cumulated subject imports would likely cause the continuation or recurrence of material injury to the domestic industry if the orders were revoked. *Views* at 46-68, PRD 300.  With respect to the imports from Brazil, however, they determined that Brazilian imports would not likely cause material injury to the domestic industry upon revocation, once again relying heavily on the fact that Brazilian imports were subject to a quota under Section 232. *Views* at 71-72, PRD 300.

Commissioners Schmidtlein and Stayin dissented from the Commission majority's findings for Brazil, firmly rejecting the majority's finding that the Brazilian imports would compete under different conditions of competition than the other subject imports. *Views* at 75-79, PRD 300.  In their dissenting views, Commissioners Schmidtlein and Stayin made clear that

---

[9] Importantly, the Commission majority made these statements in its negative likely injury analysis for Brazil but did not address this issue in the context of its analysis of conditions of competition for Brazil and the other subject countries in its cumulation discussion. *Views* at 42-45 & 72, PRD 300.

the difference in the measures imposed on cold-rolled imports from the subject countries under Section 232 did not constitute a different likely condition of competition for imports from Brazil. *Views* at 78, PRD 300.

In contrast to the Commission majority, Commissioners Schmidtlein and Stayin provided a robust and detailed analysis of conditions of competition in the market, demonstrating that the record simply did not support a finding that there were significant differences in competition between the Brazilian imports and the other subject imports. *Views* at 75-79, PRD 300. In particular, Commissioners Schmidtlein and Stayin pointed out that:

- The industries in the subject countries, including Brazil, had substantial excess capacity throughout the period of review, and imports from every subject country maintained a presence in the U.S. market in every year of the period of review.

- The United States was an attractive market for the producers in each subject country.

- There was likely to be a reasonable overlap of competition between and among subject imports and the domestic like product upon revocation.

- In the original investigations, purchasers shifted purchases from the domestic like product to imports from each subject country due to the lower price of the imports. Moreover, imports from each subject country increased during the POI and declined after the orders were imposed.

*Views* at 75 (footnotes omitted), PRD 300.

Commissioners Schmidtlein and Stayin also firmly rejected the Brazilian respondents' claims that the Brazilian imports would compete under different conditions of competition than the other subject imports after revocation, explaining that:

- The Brazilian industry had demonstrated a strong interest in exporting to the U.S. market during the original period of investigation and had increased its U.S. volume and market share levels rapidly during that period.

- The Brazilian imports significantly undersold the domestic like products during the period of investigation.

- The Brazilian orders had a significant restraining effect on the volumes of subject imports from Brazil, which were lower than they were during the original period of investigation.

- Like the other subject industries, the Brazilian industry had substantial excess capacity during the period of review, which could be used to increase exports to the United States upon revocation of the orders.

- The Brazilian industry's export levels during the period of review were similar to the levels it exported to global markets during the original period of investigation, when it increased its exports to the United States significantly.

- As a result, the Brazilian industry's alleged focus on its home market would not prevent it from increasing its exports to the United States in the reasonably foreseeable future, along with imports from the other subject countries.

*Views* at 75-76 (footnotes omitted), PRD 300.

In addition, Commissioners Schmidtlein and Stayin directly rebutted the Commission majority's finding that the Brazilian imports and the Korean imports would compete under different conditions of competition. *Views* at 78-79, PRD 300. Specifically noting that they disagreed with the Commission majority's analysis, they pointed out that:

- Like the imports from other subject countries, the imports from Brazil and South Korea were both likely to increase to their quota limits if the orders were revoked.

- Imports from Brazil and Korea had both been below their section 232 quota levels throughout the period of review, and, in fact, South Korea filled more of its quota than Brazil in 2021. Although South Korea has a larger quota volume than Brazil, upon revocation of the orders, the subject imports from Brazil would likely increase by a larger amount than the Korean imports.

- Like the other subject countries, the subject imports from Brazil and South Korea undersold the domestic like product in most cases during the period of investigation.

- The Brazilian producers had the same incentive to price aggressively when competing for 0.2 percent of the U.S. market as the Korean producers, who were competing for 0.5 percent of the U.S. market under their quota limit.

*Views* at 78-79, PRD 300. As a result, Commissioners Schmidtlein and Stayin reasonably explained that "{w}hile one may argue that the difference in quota levels between Brazil and

South Korea may ultimately have a different impact on the domestic industry (and that is debatable), the difference in quota levels does not lead to the subject imports from Brazil competing differently in the U.S. market than subject imports from South Korea or any other subject country." *Views* at 79, PRD 300.

Finally, and perhaps most importantly, Commissioners Schmidtlein and Stayin fundamentally rejected the Commission majority's claim that the differences between the quota imposed on Brazil under Section 232 and the measures imposed on other subject imports under Section 232 constituted a significant difference in conditions of competition. *Views* 77-78, PRD 300. As they explained:

> The fact that certain imports may be subject to quotas while others may be subject to tariffs or tariff-rate quotas does not affect the conditions of competition facing these imports in the U.S. market, nor does it suggest that the imports would not compete with each other and with the domestic product if the orders were to be revoked. *The different measures do not affect the types of products that may be sold in the U.S. market, nor do they affect the locations or channels of distribution through which the imports may be sold. Simply put, any differences in these Section 232 measures will not result in the imports from different subject countries competing differently in the marketplace.*

*Views* at 77-78 (emphasis added and footnotes omitted), PRD 300.

Having fully and robustly rebutted the Commission majority's finding that the Brazilian imports and the other subject imports would compete under different conditions of competition after revocation, Commissioners Schmidtlein and Stayin correctly cumulated the imports from Brazil with the other subject imports. Moreover, they appropriately concluded that the cumulated imports from all of the subject countries were likely to cause material injury to the domestic industry.

III.   **STANDARD OF REVIEW**

Under the statute, this Court is required "to hold unlawful any determination, finding, or conclusion {of the Commission} found to be "unsupported by substantial evidence on the record or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  If the Court "determine{s} that the Commission's determination is unsupported by substantial evidence or otherwise incorrect, the case will be remanded to the Commission with specific instructions, pursuant to 19 U.S.C. § 1516a(b)(1)(B)(i)."  *Altx, Inc. v. United States*, 370 F.3d 1108, 1111 (Fed. Cir. 2004).

As the statute indicates, the Court must remand a Commission determination that is not "in accordance with law."  This Court will find a Commission determination not to be "in accordance with law" if it conflicts with existing law, including judicial decisions.  *E.g., Jilin Henghe Pharmaceutical Co. v. United States*, 28 CIT 969, 342 F. Supp. 1301, 1309 (Ct. Int'l Trade 2004), *vacated and remanded*, 123 Fed. Appx. 402 (Fed. Circuit 2005) (vacated because appeal was mooted after decision by this Court).  Moreover, the Court will hold a Commission determination to be unlawful if the Commission has failed to carry out its duties properly, relied on inadequate facts or reasoning, or neglected to provide an adequate basis for its conclusions.  *See Rhone-Poulenc, Inc. v. United States*, 20 C.I.T. 573, 927 F. Supp. 451, 454 (Ct. Int'l Trade 1996); *see also Anshan Iron & Steel Co., Ltd. v. United States*, 28 C.I.T. 1728, 358 F. Supp. 2d 1236, 1243 (Ct. Int'l Trade 2004).

The Commission will also be found to have acted unlawfully if it treats similar cases differently without an adequate explanation.  Indeed, as this Court stated in a recent decision, "the Commission may not disregard previous findings of a general nature that bear directly upon the current review."  *DAK Americas LLC,* 456 F. Supp. 3d at 1354 (*quoting Usinor* 26 C.I.T. at

792.  Instead, "if there are distinguishing factors between the prior determinations in question

and the instant case, the burden is on the Commission to reasonably address them."  *Id*.

Under the statute, the Commission's determination must also be supported by substantial

evidence.  19 U.S.C. § 1516a(b)(1)(B)(i).  "Substantial evidence" means "such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion."  *Suramerica de*

*Aleaciones Laminadas, C.A v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting *Consol.*

*Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Under the substantial evidence standard, the

Commission's findings must be supported by "more than a mere scintilla" of evidence.  *Id*.

Importantly, it is not sufficient for the Court "to merely examine the evidence that

sustains the agency's conclusion," *Timken Co. v. United States*, 12 C.I.T 955, 699 F. Supp. 300,

306 (Ct. Int'l Trade 1988), *aff'd* 894 F. 2d 385 (Fed. Cir. 1990), or to find "that the evidence

supporting {the agency's} decision is 'substantial' when considered by itself."  *Suramerica de*

*Aleaciones Laminadas, C.A. v. United States*, 17 C.I.T. 146, 818 F. Supp. 348, 353 (Ct. Int'l

Trade 1993), *aff'd*, 44 F.3d 978 (Fed. Cir. 1994) (citation omitted).  Instead, "{t}o determine the

substantiality of the evidence, the Court must also take into account 'whatever in the record

fairly detracts from its weight.'"  *Nippon Steel*, 301 F. Supp. 2d at 1364.  "The 'whole record'

means that the Court must consider both sides of the record.  It is not sufficient merely to

examine the evidence that sustains the agency's conclusion."  *Timken*, 699 F. Supp. at 306.

Finally, in addition to ensuring that the Commission's determination is in accordance

with law and that its decision is based on the record as a whole, the Court must also ensure that

the Commission has provided a reasoned explanation for its determination.  The Commission's

decision must include "an examination of the relevant data and a reasoned explanation supported

by a stated connection between the facts found and the choices made."  *U.S. Steel Group v.*

*United State*s, 25 C.I.T. 1046, 1047, 162 F. Supp. 2d 676, 678 (Ct. Int'l Trade 2001) (*citing*

*Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

Accordingly, when reviewing the Commission's determination, the Court must scrutinize

any inferences drawn by the Commission from the evidence, because the Commission is "not

free to prescribe what inferences from the evidence it will accept and reject, but must draw all

those inferences that the evidence fairly demands." *Allentown Mack Sales & Service, v. NLRB*,

522 U.S. 359, 378 (1998). Moreover, the Court must ensure that the Commission's analysis

addresses "all relevant legal arguments that are made by interested parties" in an investigation or

review. 19 U.S.C. §1677f(i)(3)(B).

As the Court explained in *Altx*, *Inc. v. United States*, 26 C.I.T. 1425, 1426 (Ct. Int'l Trade

2002), "it does not matter if the arguments of the parties are easily dispensed with or require

closer examination, if the Commission does not make its thinking clear. The Court can only

review the reasoning that the Commission expresses." *Id.; see also DAK Americas,* 456 F. Supp.

3d at 1353-68 (remanding a number of Commission findings for lack of an adequate explanation

by the Commission).

## IV.    ARGUMENT

### A.   The Commission Majority's Conditions-of-Competition Analysis For Brazil Was Not In Accordance with Law and Was Unsupported by Substantial Evidence

In its analysis, the Commission majority committed a number of significant legal errors,

which are discussed in detail below. As a general matter, however, the Commission majority's

analysis is fundamentally flawed because the Commission majority failed to provide a legally

sufficient explanation of the reasons *wh*y it found that the differences in the Section 232

measures for imports from Brazil and the measures imposed on imports from the other subject

countries actually constituted a significant difference in the conditions of competition.  For

example, the Commission majority failed to explain how its findings for Brazil were consistent

with this Court's admonition that differences in import volumes alone are insufficient to justify a

decision not to cumulate imports from one of the subject countries.  *See, e.g., Neenah Foundry*,

155 F. Supp. at 771-78.

Similarly, the Commission majority failed to grapple with the persuasive analysis and

comprehensive findings of the two dissenting Commissioners, who persuasively showed that the

Section 232 measures would not cause the Brazilian imports and the other subject imports to

compete under different conditions of competition in the U.S. market upon revocation.

Finally, the Commission majority failed to explain how its determination and analysis for

Brazil was consistent with the Commission's prior decisions relating to Section 232 measures.

In those decisions, the Commission had consistently rejected the idea that Section 232 measures

would prevent the subject imports from having an impact on the industry so as to warrant

decumulation.  *See, e.g., DAK Americas LLC*, 456 F. Supp. 3d at 1354.  In sum, because the

Commission majority did not provide a reasoned explanation of these findings, its negative

determinations for Brazil were not supported by substantial evidence or in accordance with law

and should be remanded.

Each of these issues is discussed below.

**B.   The Commission Majority's Determination Not to Cumulate the Subject Imports from Brazil Relied on an Impermissibly Circular Analysis**

**1.   The Standards Governing the Commission's Decision On Cumulation in Sunset Reviews**

*a.   The Commission's Likely Injury and Cumulation Analysis In Sunset Reviews*

In five-year reviews involving imports from multiple countries, the Commission must

assess whether revocation of the orders on the subject imports under review will result in the

continuation or recurrence of material injury to the domestic industry.  19 U.S.C. §1675a(a).

When performing this analysis, the Commission "must engage in a counterfactual analysis," that

is, "it must decide the likely impact {on the subject imports and the domestic industry} in the

reasonably foreseeable future of an important change in the status quo - the revocation {of an

order}and the elimination of its restraining effects on volumes and prices of imports." *Statement*

*of Administrative Action for the Uruguay Round Amendments Act*, H.R. Rep. No. 316, 103rd

Cong., 2d Sess., Vol. I, at 884 (1994) ("SAA").  Accordingly, in a five-year review, the

Commission has an obligation to assess the impact of revocation on the likely volume and prices

of the subject imports and the condition of the domestic industry.  19 U.S.C. §1675a(a)(1).

When performing its likely injury analysis, the statute provides that the Commission

"*may* cumulatively assess the volume and effect of imports of the subject merchandise from all

countries with respect to which reviews under section 1675(c) {the provisions of the statute

governing five-year reviews} were initiated on the same day, if such imports would be likely to

compete with each other and with the domestic like products in the United States market."  19

U.S.C. §1675a(a)(7).  Thus, unlike its cumulation determination for present injury in original

injury investigations, the Commission's determination as to whether to cumulate the subject

imports from the countries in a five-year review is discretionary.  *Views* at 16, CRD 300.

In a five-year review, the Commission's cumulation analysis consists of three separate

findings.[10]  First, under the statute, the Commission may not cumulate the subject imports from

any individual country if they are "likely to have no discernible adverse impact" on the domestic

_____

[10] The threshold criterion for cumulation in the reviews below was met because the reviews for the orders covering imports from Brazil, China, India, Japan, South Korea, and the United Kingdom were all initiated on the same day.  *Views* at 25, PRD 300.

industry. 19 U.S.C. §1675a(a)(7).[11]  Second, the Commission must assess whether the subject imports from the subject countries "would be likely to compete with each other and with the domestic like products in the United States market" upon revocation of the orders subject to review.  19 U.S.C. §1675a(a)(7).[12]

In the third and final step of its cumulation analysis, the Commission must assess whether it should exercise its discretion to cumulate the imports from each subject country that meet the first two statutory criteria for cumulation.  19 U.S.C. §1675a(a)(7).  When performing this final step, the Commission assesses whether the subject imports from each of the countries subject to review "would likely compete under similar or different conditions of competition" in the market. *Views* at 41, CRD 300.

In the five-year reviews of the cold-rolled steel orders, the Commission unanimously found that (i) imports of cold-rolled steel from Brazil would have a discernible impact on the domestic industry if the Brazil antidumping and countervailing duty orders were revoked and (ii) the subject imports, including those from Brazil, would compete with one another and the domestic like product if the orders were revoked.  In other words, the Commission found that the

---

[11] When assessing whether the subject imports from an individual country will have a discernible adverse impact on the domestic industry upon revocation of an order, the Commission typically examines the likely volume of the subject imports from each country and their likely impact on the domestic industry if the orders are revoked.  The Commission's analysis takes into account the nature of the product and the behavior of subject imports in the original investigations. *See, e.g., Views* at 20 & 20-36 (addressing the discernible adverse impact of the subject imports from Brazil, China, India, Japan, South Korea, and the United Kingdom), PRD 300.

[12] In its analysis of this statutory factor, the Commission typically examines whether the subject imports are fungible or likely to be fungible, will likely be sold in the same channels of distribution upon revocation, will be sold in the same geographic regions upon revocation, and will be simultaneously present in the U.S. market upon revocation. *See Views* at 262, n. 36, PRD 300.

subject imports from Brazil met the first two criteria for cumulation.  These decisions are not at issue in this appeal.

> b. *The Standards Governing the Commission's "Conditions of Competition" Analysis When Assessing Whether to Cumulate Subject Imports in Five-Year Reviews*

The Commission generally considers a number of facts when assessing whether there are differing conditions of competition among the subject imports for purposes of its cumulation analysis in sunset reviews.  While the Commission has "wide latitude" in choosing the factors that it will examine in its conditions of competition analysis, *Allegheny Ludlum* 475 F. Supp. 2d at 1380, the Commission's discretion to choose and analyze these factors is "*not unfettered, and the Commission's exercise of discretion must be predicated upon a judgment anchored in the language and spirit of the relevant statutes and regulations*."  *Allegheny Ludlum*, 475 F. Supp. 2d at 1376; *Nucor Corp. v. United States*, 33 CIT 57, 605 F. Supp. 2d 1361, 1370 (2009) (emphasis added).

Importantly, as Congress has explained, the cumulation provisions of the statute are designed to "stem 'competition from unfairly traded imports from several countries simultaneously {which} often has a 'hammering effect' on the domestic industry … that may not be adequately addressed if the impact of the imports {is} analyzed separately on the basis of their country of origin.'"  H.R. Rep. No. 100-40, part 1, at 130 (1987).  Moreover, Congress has stated that cumulation is based on the "sound principle of preventing material injury which comes about by virtue of several simultaneous unfair acts or practices."  H.R. Rep. No. 98-725, p. 37 (1984).  As a result, cumulation is intended to:

> *Permit cumulation of imports from various countries that each account individually for a very small percentage of total market penetration, but when combined may cause material injury*.  The requirement in the bill as introduced that imports have a "contributing effect" in causing material injury *would have precluded cumulation in cases where the impact of*

*imports from each source treated individually is minimal but the combined*
*impact is injurious.*

*Id*. (emphasis added).

Because of the concerns expressed by Congress, this Court has made clear that, when the

Commission decides whether to exercise its discretion to cumulate the subject imports in a five-

year review, the Commission should not  "engage{in {a} circular analysis, relying on the same

factors for {a} refusal to cumulate as for an ultimate negative injury determination." *Neenah*

*Foundry,* 155 F. Supp. 2d at 772; *see also Allegheny Ludlum*, 475 F. Supp. 2d at 1378-79.  As

the Court explained in *Neenah Foundry*, such an approach would thwart Congressional intent

because it would require a "demonstrated, independent causation of material injury {by imports

from an individual country} before any consideration of cumulation" by the subject imports.

*Neenah Foundry*, 155 F. Supp. 2d at 772.

Accordingly, to avoid such "circular" reasoning in its cumulation analysis in five-year

reviews, the Court has stated that the Commission should not rely on the likely volumes or

pricing levels of the subject imports because these considerations properly belong in its analysis

of the likely injury presented by the subject imports.  *Id*.  Instead, the Court has emphasized that

the Commission should rely on differences in the *volume and price trends* of the subject imports

when it assesses whether there are significant differences in the conditions of competition

between the subject imports.  *E.g., Neenah Foundry*, 155 F. Supp. 2d at 773-74.  In fact, to the

extent that the absolute volumes and pricing levels of the subject imports are relevant to the

Commission's cumulation analysis in a five-year review, Congress has provided the Commission

with a method for taking these factors into account by providing that the Commission must

assess whether subject imports from a specific country will have a "discernible adverse impact"

on the domestic industry before it may cumulate the imports from this country with the other subject imports.  19 U.S.C. §1675a(a)(7).[13]

In other words, by relying on an analysis of trends, the Commission can avoid the impermissible approach of requiring that subject imports from an individual country themselves cause material injury to the domestic industry *before* it actually performs the likely injury analysis required for the cumulated subject imports in a sunset review.  *Neenah Foundry*, 155 F. Supp. 2d at 771-78.  As the Court made clear in *Neenah Foundry*, imports from individual countries that might not be responsible for material injury to the domestic industry upon revocation can, when combined with other unfairly traded imports, have a materially injurious impact on the domestic industry upon revocation.  *Id.* at 771; *see also* H.R. Rep. No. 100-40, part 1, at 130; H.R. Rep. 98-725, at p. 37 (1984).

Importantly, in *Neenah Foundry*, *Allegheny Ludlum* and *Nucor*, the Court stated that, to avoid performing this type of improper "circular" injury analysis, the Commission should not rely solely on the absolute likely volumes of the subject imports in its conditions of competition analysis.  *Neenah Foundry*, 155 F. Supp. 2d at 771-77; *see also Allegheny Ludlum*, 475 F. Supp. 2d at 1378-79; *Nucor*, 605 F. Supp. 2d at 1370, n. 12.  For example, in *Allegheny Ludlum*, the Court noted that, when the Commission chose not to cumulate the subject imports from the United Kingdom with other subject imports, the Commission had properly relied "primarily on permissible trend analyses" in its decision, including "product mix trends, production trends, and volume trends…"  The Court noted that the Commission's reliance on these types of trends,

---

[13] As noted previously, in its "discernible adverse impact" analysis, "the Commission generally considers the *likely volume of subject imports* and the likely impact of those imports on the domestic industry within a reasonably foreseeable time if the orders are revoked."  *See, e.g., Views* at 20 (emphasis added), PRD 300.

rather than the absolute volume of the likely imports, was "adequate to sustain a finding not to cumulate the subject imports." *Allegheny Ludlum*, 475 F. Supp. 2d at 1379.

Similarly, in *Nucor*, which involved a challenge by the domestic industry of the Commission's decision not to cumulate certain of the subject imports covered by a sunset review, the Court rejected the domestic plaintiffs' reliance on the likely volumes of the subject imports in their arguments before the Court.  The Court explained that "basing the cumulation decision solely on the likely volume without further justification may constitute an impermissible circular analysis that relies on the same factors for {a} refusal to cumulate as for an ultimate negative injury determination." *Nucor*, 605 F. Supp. 2d 1370, n. 12.

Indeed, in *Neenah Foundry*, the Court explained that "cumulation of countries with relatively small likely volume and price impact would not only be appropriate, *a refusal to do so without some additional justification could constitute an abuse of discretion*." *Neenah Foundry Co.*, 155 F. Supp. 2d at 774 (emphasis added).  In sum, this Court has made very clear that, when performing its conditions of competition analysis, the Commission should not rely on a comparison of the likely volumes of the subject imports from the individual countries.

Indeed, the Commission has taken heed of the Court's admonitions.  For instance, citing *Neenah Foundry*, *Nucor*, and *Allegheny Ludlum*, the Commission has cumulated subject imports, despite the existence of differences in the likely conditions of competition, because "reviewing courts have rejected the notion that the Commission may engage in a 'circular analysis, relying on the same factors to refuse to cumulate as for an ultimate negative injury determination,' such as volume or market share alone." *Polyethylene Retail Carrier Bags from China, Malaysia, and Thailand*, Inv. Nos. 731-1043-1045, USITC Pub. 4160 (June 2010) (Review) at 18 n. 109.

2.    **The Commission Majority's Conditions of Competition Analysis for Brazil Runs Afoul of This Court's Prescription Against an Impermissible Circular Analysis**

The Commission's decision for Brazil violated these basic legal principles.  When assessing whether the imports from Brazil and imports from China, Japan, India, and the United Kingdom would compete under different conditions of competition after revocation, the Commission majority relied on a comparison of the likely volumes of the Brazilian imports and imports from these four countries as *the sole distinguishing factor* between these imports.  *Views* at 42, PRD 300.  By doing so, the Commission majority engaged in the very "circular analysis" that the Court has declared to be impermissible under the statute.  *See Neenah Foundry Co.*, 155 F. Supp. 2d at 771-77; *Allegheny Ludlum*, 475 F. Supp. 2d at 1378-79; *Nucor*, 605 F. Supp. 2d at 1370, n. 12.

The Commission majority's conditions of competition analysis for Brazil and the subject imports from China, India, Japan, and the United Kingdom was simple and direct.  In its analysis, the Commission majority relied *solely* on one fact: "the distinguishing circumstances of the section 232 measures with respect to {cold-rolled steel} from Brazil."  *Views* at 42, PRD 300.  The Commission majority explained that, unlike imports of cold-rolled steel from China, India, Japan and the United Kingdom, imports of cold-rolled steel from Brazil were subject to a quota under Section 232, which set an "absolute cap on the annual volume of subject imports from Brazil" of 57,251 short tons.  *Id*.  As the Commission also noted, this amount was equivalent to 0.2 percent of apparent U.S. consumption in 2021.  *Id*.[14]

By way of comparison, the Commission majority noted that the subject imports from China and India were not subject to quota limits under Section 232 but were, instead, subject to

---

[14] The Commission also mentioned, without explanation, the volumes of the Brazilian imports during the period of review.  *Views* at 42, PRD 300.

additional tariffs of 25 percent. *Views* at 42, PRD 300. Similarly, the Commission majority noted that, although imports of cold-rolled steel from Japan and the United Kingdom were subject to TRQ's under Section 232, these TRQ's did not impose an absolute cap on the volume of these imports, as the quota for Brazil did. *Id*. Indeed, as the Commission majority noted, the TRQ's for Japan and the United Kingdom permit unlimited volumes of subject imports from each of these countries to enter the United States, once they paid the 25 percent tariffs that were applicable to any volumes in excess of the TRQ limits. *Id*.

After reciting these differences in the measures affecting imports from these countries under Section 232, the Commission majority found that, in light of the "absolute quota applicable to subject imports from Brazil," the "absence of any absolute quota on imports from {subject imports from China, India, Japan, and the United Kingdom} *means that, unlike the subject imports from Brazil, subject imports from other countries are in a position to compete for much larger volumes of sales than any of the subject producers in Brazil which must share the quota limits*." *Views* at 43 (emphasis added), PRD 300.

Importantly, the statements described above constitute the *entirety* of the Commission majority's reasoning to support its finding the subject imports from Brazil and the subject imports from China, India, Japan, and the United Kingdom would compete under different conditions of competition upon revocation of the orders. *Views* at 42-44, PRD 300. In other words, the Commission majority's conditions of competition analysis for Brazil and these four countries focused *exclusively* on the likely volumes of the subject imports after revocation.

Indeed, in its conclusion for these four countries, the Commission majority made clear that it believed that the Brazilian imports should not be cumulated with the subject imports from these four countries precisely because the Brazilian imports would enter the U.S. market in much

smaller volumes than the imports from China, India, Japan, and the United Kingdom.  *Views* at 43 (stating that the difference in the Section 232 measures for these countries "means that, unlike the subject imports from Brazil, subject imports from other countries are in a position to compete for much larger volumes of sales than any of the subject producers in Brazil which must share the quota limits"), PRD 300.

Moreover, at no point in its conditions of competition analysis for these countries did the Commission majority compare the volume or pricing trends for imports from these countries, or analyze any other, non-likely volume factor to justify its finding that the Brazilian imports and imports from China, India, Japan, and the United Kingdom would compete under different conditions of competition upon revocation.  Instead, the Commission relied solely and exclusively on an impermissible comparison of the likely volumes of the subject imports from Brazil, China, India, Japan, and the United Kingdom in its conditions of competition analysis for these countries.  *Neenah Foundry*, 155 F. Supp. 2d at 771-77; *Allegheny Ludlum*, 475 F. Supp. 2d at 1378-79; *Nucor*, 605 F. Supp. 2d at 1370, n. 12.

Clearly, the Commission majority's analysis represents the very type of "circular" likely volume analysis that is, in this Court's view, "impermissible" under the statute.  In other words, it is clear the Commission majority relied on a legally flawed analysis of the conditions of competition in the marketplace when deciding not to cumulate the Brazilian imports with the subject imports from China, India, Japan, and the United Kingdom.  Accordingly, its determination of Brazil should be remanded.

### 3.   The Commission Majority's Conditions of Competition Analysis for Korea and Brazil Rests On An Impermissible "Circular" Analysis

In its analysis of the differences in conditions of competition between the subject imports from Brazil and the subject imports from Korea, the Commission majority performed a slightly

more detailed conditions of competition analysis than it did for the imports from China, India,

Japan, and the United Kingdom.  *Views* at 43, PRD 300.  However, the Commission majority's

analysis for the imports from Brazil and Korea suffers from the same fatal legal flaw as its

analysis for the other subject countries:  it relies almost exclusively on a comparison of the likely

volumes of the imports from Brazil and Korea, which reflects, as explained above, an

impermissible approach under the statute.  *Id*.

When comparing the conditions of competition that would affect imports from Brazil and

Korea upon revocation of the orders, the Commission majority claimed that, although the

Brazilian and Korean imports were both subject to a quota under Section 232, there were

"*significant differences between the level of South Korea's quota and presence in the U.S.

market relative to those for Brazil*."  Views at 43, PRD 300. According to the Commission

majority:

> The annual absolute quota on subject imports from South Korea is
> 141,018 short tons (equivalent to 0.5 percent of apparent U.S.
> consumption in 2021), whereas the annual absolute quota on subject
> imports from Brazil is only 57,251 short tons (equivalent to 0.2 percent of
> apparent U.S. consumption in 2021).  In other words, the absolute quota
> on subject imports from South Korea is almost three times larger than the
> absolute quota for subject imports from Brazil.  Further, while the volume
> of subject imports from South Korea approached their quota limit (and
> were higher than the volume associated with the quota limit for Brazil)
> and maintained a substantial presence in the U.S. market throughout the
> POR, subject imports from Brazil remained well below their much smaller
> quota limit and were virtually absent from the U.S. market during the
> POR.

*Views* at 43 (citations omitted), PRD 300.  Based on these factors, the Commission majority

concluded that, in light of the "absolute quota applicable to subject imports from Brazil, even if

imports from Brazil reached that level, the substantially larger quota for South Korea … means

that, unlike subject imports from Brazil, the subject imports from {Korea} are *in a position to*

*compete for much larger volumes of sales than any of the subject producers in Brazil which must share the quota limits*."  *Views* at 44, PRD 300.

As shown above, even a cursory review of the Commission majority's analysis for Brazil and Korea makes clear that it was premised *almost exclusively* on the finding that, upon revocation, the Brazilian and Korean imports would enter the U.S. market at different volume levels after revocation.  *Views* at 43, PRD 300.  By relying so heavily on a finding that imports from Brazil would enter the market in somewhat smaller volumes than the imports from Korea, the Commission was once again relying on the type of impermissibly "circular" analysis of likely volumes that this Court has stated is inconsistent with the Commission's obligations under the statute in *Neenah Foundry*, *Allegheny Ludlum*, and *Nucor*.  Given this obvious legal error, the Court should remand these findings for further consideration by the Commission.

We would add that, in its analysis, the Commission majority also discussed -- in a footnote[15] -- the fact that there were differences in the production and export levels of the Brazilian and Korean industries.  *Views* at 43, PRD 300.  This fact does not, however, provide support for the Commission's majority's finding that the Brazilian and Korean imports would compete under different conditions of competition if the orders were revoked.  While it may be true that the Korean cold-rolled steel industry produced and exported a larger amount of cold-rolled steel than the Brazilian industry during the period of review, the differences between the production and export levels of the two countries do not demonstrate, in any way, that imports from Brazil and Korea would compete differently in the United States upon revocation, given that both countries produced and exported cold-rolled steel in substantial volumes that were *well in excess of the annual quota limits imposed on these imports under Section 232*.

---

[15] *Views* at 43, n. 307, PRD 300.

For example, in the case of Brazil, the annual quota volume in 2021 was 57,251 short tons.  In 2021, however, the responding producers in Brazil reported that they produced [          ] short tons of cold-rolled steel in 2021 and exported [          ] short tons to global markets in that same year.  Confidential Staff Report at Table IV-12, CRD 240.  Given these facts, the record showed that the Brazilian industry had [          ] amounts of capacity that could be used to fill the quota under Section 232 upon revocation and that the Brazilian producers exported significant amounts of cold-rolled steel during the period of review.  In light of these considerations, the record showed that the Brazilian industry had the ability and the incentive to export significant amounts of cold-rolled steel to the United States.

Similarly, the annual quota volume for Korea in 2021 was 141,018 short tons.  The sole responding producer in Korea reported that it produced [          ] short tons of cold-rolled steel in 2021 and that it exported [          ] short tons to global markets in 2021.  Confidential Staff Report at Table IV-35, CRD 240.  Given these facts, it is clear that the Korean industry -- like the Brazilian industry -- had [          ] amounts of capacity that could be used to fill the quota under Section 232 after revocation and that the Korean producers exported significant amounts of cold-rolled steel.  Thus, like the Brazilian industry, the Korean industry had the ability and incentive to export significant amounts of cold-rolled steel to the United States.

Given these facts, the record demonstrates firmly that, from the perspective of their potential impact on the U.S. market, there is, in fact, little real practical difference in the size of the industries in Brazil and Korea or their export patterns and shipments.  Clearly, the industries in both countries have the ability and willingness to ship significant amounts of cold-rolled steel to the United States in the absence of the Orders.  To put it another way, the difference between

the production and export levels of the Brazilian and Korean industries is a distinction without a difference.

Moreover, and perhaps more importantly, in its analysis of these two countries, the Commission majority failed entirely to explain *why* the differences in the Brazilian and Korean production and export levels indicated that imports from those two countries would compete under different conditions of competition in the U.S. market after revocation. *Views* at 43, PRD 300. Instead, the Commission majority simply noted the fact that there were differences in the levels of production and exports for the two countries. The Commission's failure to explain why and how these differences matter renders its analysis flawed as a legal matter. By failing to provide such an explanation, the Commission again failed to provide a "a stated connection between the facts found and the choice made," as it is required to do. *U.S. Steel Group* 162 F. Supp. 2d at 678 (*citing Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

In sum, the record conclusively demonstrates that any differences in the quota volumes, production, and export levels of the two countries would not cause the Brazilian and Korean imports to compete under different conditions of competition after revocation. Given the issues identified above, it is clear that the Commission majority has not really taken "a 'hard look' at the salient problems and has not genuinely engaged in reasoned decision-making." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841 (D.C. Cir. 1970). Indeed, the Commission majority has failed to "articulate a 'rational connection between the facts found and the choices made.'" *Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc.*, 419 U.S. 281, 285 (1974) (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Accordingly, the Court should remand the Commission's findings on these issues.

C.  **The Commission Majority Failed to Adequately Address the Overwhelming Evidence Cited By the Dissent Showing That The Brazilian Imports and The Other Subject Imports Would Compete Under the Same Conditions of Competition**

The Commission majority also failed to explain how the differences in the measures imposed under Section 232 would practically affect the manner in which the subject imports from Brazil and the other subject imports compete in the U.S. market after revocation, which is, of course, the entire point of the conditions of competition analysis.  In fact, in its decision, the Commission majority provided only a brief justification of its reliance on the differences in the Section 232 measures between the subject imports in its analysis, noting only that the Federal Circuit has held that it has "wide latitude in selecting the types of factors that it considers relevant in deciding whether to exercise discretion to cumulate subject imports in five year reviews."  *Views* at 41-42, n. 298, PRD 300.

This sort of *ipse dixit* by the Commission is hardly the type of analytical choice that warrants affirmance by the Court, given that the Commission must articulate a "rational connection between the facts found and the choices made" in its investigations and reviews. *Bowman Transportation, Inc.,* 419 U.S. at 285.  Indeed, as this Court has stated, the Commission must provide the parties – and this Court – with an analysis that makes its thinking on such an important issue clear.  *Altx, Inc.*, 167 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 2001).  In a situation where the Commission simply asserts that it has "wide latitude" to rely on a single factor in its analysis, the Court must scrutinize closely any questionable inferences that are drawn by the Commission when analyzing that factor because, as this Court has stated, the Commission is "not free to prescribe what inference from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands." *Allentown Mack Sales & Service, v. NLRB*, 522 U.S. 359, 378 (1998).

Indeed, the significant analytical flaws in the Commission majority's analysis were clearly pointed out by the two dissenting Commissioners, Commissioners Schmidtlein and Stayin.  In their robust discussion of the conditions of competition issue, Commissioners Schmidtlein and Stayin firmly rejected the Commission majority's conclusion that there were significant differences in the conditions of competition between the subject imports from Brazil and the other subject imports. *Views* at 75-78, PRD 300.  In fact, they provided an overwhelming amount of record support for their finding that there were not likely to be differences in the conditions of competition between the subject imports, pointing out that:

- The industries in the subject countries, including Brazil, had substantial excess capacity throughout the period of review which could be used to export the subject merchandise to the U.S. market.

- The United States was an attractive market for the producers in each subject country.

- There was likely to be a reasonable overlap of competition between and among subject imports and the domestic like product upon revocation.

- Imports from every subject country, including Brazil, maintained a presence in the U.S. market in every year of the period of review.

- The Brazilian industry rapidly increased its imports into the United States and its market share levels during the period of investigation, thereby demonstrating a strong interest in exporting to the U.S. market during the original period of investigation.

- The Brazilian imports significantly undersold the domestic like product during the original period of investigation.

- The Brazilian orders had a significant restraining effect on the volumes of subject imports from Brazil, which were lower than they were during the original period of investigation.

- The Brazilian industry's export levels during the period of review were similar to the levels they exported to global markets during the original period of investigation, when they rapidly increased their exports to the United States.  As a result, the Brazilian industry's focus on its home market would not prevent it from increasing its exports to the United States upon revocation in the reasonably foreseeable future,

and imports from Brazil would likely increase along with imports from
the other subject countries.

*Views* at 75-76 (footnotes omitted), PRD 300.

In addition, Commissioners Schmidtlein and Stayin directly addressed -- and rebutted --

the Commission majority's finding that the Brazilian imports and the Korean imports would

compete under different conditions of competition upon revocation. *Views* at 78-79, PRD 300.

Explaining their disagreement with the Commission majority on this issue, they pointed out that:

- Like the imports from other subject countries, the imports from Brazil and South
  Korea were both likely to increase if the orders were revoked.

- Imports from Brazil and Korea had both been below their Section 232 quota levels
  throughout the period of review and, in fact, South Korea filled more of its quota than
  Brazil in 2021. Thus, although South Korea has a larger quota volume than Brazil,
  upon revocation of the orders, the subject imports from Brazil would likely increase
  by a *larger amount* than the Korean imports after revocation.

- During the original period of investigation, like the other subject countries, the
  subject imports from Brazil and South Korea undersold the domestic like product in
  most cases during the period of investigation.

- The Brazilian producers had the same incentive to price aggressively when competing
  for 0.2 percent of the U.S. market as the Korean producers, who were competing for
  0.5 percent of the U.S. market under their quota limit.

*Views* at 78-79 (emphasis added), PRD 300. In light of these considerations, Commissioners

Schmidtlein and Stayin reasonably explained, "{w}hile one may argue that the difference in

quota levels between Brazil and South Korea may ultimately have a different impact on the

domestic industry (and that is debatable), the difference in quota levels does not lead to the

subject imports from Brazil competing *differently* in the U.S. market than subject imports from

South Korea or any other subject country." *Views* at 79 (emphasis added)., PRD 300

Finally, Commissioners Schmidtlein and Stayin firmly rejected the Commission

majority's analytical conclusion that it was appropriate to rely heavily on the differences in the

measures imposed under Section 232 to find that the Brazilian imports and the other subject

imports would compete under different conditions of competition.  Noting that they did not

believe that "any difference in the applicable Section 232 measures constitute{d} different

conditions of competition that warrant analyzing subject imports from Brazil on a decumulated

basis," the two Commissioners correctly explained that:

> The fact that certain imports may be subject to quotas while others may be
> subject to tariffs or tariff-rate quotas does not affect the conditions of
> competition facing these imports in the U.S. market, nor does it suggest
> that the imports would not compete with each other and with the domestic
> product if the orders were to be revoked.  *The different measures do not
> affect the types of products that may be sold in the U.S. market, nor do
> they affect the locations or channels of distribution through which the
> imports may be sold. Simply put, any differences in these Section 232
> measures will not result in the imports from different subject countries
> competing differently in the marketplace.*

*Views* at 77-78 (emphasis added and footnotes omitted), PRD 300.  Unlike the Commission

majority, Commissioners Schmidtlein and Stayin considered *why and how* the Section 232

measures would affect conditions of competition for the subject imports in the market after

revocation.

Despite this detailed and comprehensive analysis of the record evidence, the Commission

majority failed to address the analysis of the dissenting Commissioners or the comprehensive set

of facts cited by the dissenting Commissioners.  Nor did the Commission majority address the

dissent's rebuttal of the Commission majority's conclusion that the quota covering the Brazilian

imports would not have an impact on their ability to compete in the market in the same manner

as the other imports.  This failure of the Commission majority makes clear that, unlike the

dissenting Commissioners, the Commission majority did not take "a 'hard look' at the salient

problems and {had} not genuinely engaged in reasoned decision-making" when addressing these

issues.  *Greater Boston Television Corp. v. FCC*, 444 F.2d 841 (D.C. Cir. 1970).

This failure warrants remand.  The Court should send the Commission majority's findings for Brazil back with instructions for the Commission majority to address the facts and analysis conducted by Commissioners Schmidtlein and Stayin upon remand.

**D.   In Its Conditions of Competition Analysis, The Commission Majority Failed to Address the Domestic Parties' Arguments That the Commission Could Not Presume That the Biden Administration Would Keep the Brazil Quota in Place**

During the Commission's five-year reviews, the Domestic Industry provided the Commission with evidence showing that there was reason to believe that the Biden Administration might revoke or modify the Section 232 quota applicable to the Brazilian imports.  *See, e.g.,* Post-Hearing Brief of Cleveland-Cliffs at 11-12, & Exhibits 4, 5, 8, 9, 11 and 12, PRD 222.  For example, the Domestic Industry provided evidence to the Commission demonstrating that the government of Brazil was putting pressure on the Administration to revise the quotas imposed under Section 232 on Brazilian imports to allow more Brazilian imports into the United States.  *Id*.  The Domestic Industry also provided evidence to the Commission demonstrating that the Administration had already revised the Section 232 tariffs and liberalized the measures on imports from other significant U.S. trading partners, including the members of the European Union, the United Kingdom, and Japan.  *Id.* at Exhibits 4, 5, 11, & 12, PRD 222.  The evidence provided by the Domestic Industry established that the Commission should not, and could not, conclude that the quota on Brazilian imports of cold-rolled steel would remain in place in its existing form for the reasonably foreseeable future.

The Commission majority simply ignored this evidence.  Rather than directly grappling with the evidence provided by the domestic parties -- which showed that the continuation of the Brazilian quota in its current form could not be taken for granted -- the Commission majority simply and incorrectly stated that there was "nothing in the record" to suggest that the Section 232 quota would be terminated or revised in the reasonably foreseeable future.  *Views* at 56, PRD

300.  Rather than directly addressing the evidence presented by the Domestic Industry on this issue, the Commission majority rejected the domestic parties' arguments in a brief statement, noting only that the "parties disagree" with its conclusion that the Brazilian quota would remain in place for the reasonably foreseeable future, adding that the Administration had not announced its intent to consider revising the quota.  *Views* at 72, PRD 300.

Once again, the Commission's analysis does not demonstrate it took a "a 'hard look' at the salient problems" and "genuinely engaged in reasoned decision-making," as it is required to do.  *Greater Boston Television Corp. v. FCC*, 444 F.2d 841 (D.C. Cir. 1970).  Indeed, the Commission's statement that there "was nothing in the record" to demonstrate that the Brazilian Section 232 quota might be revoked or modified is clearly wrong given that the Domestic Industry had provided the Commission with significant evidence to the contrary.  By failing to address the strong evidence provided by the domestic parties on this issue, the Commission did not provide a reasoned explanation of its thinking on the issue, as it is required to do.  *U.S. Steel Group*, 162 F. Supp. 2d at 678.  Just as importantly, the Commission failed to seriously address the relevant arguments of the parties, as it is required to do under the statute. 19 U.S.C. §1677f(i)(3)(B).  For each of these reasons, the Court should remand the Commission's analysis and conclusions on this issue for further consideration.

## E.   The Commission's Conditions of Competition Analysis Was Not Consistent with Its Prior Decisions Addressing the Impact of Section 232 On the Volume and Pricing of Subject Imports

Finally, the Commission's determination not to cumulate subject imports from Brazil was inconsistent with its prior determinations addressing the likely impact of the Section 232 measures on the volume and prices of subject imports.  It is well-settled that an agency may not make decisions that are "so inconsistent with its own precedent as to constitute arbitrary treatment amounting to an abuse of discretion."  *Crosthwait v. Fed. Commc'ns Comm'n*, 189

U.S. App. D.C. 392, 584 F.2d 550, 556 (D.C. Cir. 1978) (quoting *Herbert Harvey, Inc. v. NLRB*,

137 U.S. App. D.C. 282, 292, 424 F.2d 770, 780 (D.C. Cir. 1969)).  Indeed, as this Court has

stated, "the Commission may not disregard previous findings of a general nature that bear

directly upon the current review."  *DAK Americas LLC,* 456 F. Supp. 3d at 1354 (*quoting*

*Usinor*, 26 C.I.T. at 792.  Instead, "if there are distinguishing factors between the prior

determinations in question and the instant case, the burden is on the Commission to reasonably

address them."  *Id*.

        Significantly, until the Commission's decision for cold-rolled steel from Brazil, the

Commission had consistently found that the existence of Section 232 relief would not prevent

unfairly traded imports from entering the U.S. market in a manner that would impact the

domestic industry.  For example, in *Clad Steel Plate from Japan,* the Commission found that

"the U.S. market is sufficiently attractive, particularly in light of the Japanese industry's

substantial unused capacity and export orientation, to encourage subject producers to again

export significant quantities of clad steel plate in the absence of the antidumping duty order even

with the Section 232 tariffs in place."[16]  Similarly, in its reviews of *Non-Oriented Electrical*

*Steel,* the Commission found that "the Section 232 and/or Section 301 trade actions, though they

may well have had some deterrent effect, will not likely prevent a significant volume of subject

imports from entering the U.S. market in the event of revocation."[17]

---

        [16] *Clad Steel Plate from Japan*, Inv. Nos. 731-TA-739 (Fourth Review), USITC Pub.
4851 (Dec. 2018) at 20.

        [17] *Non-Oriented Electrical Steel from China, Germany, Japan, Korea, Sweden, and*
*Taiwan*, Inv. Nos. 701-TA-506 and 508 and 731-TA-1238-1243 (Review), USITC Pub. 5140
(Dec. 2020) at 33 n. 189.  The reference to Section 301 duties refers to duties imposed on certain
imports from China pursuant to Section 301 of the Trade Act of 1974, as amended, 19 U.S.C. §
2411 *et seq.*

Significantly, the Commission has also applied this reasoning to cases involving imports from Brazil.  In its August 2020 five-year reviews of *Carbon and Certain Alloy Steel Wire Rod*, the Commission found that "section 232 tariffs are not likely appreciably to impede increased volumes of cumulated subject imports upon revocation of the orders.  Imports from Brazil and Mexico are not currently subject to additional tariffs pursuant to section 232, *although imports from Brazil are currently subject to a quota*."[18]  The Commission went on to find that "subject imports from the five subject countries declined in response to the antidumping and countervailing duty orders well before the imposition of Section 232 tariffs, stating that "the U.S. market is sufficiently attractive to encourage subject producers to again export significant quantities of wire rod in the absence of the antidumping and countervailing duty orders notwithstanding section 232 tariffs."  *Id.*

Finally, in *Tin- and Chromium-Coated Steel Sheet from Japan*, the Commission found that the U.S. market was "sufficiently attractive to encourage Japanese producers to again export significant quantities of {tin mill products} in the absence of the antidumping duty order even with the imposition of Section 232 tariffs."[19]  In each of these reviews, therefore, the Commission took exactly the approach the Commission should have taken with respect to the Brazilian order here:  it avoided speculating as to whether the Section 232 measures would remain in place, and relied on evidence showing that revocation of antidumping and countervailing duty relief would lead to material injury, regardless of what happened with measures under Section 232.

---

[18] *Carbon and Certain Alloy Steel Wire Rod from Brazil, Indonesia, Mexico, Moldova, and Trinidad and Tobago*, Inv. Nos. 701-TA-417 and 731-TA-953, 957-959, and 961 (Third Review), USITC Pub. 5100 (Aug. 2020) at 46 n. 298 (emphasis added).

[19] *Tin- and Chromium-Coated Steel Sheet from Japan*, Inv. Nos. 731-TA-860 (Third Review), USITC Pub. 4795 (June 2018) at 21.

The only apparent exception to this rule – before the Commission's decision for Brazil in the cold-rolled steel reviews – was *Stainless Steel Bar*, which involved an antidumping duty order that had been in place on Brazil since 1995.[20]  But that case is very different from this one. In *Stainless Steel Bar,* the Commission noted that, in May 2018 – only a few months before the review took place – the President imposed a quota on stainless steel bar from Brazil that would hold imports from that country significantly *below* the volumes seen during the period of review while the imports were covered by the antidumping duty order.[21]  In other words, *Stainless Steel Bar* involved a situation in which:  (1) the President had only recently imposed Section 232 relief, (2) the same President who imposed the relief was still in office, and (3) the Section 232 relief at issue would keep Brazilian imports *below* the levels seen *with the antidumping duty order in place.*  None of those facts exist here.

Because of these significant differences, the Commission's decision in *Stainless Steel Bar* is not relevant here.  Instead of relying on a quota set by the same President only a few months earlier, the Commission here was dealing with a different Administration that had already shown a willingness to make significant modifications to Section 232 relief.  Furthermore, instead of a situation in which Section 232 relief would hold subject imports below the volumes seen during the period of review, the record here showed that revocation of the Brazilian orders would likely lead to an *increase* in the volumes of the subject imports from Brazil, even if the Section 232 quota remained.  Indeed, even the Commission majority concluded that, upon revocation, there

---

[20] *Stainless Steel Bar from Brazil, India, Japan, and Spain*, Inv. Nos. 731-TA-678, 679, 681, and 682 (Fourth Review), USITC Pub. 4820 (Sept. 2018) at 3.

[21] *Id*. at 16, Table I-12 (showing that in each year from 2015 to 2017, subject imports from Brazil totaled between 2,165 short tons and 2,499 short tons, while the quota was set at 1,645 short tons).  In other words, the quota was at least 24 percent lower than import volumes from Brazil from 2015 to 2017.

would be an increase in the volumes of the Brazilian imports. *Views* at 20-23, PRD 300. In short, the Commission should have disregarded *Stainless Steel Bar*, and treated Brazilian imports here as it treated other steel imports in the other reviews cited above – or, for that matter, as it treated imports from other countries in these reviews.

This Court has stated that the Commission will be found to have acted unlawfully if it treats similar cases differently without an adequate explanation. As this Court stated in a recent decision, "the Commission may not disregard previous findings of a general nature that bear directly upon the current review." *DAK Americas LLC,* 456 F. Supp. 3d at 1354 (*quoting Usinor*, 26 C.I.T. at 792. Because the Commission majority's decision for Brazil is inconsistent with the Commission's prior decisions analyzing the impact of Section 232 measures on the subject imports, the Court should remand the Commission's negative determination for Brazil with instructions for the Commission to address its departure from the practice established in these prior determinations.

## V.      CONCLUSION AND PRAYER FOR RELIEF

The Commission majority's determination not to cumulate the subject imports of cold-rolled steel from Brazil was clearly inconsistent with this Court's prior holdings addressing the legal limitations governing the Commission's cumulation determinations in sunset reviews. Moreover, the Commission majority's determination ignored critical facts relating to this issue that were part of the Commission's record. Finally, the Commission majority's determination not to cumulate imports from Brazil with the other subject imports was inconsistent with its prior decisions addressing the impact of Section 232 trade measures on the likely volumes of subject imports. Ultimately, the Commission's failure to address these issues, and provide an adequate analysis of its findings, violates one of its fundamental obligations under the statute: to provide the parties with a reasoned explanation of its findings on the relevant legal issues. This failure

warrants remand.

Given this, we respectfully request that the Court find that the Commission's negative determination for Brazil was unsupported by substantial evidence and not otherwise in accordance with law.  Accordingly, the Court should remand this matter with instructions for the Commission majority to reconsider its negative determination for Brazil.

Respectfully submitted,


*/s/ Stephen P. Vaughn*
Stephen P. Vaughn, Esq.
Neal J. Reynolds, Esq.
Barbara Medrado, Esq.

**KING & SPALDING LLP**
1700 Pennsylvania Ave., NW
Washington, DC 20006
(202) 737-0500

*Counsel to Cleveland-Cliffs Inc.*


*/s/ Alan H. Price*
Alan H. Price, Esq.
Christopher B. Weld, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Nucor Corporation*

_/s/ Roger B. Schagrin_
Roger B. Schagrin, Esq.
Jeffrey D. Gerrish, Esq.

**SCHAGRIN ASSOCIATES**
900 Seventh Street, NW
Suite 500
Washington, DC 20001
(202) 223-1700

_Counsel to Steel Dynamics, Inc._


_/s/ Thomas M. Beline_
Thomas M. Beline, Esq.
Sarah E. Shulman, Esq.

**CASSIDY LEVY KENT (USA) LLP**
900 19th Street, NW
Suite 400
Washington, DC 20006
(202) 567-2316

_Counsel to United States Steel Corporation_

March 15, 2023

**CERTIFICATE OF COMPLIANCE**
**WITH WORD COUNT LIMITATIONS**

Pursuant to paragraph 2(B)(2) of the U.S. Court of International Trade's *Standard*

*Chambers Procedures*, the undersigned certifies that this brief complies with the word count

limitations set forth in the Court's scheduling order.  Exclusive of the exempted portions, as

provided in paragraph 2(B)(1), this brief includes 13,295 words.  In preparing this certificate, the

undersigned has relied upon the word count feature of the word-processing system used to

prepare the submission.

*/s/ Stephen P. Vaughn*
Stephen P.  Vaughn

KING & SPALDING LLP
1700 Pennsylvania Avenue, NW,
Washington, DC 20006
(202) 737-0500

*Counsel For Cleveland-Cliffs Inc.*

March 15, 2023