## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| **CLEVELAND-CLIFFS INC.** )<br><br>**Plaintiff,** )<br><br>**v.** )<br><br>**UNITED STATES,** )<br><br>**Defendant.** ) | **Court No. 22-00257** |

## PLAINTIFF AND PLAINTIFF-INTERVENORS' REPLY BRIEF

Stephen P. Vaughn, Esq.
Neal J. Reynolds, Esq.
Barbara Medrado, Esq.
**KING & SPALDING LLP**
1700 Pennsylvania Ave., NW
Washington, DC 20006
(202) 737-0500

*Counsel to Cleveland-Cliffs Inc.*

Alan H. Price, Esq.
Christopher B. Weld, Esq.
**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Nucor Corporation*

Roger B. Schagrin, Esq.
Jeffrey D. Gerrish, Esq.
**SCHAGRIN ASSOCIATES**
900 Seventh Street, NW
Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel to Steel Dynamics, Inc.*

Thomas M. Beline, Esq.
Sarah E. Shulman, Esq.
**CASSIDY LEVY KENT (USA) LLP**
900 19th Street, NW
Suite 400
Washington, DC 20006
(202) 567-2316

*Counsel to United States Steel Corporation*

July 31, 2023

## <u>TABLE OF CONTENTS</u>

I.   PLAINTIFFS ARE NOT ASKING THE COURT TO RE-WEIGH THE EVIDENCE.... 1

II.  THE COMMISSION MAJORITY'S DECISION NOT TO CUMULATE IMPORTS
     FROM BRAZIL WAS NOT IN ACCORDANCE WITH LAW ...................................... 3

     A.   Defendants Overstate Applicable Deference Doctrines ......................................... 3

     B.   The Commission's Cumulation Decision Was Not Consistent with the Principles
          Articulated In This Court's Precedents.................................................................... 4

     C.   The Commission's Determination Not To Cumulate The Subject Imports From
          Brazil With The Subject Imports From China, India, Japan and the United
          Kingdom Conflicts with This Court's Precedents ................................................... 6

     D.   The Commission's Determination Not To Cumulate The Subject Imports From
          Brazil With The Subject Imports From Korea Also Conflicts with The Principles
          Articulated In This Court's Precedents.................................................................... 9

     E.   Defendants' Attempts to Distinguish This Court's Precedents Are Unavailing... 13

III. The Commission Failed to Address Key Evidence Relating to Its Cumulation Decision
     for Brazil ......................................................................................................................... 15

IV.  Despite the Commission's Claims, the Court Can, And Should, Consider The Dissenting
     Commissioners' Detailed and Legally Sound Cumulation Analysis................................ 17

V.   Despite Defendants' Claims, the Commission's Discussion of the Impact of the Section
     232 Measures on the Subject Imports Was Inconsistent with Its Prior Determinations... 20

VI.  CONCLUSION ............................................................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allegheny Ludlum Corp. v. United States*,
　　30 CIT 1995, 475 F. Supp. 2d 1370 (Ct Int'l Trade 2006) .......................................... *passim*

*Allentown Mack Sales and Service, Inc., v. NLRB*,
　　522 U.S. 359 (1998) ................................................................................................... 13

*Altx, Inc. v. U.S.*,
　　26 C.I.T. 1425 (2002) (Ct. Int'l Trade 2002) ............................................................ 17

*Greater Boston Television Corp. v. FCC*,
　　444 F.2d 841 (D.C. Cir. 1970) ................................................................................... 16

*Neenah Foundry Co. v. United States*,
　　25 CIT 702, 155 F. Supp. 2d 766 (2001) .................................................................. *passim*

*Nippon Steel Corp. v. United States*,
　　391 F. Supp. 2d 1258 (Ct. Int'l Trade 2005) ............................................................ 20

*Nucor Corporation v. United States*,
　　33 CIT 57, 605 F. Supp. 2d 1361 (Ct. Int'l Trade 2009) ........................................... *passim*

*Swiff-Train v. United States*,
　　37 CIT 394, 904 F. Supp. 2d 1336 (2013) ................................................................. 19

*U.S. Steel Group v. United State*s,
　　25 CIT 1046, 162 F. Supp. 2d 676 (Ct. Int'l Trade 2001) ......................................... 12

**Statutes**

19 U.S.C. §1677f(i)(3)(B) ................................................................................................... 16

**Other Authorities**

*Carbon and Certain Alloy Steel Wire Rod from Brazil, Indonesia, Mexico,
　　Moldova, and Trinidad and Tobago*,
　　Inv. Nos. 701-TA-417 and 731-TA-953, 957-959, and 961 (Third Review),
　　USITC Pub. 5100 (Aug. 2020) ............................................................................. 20, 21, 22

*Certain Corrosion-Resistant Steel Products from China, India, Italy, South Korea
　　and Taiwan*,
　　Inv. Nos. 701-TA-534-537 & 731-TA-1274-1278 (Review), USITC Pub.
　　5337 (Aug. 2022) ....................................................................................................... 21

*Clad Steel Plate from Japan*,
Inv. Nos. 731-TA-739 (Fourth Review), USITC Pub. 4851 (Dec. 2018) ..............................21

*Non-Oriented Electrical Steel from China, Germany, Japan, Korea, Sweden, and Taiwan*,
Inv. Nos. 701-TA-506 and 508 and 731-TA-1238-1243 (Review), USITC Pub. 5140 (Dec. 2020) ..................................................................................21

*Polyethylene Retail Carrier Bags from China, Malaysia, and Thailand*, Inv. Nos. 731-TA-1043-1045 (Review), USITC Pub. 4160 (June 2010)..............................6, 9

*Stainless Steel Bar from Brazil, India, Japan, and Spain*,
Inv. Nos. 731-TA-678, 679, 681, and 682 (Fourth Review), USITC Pub. 4820 (Sept. 2018)......................................................................................22

*Tin- and Chromium-Coated Steel Sheet from Japan*,
Inv. Nos. 731-TA-860 (Third Review), USITC Pub. 4795 (June 2018) ...............................21

On behalf of Plaintiff Cleveland-Cliffs Inc. and Plaintiff-Intervenors Steel Dynamics Inc., Nucor Corporation, and United States Steel Corporation (collectively "Plaintiffs"),[1] we hereby file our reply brief in this appeal.  As Plaintiffs' opening brief explained, the Commission majority committed significant legal error when it chose not to cumulate the subject imports of cold-rolled steel from Brazil in the underlying sunset reviews.  In particular, the Commission's decision was inconsistent with (i) the policy underlying the cumulation provisions of the statute, (ii) this Court's precedents, (iii) the Commission's interpretation of those precedents, and (iv) the Commission's own prior determinations.

Furthermore, the Commission majority impermissibly ignored significant record evidence that undercuts its determination, as well as dispositive legal issues raised by the dissenting Commissioners' views.  Because the Commission's determination for Brazil was not in accordance with law and was unsupported by substantial evidence, and because neither the Commission nor the Defendant-Intervenors (collectively, the "Defendants") have persuasively rebutted Plaintiffs' arguments regarding these errors, the Court should remand the Commission majority's negative determination for Brazil with instructions for the Commission to perform an analysis that does comport with the law.

## I.     PLAINTIFFS ARE NOT ASKING THE COURT TO RE-WEIGH THE EVIDENCE

As an initial matter, Defendants mischaracterize Plaintiffs' core arguments.  In this regard, the Commission asserts that Plaintiffs' fundamental claim is that the Commission majority's determination for Brazil was not supported by substantial evidence.[2]  According to the Commission, Plaintiffs "essentially ask this Court to serve as a 'sixth Commissioner' and

---

[1] Plaintiffs are the primary U.S. producers of cold-rolled steel.
[2] Commission Brief ("CB") at 7-8.

overrule the reasonable factual findings made, and methodology employed, by the Commission."[3]  Similarly, Defendant-Intervenors contend that Plaintiffs "urge this Court to weigh the evidence differently from the Commission" in this appeal.[4]  Defendants' claims are plainly incorrect.

To begin with, Plaintiffs' core argument on appeal is not that the Commission's decision for Brazil was not supported by substantial evidence.  Instead, Plaintiffs' primary argument is that the Commission's decision was not "in accordance with law."  In our brief, Plaintiffs made clear that our primary concern is that the Commission's analysis for Brazil conflicts with the fundamental principles underlying the Commission's cumulation analysis in sunset reviews.[5]  In fact, Plaintiffs' opening brief argues that (i) the "Commission's decision for Brazil violated the{} basic legal principles" governing the Commission's cumulation analysis that were articulated in *Neenah Foundry Co. v. United States*, *Allegheny Ludlum Corp. v. United States*, and *Nucor Corporation v. United States*, (ii) the Commission majority's analysis for Brazil was "impermissible" under the statute, (iii) the Commission's cumulation findings for Brazil relied on a "legally flawed analysis of the conditions of competition in the market place," (iv) the Commission majority committed "legal error" when it relied so heavily on the absolute volumes of Brazil and the other subject imports in its analysis, and (v) the Commission majority's decision was inconsistent with its prior sunset determinations addressing the impact of section 232 measures on the subject imports after revocation.[6]  In sum, Defendants' attempt to recast

---

[3] CB at 7 & 20.
[4] Defendant-Intervenors' Brief ("DIB") at 3 & 5.
[5] Plaintiffs' Brief ("PB") at 18-32 & 37-42.
[6] CB at 3, 25, 27, & 37-41.

Plaintiffs' core arguments as "substantial evidence" claims is fundamentally mistaken and should be rejected by the Court.

## II.     THE COMMISSION MAJORITY'S DECISION NOT TO CUMULATE IMPORTS FROM BRAZIL WAS NOT IN ACCORDANCE WITH LAW

### A.  Defendants Overstate Applicable Deference Doctrines

In addition to mischaracterizing Plaintiffs' core argument, Defendants ask the Court to apply an overly broad level of deference to the Commission's determination for Brazil.  In Plaintiffs opening brief, Plaintiffs correctly stated that the Commission's decision not to cumulate subject imports in sunset reviews was discretionary and the Commission may address differences in product mix, volume, price and other trends when exercising this discretion.[7]   In response, the Commission claims that Plaintiffs merely "pay lip service" to these principles.[8] Because Plaintiffs' description of these principles (as articulated by this Court in *Neenah*, *Allegheny* and *Nucor*) was accurate, and because Plaintiffs accurately explained why the Commission's analysis for Brazil does not conform to these principles, the Commission has no basis for asserting that Plaintiffs merely paid "lip service" to them.

Nor is there any support for the Commission's assertion that "the statute and case law provide the Commission *far more discretion* in determining whether to cumulate subject imports

---

[7] PB at 18-25.

[8] CB at 12.  In its brief, the Commission claims that Plaintiffs "intimate that the Commission *must* cumulate subject imports in a five-year review unless it finds no likely reasonable overlap of competition or unless it finds that revocation of an order will have no likely discernible adverse impact" on the domestic industry.  CB at 12 (emphasis added).  This is clearly not true. In our brief, Plaintiffs expressly acknowledged that, even if the other statutory cumulation factors are met, the Commission still has discretion not to cumulate the subject imports.  In fact, Plaintiffs' arguments are premised on the concept that the Commission *exercised its discretion in a manner that conflicts with the statute and this Court's prior decisions*.

in a five-year review than Plaintiffs contend."[9]  As Plaintiffs explained,[10] this Court has made

clear that the Commission's discretion not to cumulate imports under the statute is "not

unfettered."  *Allegheny Ludlum Corp. v. United States*, 30 C.I.T. 1995, 475 F. Supp. 2d 1370,

1376 (Ct. Int'l Trade 2006); *Nucor Corp. v. United States*, 33 CIT 57, 605 F. Supp. 2d 1361,

1369-70 (Ct. Int'l Trade 2009).  Instead, the Commission's decision *"*must be predicated upon a

judgment anchored in the language and spirit of the relevant statutes and regulations." *Id*.  Given

these principles, this Court should not give undue deference to the Commission's decision for

Brazil, which is what Defendants seek.  Instead, it should closely review the Commission's

decision to ensure that it is consistent with "the language and spirit of the relevant statutes and

regulations."

### B.   The Commission's Cumulation Decision Was Not Consistent with the Principles Articulated In This Court's Precedents

The Commission's cumulation decision for Brazil was not anchored in the language or

spirit of the relevant statutes and regulations.  As Plaintiffs explained,[11] when the Commission

assesses whether to cumulate subject imports in a sunset review, it may not engage in a "circular

analysis, relying on the same factors for {a} refusal to cumulate as for an ultimate negative

injury determination." *Neenah Foundry Co. v. United States,* 25 CIT 702, 155 F. Supp. 2d 766,

772 (2001); *Allegheny,* 475 F. Supp. 2d at 1378-79.  Taking such an approach thwarts

Congressional intent because it requires a "demonstrated, independent causation of material

injury {by imports from an individual country} before any consideration of cumulation" by the

subject imports.  *Neenah*, 155 F. Supp. 2d at 772.

---

[9] CB at 12.

[10] PB at 21.

[11] PB at 21-22.

Accordingly, to avoid this type of "circular" reasoning in the cumulation analysis in five-year reviews, the Court has cautioned the Commission not to rely solely on the absolute likely volumes of the subject imports in its analysis.  *Neenah*, 155 F. Supp. 2d at 773-77; *Allegheny*, 475 F. Supp. 2d 1379; *Nucor*, 605 F. Supp. 2d at 1370-71, n.12.  In *Allegheny*, for example, the Court noted that, when deciding not to cumulate the subject imports from the United Kingdom with other subject imports, the Commission "did not rely *only on low volume figures and pre-order imports* in making its cumulation determinations, but also based its analysis on *product mix trends, production trends, and volume trends*…"  *Allegheny*, 475 F. Supp. 2d at 1379 (emphasis added).   Because the Commission relied "primarily on permissible *trends* analyses," the Court found that the Commission's analysis was "adequate to sustain a finding not to cumulate the subject imports."  *Id.*

Similarly, in *Nucor*, the domestic industry appealed the Commission's decision not to cumulate certain imports in a sunset review.  In the appeal, the domestic industry relied heavily on the likely volumes of the subject countries to support its claim that the Commission incorrectly chose not to cumulate certain subject imports.  The Court rejected the industry's argument, stating that "basing the cumulation decision solely on the likely volume *without further justification* may constitute an impermissible circular analysis that relies on the same factors for {a} refusal to cumulate as for an ultimate negative injury determination."  *Nucor*, 605 F. Supp. 2d 1370, n.12 (emphasis added).   Finally, in *Neenah*, the Court explained that "cumulation of countries with relatively small likely volume and price impact would not only be appropriate, *a refusal to do so without some additional justification could constitute an abuse of discretion*."  *Neenah*, 155 F. Supp. 2d at 774 (emphasis added).

Given these statements by the Court, Defendant-Intervenors have no basis for their claim that "the purported 'circular reasoning' standard Plaintiffs are seeking to impose on the Commission's discretion … is itself dubious."[12]  Not only has the Court confirmed that the "circularity" standard applies to the Commission's cumulation analysis on at least three separate occasions, the Commission itself has confirmed that these decisions prohibit the Commission from performing a "circular" analysis when making a cumulation decision in sunset reviews.  In *Polyethylene Retail Carrier Bags from China, Malaysia, and Thailand*,[13] the Commission explicitly acknowledged that, with respect to its cumulation analysis in sunset reviews, the Commission's "*reviewing courts have rejected the notion that the Commission may engage in a 'circular analysis, relying on the same factors to refuse to cumulate as for an ultimate negative injury determination,' such as volume or market share alone*."[14]  Given this statement by the Commission, Defendant-Intervenors' claims are clearly based on a flawed understanding of the case law.

### C.  The Commission's Determination Not To Cumulate The Subject Imports From Brazil With The Subject Imports From China, India, Japan and the United Kingdom Conflicts with This Court's Precedents

Setting aside Defendant-Intervenors' obvious disagreement with this Court's precedents, the fact remains that the Commission majority's decision not to cumulate the subject imports from Brazil with the subject imports from China, India, Japan and the United Kingdom does, in fact, clearly conflict with *Neenah*, *Allegheny* and *Nucor*.  As Plaintiffs have explained,[15] the Commission's decision for these countries relied *solely* on the fact that the likely volumes of the

---

[12]DIB at 8.

[13] *Polyethylene Retail Carrier Bags from China, Malaysia, and Thailand*, Inv. Nos. 731-TA-1043-1045, USITC Pub. 4160 (June 2010) (Review) at 18, n.109 (emphasis added).

[14] In fact, in support of this statement, the Commission cited the Court's decisions in *Neenah*, *Allegheny* and *Nucor*.  *Id.*

[15] PB at 25-27.

Brazilian imports would be smaller than the subject volumes from China, India, Japan and the United Kingdom.[16]  By relying solely on a comparison of the likely volumes for Brazil with the likely volumes for these four countries, the Commission majority performed the very analysis that this Court has made clear is in conflict with the statute.

In its brief discussion for these countries, the Commission majority noted that the Brazilian imports were subject to a quota under section 232, which set an "absolute cap on the annual volume of subject imports from Brazil" of 57,251 short tons.[17]  In comparison, the Commission majority stated, the subject imports from China, India, Japan and the United Kingdom were not subject to section 232 quotas.  Instead, they pointed out, the Chinese and Indian imports were subject to a tariff of 25 percent, while imports from Japan and the United Kingdom were subject to tariff rate quotas, which meant that these imports were not subject to an absolute cap under section 232.  After reciting these differences, the Commission majority drew one simple conclusion:  the "absence of any absolute quota on {subject imports from China, India, Japan, and the United Kingdom} *means that, unlike the subject imports from Brazil, subject imports from {these} countries are in a position to compete for much larger volumes of sales than any of the subject producers in Brazil which must share the quota limits*."[18]

Importantly, this is the *entire* analysis that the Commission majority used to support its decision not to cumulate the Brazilian imports with imports from China, India, Japan, and the United Kingdom.  In that analysis, the Commission majority did not consider any factors aside from the absolute likely volumes of the subject imports.  It did not consider possible product mix

---

[16] *Views* at 42, PRD 300 (cites to the *Views* hereinafter are to PRD 300).
[17] The Commission also noted, without explanation, the volumes of the Brazilian imports during the period of review.  *Views* at 42.
[18] *Views* at 43 (emphasis added).

differences between the countries, differences between their production, capacity or export levels, or the existence of corporate affiliations between the subject countries. Moreover, they did not assess whether there were different volume or pricing trends for these countries.[19] Instead, the Commission majority relied exclusively on a comparison of the likely volumes of the subject imports from these countries, which is the very sort of "circular" analysis that is "impermissible" under *Neenah*, *Allegheny,* and *Nucor*.

Neither the Commission nor Defendant-Intervenors spend much time responding to Plaintiffs' argument. Indeed, Defendant-Intervenors do not directly address Plaintiffs' argument at all. The Commission does briefly address our argument but mistakenly asserts that it "did not rely only on absolute small volumes for Brazil or on the quota level for imports from Brazil" when deciding whether to cumulate Brazil with China, India, Japan and the United Kingdom.[20] According to the Commission, its cumulation analysis for these countries also relied significantly on the fact that "the section 232 quota for Brazil was different from the trade restrictive measures for China, India, Japan, and the United Kingdom."[21]

This argument mischaracterizes the Commission majority's analysis. While the Commission majority did note that the imports from Brazil and the imports from China, India, Japan, and the United Kingdom were subject to different measures under section 232, the Commission majority clearly linked this fact directly to its finding that the volume of the imports from Brazil would be smaller than the volume of the imports from China, India, Japan and the United Kingdom. In other words, the Commission majority found that the different measures

---

[19] *Views* at 42-43.
[20] CB at 18.
[21] CB at 18.

under section 232 were significant *only because they resulted in lower volumes from Brazil in comparison to other subject countries.*

Thus, the Commission majority's analysis for these countries was not based on "several meaningful differences" between these countries, as the Commission broadly claims.[22]  The Commission majority's analysis for these countries was, instead, based on the single finding that the difference between section 232 measures for these countries would cause Brazilian import volumes to be smaller than import volumes from China, India, Japan and the United Kingdom.

This analysis cannot be sustained.  It violates the fundamental principle – articulated by this Court in *Neenah*, *Allegheny*, and *Nucor,* and acknowledged by the Commission in *Polyethylene Retail Carrier Bags* – that the Commission may not rely on the "volume or market share {of the subject imports} alone" when deciding whether to exercise its discretion not to cumulate the subject imports from one or more countries.[23]  The Court should remand the determination so that the Commission can address this clear legal error.

### D.  The Commission's Determination Not To Cumulate The Subject Imports From Brazil With The Subject Imports From Korea Also Conflicts with The Principles Articulated In This Court's Precedents

Defendants also argue that the Commission's cumulation analysis for Brazil and Korea does not conflict with the principles articulated in *Neenah*, *Allegheny* and *Nucor*.[24]  Defendants contend that, the Commission reasonably relied not only on the differences in the section 232 measures for Brazil and Korea in its analysis, it also reasonably referenced the fact that there were differences with respect to each country's production and capacity levels.[25]  Once again, Defendants' claims are unfounded.

---

[22] CB at 13.
[23] USITC Pub 4160, at 18, n.109.
[24] CB at 14-16; DIB at 14-18.
[25] *Id*.

As Plaintiffs explained,[26] the Commission majority's analysis for Brazil and Korea was premised heavily on the finding that the Brazilian and Korean imports would enter the U.S. market at different volume levels after revocation.[27]  In its analysis, the Commission majority acknowledged that the Brazilian and Korean imports were both subject to quotas under section 232 but stated that there were "*significant differences between the level of South Korea's quota and presence in the U.S. market relative to those for Brazil*."  After pointing out that the quota for Korea was 141,018 short tons while the quota for Brazil was 57,251 short tons, the majority emphasized that "the absolute quota on subject imports from South Korea is almost three times larger than the absolute quota for subject imports from Brazil."[28]  The majority also noted that the Korean imports had approached their quota limit and maintained a substantial presence in the U.S. market during the period of review, while the Brazilian imports remained well below their much smaller quota limit and were virtually absent from the U.S. market during the period.[29]

Given these differences, the Commission majority found that, in light of the "absolute quota applicable to subject imports from Brazil, even if imports from Brazil reached that level, the substantially larger quota for South Korea … means that, unlike subject imports from Brazil, the subject imports from {Korea} are *in a position to compete for much larger volumes of sales than any of the subject producers in Brazil which must share the quota limits*."[30]  By relying on a finding that the difference in the quota levels between Brazil and Korea would cause the Brazilian imports to enter the market in smaller volumes than the Korean imports, the

---

[26] PB at 27-31.
[27] *Views* at 43.
[28] *Id*.
[29] *Id*.
[30] *Id*.

Commission again relied on the "circular" analysis of likely volumes that this Court has described as "impermissible" in *Neenah*, *Allegheny* and *Nucor*.

In their briefs, Defendants emphasize that the Commission majority noted – in a footnote[31] – that there were also differences in the production and export levels of the Brazilian and Korean industries.[32]  This fact does not, however, establish that the Brazilian and Korean imports would compete under different conditions of competition upon revocation, as the Commission now asserts.  While it may be true that the Korean cold-rolled steel industry produced and exported a larger amount of cold-rolled steel than the Brazilian industry during the period of review, both countries produced and exported cold-rolled steel in substantial volumes that were *well in excess of the annual quota limits imposed on these imports under section 232*.[33]

As a result, both countries could produce and export cold-rolled steel to the United States in volumes that would meet their quota levels.  Obviously, then, the difference in export and production levels between Brazil and Korea was simply irrelevant to their ability to ship cold-rolled steel in volumes that would fill their quota levels.  This is a critical fact that the Commission ignores.  Thus, from the perspective of their potential impact on the U.S. market, there is little practical difference in the size of the industries in Brazil and Korea or their export patterns and shipments.  Both countries clearly have the ability and willingness to ship significant amounts of cold-rolled steel to the United States that would fill their quotas upon revocation.

In sum, rather than explaining *why* the differences between Brazilian and Korean production and export levels meant that the Brazilian and Korea imports would compete under

---

[31] *Views* at 43, n.307.
[32] CB at 15-16; DIB at 16-17.
[33] For a detailed discussion of this issue, *see* PB at 30.

different conditions of competition after revocation, the Commission majority simply stated that there were differences between the countries.  By making such a conclusory statement on this issue, the Commission majority failed to provide a "'reasoned explanation supported by a stated connection between the facts found and the choice made.'" *U.S. Steel Group v. United States,* 25 C.I.T. 1046, 162 F. Supp. 2d 676, 678 (Ct. Int'l Trade 2001) (citations omitted).  The Court should remand the Commission majority's findings, with instructions to provide a reasoned explanation why these factors support its decision not to cumulate the Brazilian and Korean imports.

Lastly, and importantly, the Commission claims that it need not explain why it relied on the production and export differences between Brazil and Korea to support its decision not to cumulate their imports.[34]  According to the Commission:

> Nor have Plaintiffs provided any authority for their assertion that the Commission was obliged to explain further why differences in export-orientation and production are relevant to the purpose of discretionary cumulation in sunset reviews.  Pl. Br. at 31.  *Neither the statutory language in 19 U.S.C. §1675a(a)(7) nor the {Statement of Administrative Action for the Uruguay Round Amendments Act} provides any basis for imposing such a requirement.*  Moreover, the caselaw, by confirming that the Commission can exercise its discretion not to cumulate based on likely differences in competition, including differences in export orientation and production, rebuts the notion that the agency must provide the type of further explanation advocated by Plaintiffs.[35]

This argument should be rejected.  Providing a reasoned explanation of its significant findings is one of the Commission's most fundamental obligations under the statute.  The Commission must provide "a reasoned explanation {for its findings,} supported by a stated connection between the facts found and the choices made."  *U.S. Steel Group*, 162 F. Supp. 2d at 678.  Indeed, because of this obligation, the Court must scrutinize the inferences drawn by the

---

[34] CB at 26-27.
[35] *Id.*

12

Commission because it is "not free to prescribe what inferences from the evidence it will accept and reject but must draw all those inferences that the evidence fairly demands."  *Allentown Mack Sales & Service, v. NLRB*, 522 U.S. 359, 378 (1998).

Given the fundamental nature of this obligation, it is extraordinary that the Commission now claims that, because the Court has approved its reliance on production and export levels in prior cases, the Commission can simply point to these differences in its analysis *without explaining why these differences are relevant*.[36]  This assertion seriously misstates the Commission's legal obligations.  Under this Court's decisions, the Commission must explain why the facts cited support the inferences it drew on such a critical issue.  The Court should remand this analysis so that the Commission can provide a reasoned explanation of its findings so that the parties, the public and the Court can understand them.

### E.  Defendants' Attempts to Distinguish This Court's Precedents Are Unavailing

Defendants make much of the fact that, in *Neenah*, *Allegheny*, and *Nucor*, the Court ultimately affirmed the Commission's decision not to cumulate the subject imports from certain countries in the underlying sunset reviews.[37]  According to Defendants, by upholding the Commission's cumulation analysis in these decisions, the Court has, in effect, given the Commission *carte blanche* to perform the type of limited analysis that supported its cumulation findings for Brazil below.[38]

---

[36] CB at 26-27 (arguing that "the caselaw, by confirming that the Commission can exercise its discretion not to cumulate based on likely differences in competition, including differences in export orientation and production, rebuts the notion that the agency must provide the type of further explanation advocated by Plaintiffs.").

[37] CB at 21-26; DIB at 10-13.

[38] *Id.*

Defendants overstate the Court's findings.  In *Neenah*, *Allegheny*, and *Nucor*, the Court affirmed the Commission's exercise of its discretion not to cumulate certain imports because the Commission relied on *multiple factors*, including differences in volume and price trends, to support its decision.  In *Allegheny*, for example, the Court found that, when the Commission decided not to cumulate imports from the United Kingdom with imports from other subject countries, it relied "primarily on permissible trend analyses" in its decision, including differences in "product mix trends, production trends, and volume trends…"  The Court noted that the Commission's reliance on these types of trends, rather than the absolute likely volume of the imports alone, was "adequate to sustain a finding not to cumulate the subject imports." *Allegheny*, 475 F. Supp. 2d at 1379.

Similarly, in *Neenah*, the Court found that Commissioner Koplan reasonably chose not to cumulate imports from India with imports from Brazil, China, and Canada because there were significant differences in the volume and price trends for India and the other imports, as well as significant differences in the size of the dumping margins for these countries.[39]  Finally, in *Nucor*, the Court affirmed the Commission's decision not to cumulate the subject imports from Kazakhstan, Romania, and South Africa with imports from the other subject countries based on the fact that, in addition to several other factors, there was a significant corporate relationship between the subject producers in Kazakhstan, Romania, and South Africa.[40]

In sum, in each of these cases, the Commission relied on a variety of factors to assess whether to exercise its discretion not to cumulate the imports from one subject country.  In none of these cases did the Commission rely *solely* on the absolute likely volumes or market share of

---

[39] *Neenah*, 155 F. Supp. 2d at 769-771.
[40] *Nucor*, 605 F. Supp. 2d at 1371-72 & n.13.

the subject imports to justify a decision not to cumulate the subject imports from certain

countries.  Thus, despite Defendants' assertions, the Court's decisions in *Neenah*, *Allegheny,* and

*Nucor* do not support the Commission majority's decision for Brazil.  Indeed, as shown above,

those decisions show that a decision like the one for Brazil – where the Commission majority

relied *solely* on import volumes – cannot be sustained, because it rests upon a legally flawed

circular analysis.

### III.    The Commission Failed to Address Key Evidence Relating to Its Cumulation Decision for Brazil

Plaintiffs' opening brief also demonstrated that the Commission majority failed to

adequately grapple with Plaintiffs' arguments that the Biden Administration would likely modify

the section 232 quota covering Brazilian imports.[41]  In response, the Commission asserts that the

Commission majority did adequately address these arguments because it "acknowledged the

disagreement among the parties on this very issue" and "cited to pages in prehearing briefs

submitted by {Plaintiffs} where they presented arguments that the absolute quota for Brazil was

not likely to continue going forward."[42]  But a glancing reference to a major argument by the

parties does not constitute the sort of reasoned response to a party's arguments that is required by

the statute.

In the reviews, Plaintiffs provided the Commission with detailed evidence indicating that

the Biden Administration was unlikely to keep the Brazilian quota in place.[43]  Specifically,

Plaintiffs provided detailed evidence demonstrating that the Government of Brazil was

pressuring the Administration to revise the quotas imposed under section 232 on Brazilian

---

[41] PB at 36.

[42] CB at 27.

[43]  PB at 36-37 (*citing, e.g.*, Post-Hearing Brief of Cleveland-Cliffs at 11-12, & Exhibits 4, 5, 8, 9, 11 and 12, PRD 222).

imports so that larger volumes of Brazilian imports could enter the U.S. market.[44]  Plaintiffs also

provided detailed evidence demonstrating that the Administration had liberalized the section 232

measures for other significant U.S. trading partners, including the European Union, the United

Kingdom, and Japan.[45]  Given this evidence, the Commission majority should not, and could not,

have concluded – as it did – that the quota on the Brazilian imports would remain in place in its

existing form for the reasonably foreseeable future.

The Commission majority simply ignored the evidence provided by Plaintiffs.  Indeed,

rather than discuss the evidence provided by Plaintiffs – which showed that continuation of the

Brazilian quota in its current form could not be taken for granted – the Commission majority

simply stated that there was "nothing in the record" to suggest that the section 232 quota would

be terminated or revised in the reasonably foreseeable future.[46]  This finding was clearly

mistaken because Plaintiffs did, in fact, put significant evidence to this effect on the record.  The

Commission majority simply ignored it.

The Commission majority's cursory dismissal of this critical issue constituted a complete

failure to take "a 'hard look' at the salient problems" and to "genuinely engage{} in reasoned

decision-making."[47]  By failing to actually address the evidence provided by Plaintiffs on this

issue, the Commission majority failed to address the relevant arguments of the parties, as the

statute requires it to do.[48]  As this Court has explained, "it does not matter if the arguments of the

parties are easily dispensed with or require closer examination, if the Commission does not make

---

[44] *Id*.
[45] PB at 36-37 (*citing, e.g.,* Post-Hearing Brief of Cleveland-Cliffs at Exhibits 4, 5, 11, & 12, PRD 222).
[46] *Views* at 56.
[47] *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C. Cir. 1970).
[48] 19 U.S.C. § 1677f(i)(3)(B).

its thinking clear.  The Court can only review the reasoning that the Commission expresses."[49]

Because the Commission majority failed to provide the type of reasoning required by the statute,

the Court should remand the Commission's determination for Brazil for appropriate

reconsideration.

### IV.    Despite the Commission's Claims, the Court Can, And Should, Consider The Dissenting Commissioners' Detailed and Legally Sound Cumulation Analysis

Plaintiffs' opening brief also demonstrated that, unlike the Commission majority, the two

dissenting Commissioners, Commissioner Schmidtlein and Commissioner Stayin, performed a

robust and legally sound cumulation analysis for Brazil.[50]  After providing a detailed analysis of

the record evidence relating to this issue, Commissioners Schmidtlein and Stayin firmly rejected

the Commission majority's conclusion that there were significant differences in the conditions of

competition between Brazil and the other subject countries.[51]  In particular, they noted:

- Like the imports from other subject countries, the imports from Brazil and South Korea were likely to increase if the orders were revoked.

- Imports from Brazil and Korea had both been below their section 232 quota levels throughout the period of review and, in fact, South Korea filled more of its quota than Brazil in 2021.  Thus, although South Korea has a larger quota volume than Brazil, after revocation, the subject imports from Brazil would likely increase by a larger amount than the Korean imports after revocation.

- During the original period of investigation, like the other subject countries, the subject imports from Brazil and South Korea undersold the domestic like product in most cases during the period of investigation.

- The Brazilian producers had the same incentive to price aggressively when competing for 0.2 percent of the U.S. market as the Korean producers, who were competing for 0.5 percent of the U.S. market under their quota limit.[52]

---

[49] *Altx, Inc. v. United States*, 26 C.I.T. 1425, 1426 (2002) (Ct. Int'l Trade 2002).
[50] PB at 32-36.
[51] *Views* at 75-78.
[52] *Views* at 78-79.

Accordingly, the two Commissioners emphasized, "{w}hile one may argue that the difference in quota levels between Brazil and South Korea may ultimately have a different impact on the domestic industry (and that is debatable), the difference in quota levels does not lead to the subject imports from Brazil competing *differently* in the U.S. market than subject imports from South Korea or any other subject country."

Importantly, Commissioners Schmidtlein and Stayin observed that the Commission majority had committed legal and analytical error in reaching its determination relating to Brazil. Rejecting the Commission majority's finding that the "difference in the applicable Section 232 measures constitute{d} different conditions of competition that warrant analyzing subject imports from Brazil on a decumulated basis," the dissenting Commissioners correctly explained that:

> The fact that certain imports may be subject to quotas while others may be subject to tariffs or tariff-rate quotas does not affect the conditions of competition facing these imports in the U.S. market, nor does it suggest that the imports would not compete with each other and with the domestic product if the orders were to be revoked.[53]

The Commission contends that the dissent's robust and legally sound findings have "no bearing on the Court's review of the Commission's findings."[54]  Relying on the usual arguments made in the wake of a split decision, the Commission contends that the dissent's views do not undermine the Commission majority's analysis because the "'possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.'"[55]

---

[53] *Views* at 77-78 (emphasis added).
[54] CB at 29.
[55] CB at 29.

This argument misses the point.  Plaintiffs do not claim that this case should be remanded because two Commissioners disagreed with the Commission majority on how to weigh the evidence.  Instead, Plaintiffs are arguing that, unlike the Commission majority, the dissenters performed the type of legally sound analysis that is required by this Court's precedents.  Indeed, the dissenting Commissioners emphasized that, as a matter of law, the Commission majority failed to conduct a proper conditions of competition analysis.[56]  For example, Commissioners Schmidtlein and Stayin both rejected the Commission majority's findings that the "difference in the applicable Section 232 measures constitute{d} different conditions of competition that warrant analyzing subject imports from Brazil on a decumulated basis," explaining that:

> *The different measures do not affect the types of products that may be sold in the U.S. market, nor do they affect the locations or channels of distribution through which the imports may be sold. Simply put, any differences in these Section 232 measures will not result in the imports from different subject countries competing differently in the marketplace.*[57]

This Court should remand this case so that the entire Commission can undertake the type of legally sound analysis that was used by the dissenting Commissioners.

Moreover, the Commission is mistaken when it claims that the dissent's views have "no bearing" on the Court's analysis.[58]  In prior cases, this Court has remanded Commission determinations because the Commission majority's findings were proven unsound by the dissenting Commissioners.  For example, in *Swiff-Train v. United States*, 37 CIT 394, 402-405, 904 F. Supp. 2d 1336, 1343-1347 (2013), the Court remanded the Commission majority's findings on price suppression and impact after approvingly citing the findings of the dissenting Commissioners.  Indeed, the Court specifically directed the Commission to address on remand

---

[56] *Views* at 77-78 (emphasis added).
[57] *Id*.
[58] CB at 29.

the price and impact findings of the dissenting Commissioners.  *Id.*  Similarly, in *Nippon Steel Corporation v. United States*, 391 F. Supp. 2d 1258, 1279-1280 (Ct. Int'l Trade 2005), the Court remanded the Commission's findings on likely volume, noting that the problems with the Commission majority's analysis were "best demonstrated by the dissenting views of Commissioners Okun and Hillman," which the Court recited in detail.

Given these decisions, the dissenting Commissioners' views provide the Court with a relevant and highly illuminating explanation of the reasons that the Commission majority's views are not in accordance with law.

## V. Despite Defendants' Claims, the Commission's Discussion of the Impact of the Section 232 Measures on the Subject Imports Was Inconsistent with Its Prior Determinations

Finally, Defendants assert that Plaintiffs have no basis for claiming that the Commission majority's decision for Brazil was inconsistent with the Commission's prior decisions addressing the impact of the section 232 measures on imports.[59]  Again, Defendants are mistaken.  As Plaintiffs explained,[60] until the Commission issued its decision for Brazil in the underlying reviews, the Commission had consistently found that the existence of section 232 relief would not prevent unfairly traded imports from entering the U.S. market in a manner that would adversely impact the domestic industry:

- In its August 2020 five-year reviews of *Carbon and Certain Alloy Steel Wire Rod from Brazil, Indonesia, Mexico, Moldova, and Trinidad and Tobago*, the Commission found that the section 232 measures would not restrain imports from Brazil.  The Commission explained that the "section 232 tariffs are not likely appreciably to impede increased volumes of cumulated subject imports upon revocation.  Imports from Brazil and Mexico are not currently subject to additional tariffs pursuant to section 232, *although imports from Brazil are currently subject to a quota*."  The Commission added that "the U.S. market is sufficiently attractive to encourage subject producers to again export significant quantities of wire rod in the absence of the antidumping and countervailing

---

[59] CB at 31-34; DIB at 19-24.
[60] PB at 37-40.

duty orders notwithstanding section 232 tariffs."[61]  The Commission cumulated all
subject imports, including those from Brazil.

- In its 2020 reviews of *Non-Oriented Electrical Steel from China, Germany, Japan,
Korea, Sweden, and Taiwan,* the Commission found that "the Section 232 and/or
Section 301 trade actions, though they may well have had some deterrent effect, will
not likely prevent a significant volume of subject imports from entering the U.S. market
in the event of revocation."[62]  Again, the Commission cumulated all subject imports.

- In its August 2022 reviews of *Corrosion-Resistant Steel from China, India, Italy, South
Korea, and Taiwan,* the Commission found that "the United States is a sufficiently
attractive market for CORE such that the section 232 and 301 measures {including
quotas on Korea} will likely not prevent increased volumes of subject imports if the
antidumping and countervailing duties are revoked."[63]  The Commission again
cumulated all subject imports.

- In *Clad Steel Plate from Japan,* the Commission found that "the U.S. market is
sufficiently attractive … to encourage subject producers to again export significant
quantities of clad steel plate in the absence of the antidumping duty order even with the
Section 232 tariffs in place."[64]

- Finally, in *Tin- and Chromium-Coated Steel Sheet from Japan*, the Commission found
that the U.S. market was "sufficiently attractive to encourage Japanese producers to
again export significant quantities of {tin mill products} in the absence of the
antidumping duty order even with the imposition of Section 232 tariffs."[65]

In each of these reviews (three of which addressed the impact of the section 232 measures on the

Commission's cumulation analysis), the Commission took the approach that the Commission

---

[61] *Carbon and Certain Alloy Steel Wire Rod from Brazil, Indonesia, Mexico, Moldova, and
Trinidad and Tobago*, Inv. Nos. 701-TA-417 and 731-TA-953, 957-959, and 961 (Third
Review), USITC Pub. 5100 (Aug. 2020) at 31 & 46, n298 (emphasis added).
[62] *Non-Oriented Electrical Steel from China, Germany, Japan, Korea, Sweden, and Taiwan*, Inv.
Nos. 701-TA-506 & 508 and 731-TA-1238-1243 (Review), USITC Pub. 5140 (Dec. 2020) at 16
& 33, n.189.
[63] *Corrosion-Resistant Steel from China, India, Italy, South Korea, and Taiwan*, Inv. Nos. 701-
TA-534-537 & 731-TA-1274-1278 (Review), USITC Pub. 5337 (August 2022) at 37 & 51.
[64] *Clad Steel Plate from Japan*, Inv. Nos. 731-TA-739 (Fourth Review), USITC Pub. 4851 (Dec.
2018) at 19-20.
[65] *Tin- and Chromium-Coated Steel Sheet from Japan*, Inv. Nos. 731-TA-860 (Third Review),
USITC Pub. 4795 (June 2018) at 21.

should have taken below:  it found that revocation would cause subject imports to have an adverse impact on the domestic industry, even with the section 232 measures in place.[66]

Despite this demonstrated and consistent history, Defendants contend that, prior to the Commission's decision for cold-rolled steel from Brazil, the Commission had not established a "practice" of finding that section 232 measures would not prevent the subject imports from having an adverse impact on the domestic industry after revocation.[67]  Rather, the Commission claims that it addressed this issue differently in each case, which supposedly indicates that the Commission's decisions were "sui generis."[68]

That is clearly not accurate.  These cases demonstrate that, until the decision below, the Commission had historically taken the same approach with respect to the section 232 measures in its analysis.  In these decisions, the Commission found that the U.S. market was "sufficiently attractive" that it would encourage the subject producers to export significant quantities of the subject merchandise to the U.S. market after revocation, even with the 232 measures in place.[69] Given these consistent findings – which reflected the Commission's general approach until it made its decision for the Brazilian imports in the underlying sunset reviews – "a party, in the absence of notification of change, {would} reasonably {} expect adherence to the {Commission's} established practice or procedure."[70]

---

[66] In fact, until the Commission issued its decision for Brazil in the underlying reviews, the only exception to this rule was the Commission's decision finding that the section 232 measures would have an impact on the volumes of the subject imports from Brazil in *Stainless Steel Bar from Brazil, India, Japan, and Spain*, Inv. Nos. 731-TA-678, 679, 681, and 682 (Fourth Review), USITC Pub. 4820 (Sept. 2018).  As Plaintiffs' opening brief discusses, however, there are significant distinctions between the facts in that case and the decision now on appeal.  PB at 40.

[67] CB at 31-34; DIB at 18-23.

[68] CB at 32.

[69] *See, e.g., Carbon and Certain Alloy Steel Wire Rod,* USITC Pub. 5100 at 46 n.298.

[70] *See* CB at 33 (*citing Ranchers-Cattlemen Action Legal Foundation v. United States*, 23 CIT 861, 884-885, 74 F. Supp. 2d 1353, 1374 (1999)).

Moreover, as this Court has stated, "'the Commission may not disregard previous findings of a general nature that bear directly upon the current review.'" *DAK Americas LLC,* 456 F. Supp. 3d 1340, 1354 (Ct. Int'l Trade 2020) (*citations omitted*). Indeed, "if there are distinguishing factors between the prior determinations in question and the instant case, the burden is on the Commission to reasonably address them." *Id.* In the underlying reviews, the Commission adopted an entirely different approach to the section 232 measures than it has in prior cases. And it did so without acknowledgement or explanation. The Court should therefore remand the Commission's negative determination for Brazil with instructions for the Commission to address its departure from its prior decisions addressing the impact of the section 232 measures.

## VI.    CONCLUSION

The Commission majority's decision to exercise its discretion not to cumulate the subject imports from Brazil was inconsistent with the legal principles governing the Commission's cumulation determinations in sunset reviews. It was also inconsistent with the Commission's previous decisions addressing the likely impact of the section 232 measures on subject imports. Moreover, the Commission majority failed to discuss critical record evidence provided by Plaintiffs relating to this issue. Finally, the Commission's failure to address these issues violates one of its fundamental obligations under the statute – the need to provide a reasoned explanation of its findings on pertinent legal and factual matters.

Given these errors, Plaintiffs respectfully request that the Court find that the Commission's determination for Brazil was unsupported by substantial evidence and otherwise not in accordance with law. Accordingly, the Court should remand this matter to the Commission so that it can issue a revised determination on remand that is in accordance with law

and supported by substantial evidence.

Respectfully submitted,

*/s/ Stephen P. Vaughn*
Stephen P. Vaughn, Esq.
Neal J. Reynolds, Esq.

**KING & SPALDING LLP**

*Counsel to Cleveland-Cliffs Inc.*

*/s/ Christopher B. Weld*
Alan H. Price, Esq.
Christopher B. Weld, Esq.

**WILEY REIN LLP**

*Counsel to Nucor Corporation*

*/s/ Jeffrey D. Gerrish*
Roger B. Schagrin, Esq.
Jeffrey D. Gerrish, Esq.

**SCHAGRIN ASSOCIATES**

*Counsel to Steel Dynamics, Inc.*

*/s/ Sarah E. Shulman*
Thomas M. Beline, Esq.
Sarah E. Shulman, Esq.

**CASSIDY LEVY KENT (USA) LLP**

*Counsel to United States Steel Corporation*

July 31, 2023

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to paragraph 2(B)(2) of the U.S. Court of International Trade's *Standard Chamber Procedures*, the undersigned certifies that this brief complies with the word count limitations set forth in the Court's scheduling order. Exclusive of the exempted portions, as provided in paragraph 2(B)(1), this brief includes **6,958** words. In preparing this certificate, the undersigned has relied upon the word count feature of the word-processing system used to prepare this submission.

*/s/ Stephen P. Vaughn*
Stephen P. Vaughn, Esq.

**KING & SPALDING LLP**

*Counsel to Cleveland-Cliffs Inc.*

July 31, 2023