# UNITED STATES COURT OF INTERNATIONAL TRADE
# BEFORE THE GARY S. KATZMANN, JUDGE

|  |  |
|---|---|
| CLEVELAND-CLIFFS INC., <br>    Plaintiff, <br><br> NUCOR CORPORATION, STEEL DYNAMICS, INC., UNITED STATES STEEL CORPORATION, <br>    Plaintiff-Intervenors <br><br> v. <br><br> UNITED STATES, <br>    Defendant, <br><br> and <br><br> COMPANHIA SIDERÚRGICA NACIONAL S.A., COMPANHIA SIDERÚRGICA NACIONAL, LLC, USINAS SIDERURGICAS DE MINAS GERAIS S.A. USIMINAS <br>    Defendant-Intervenors. | Court No. 22-00257 |

## DEFENDANT-INTERVENORS' RESPONSE TO THE COURT'S QUESTIONS FOR ORAL ARGUMENT

Craig A. Lewis
Michael G. Jacobson

HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
202-637-5600

*Counsel to Companhia Siderúrgica Nacional S.A.*

Lian Yang
Lucas A. Queiroz Pires

ALSTON & BIRD LLP
The Atlantic Building
950 F Street, NW
Washington, DC 20004
202-239-3300

*Counsel to USIMINAS*

November 6, 2023

1. **In arguing that the ITC's determination is supported by substantial evidence, Defendant-Intervenors cite evidence that the quota imposed on Brazil has impeded producers from making sales of a certain size and has caused them to shift focus to limited sales on specialty and value-added product categories instead. Def.-Inters.' Br. at 14, June 27, 2023, ECF No. 49. Identify where this evidence is referenced in the ITC's decision not to cumulate Brazil's imports.**

    **a. If such reasoning appears only in the likely material injury analysis section, see Views at 73–74, why should the court infer that the ITC relied on unarticulated reasoning in its cumulation decision?**

This Court, affirmed by the Federal Circuit, has made clear that the Commission is presumed to have considered the entire record absent evidence to the contrary. *Torrington Co. v. United States*, 16 C.I.T. 220, 790 F. Supp. 1161 (1992) ("the fact that certain information is not discussed in a Commission determination does not establish that the Commission failed to consider that information"), aff'd, 991 F.2d 809 (Fed. Cir. 1993)*; Nippon Steel Corp. v. United States*, 19 C.I.T. 450. Slip Op. 95-57 at 39-40 (Apr. 3, 1995). As discussed below, extensive record evidence supports that the quota caused imports from Brazil to shift toward specialty and value-added products at small volumes. As such, whether specifically articulated or not, this evidence forms a part of the record that the Court must presume was considered by the Commission in making its cumulation determination.

That legal presumption is warranted. Viewed in the context of the extensive evidence that was presented to the Commission on this subject, the Commission's written cumulation analysis evidences that the Commission considered the impact of the absolute quota in shifting imports from Brazil into more limited volumes of specialty and value-added products in its cumulation decision. The Commission found that "the absolute quota on imports from Brazil is a relevant likely condition of competition affecting their ability to supply and compete in the U.S. market," Views at 42; fn. 298, and that "subject imports from other countries are in a position to compete for much larger volumes of sales than any of the subject producers in Brazil which must share the

quota limits." *Id*. at 44. The Commission also made findings about the volumes of sales that "subject ***producers*** in Brazil" are able to compete for, given the quota limits, citing to Brazilian producers' questionnaires. *Id*. (emphasis added). The Commission therefore undoubtedly evaluated the impact of the quota on a producer level.

The extensive evidence on the record the Commission is deemed to have considered shows that the quota impedes Brazilian producers from making sales of a certain volume, causing them to shift focus to limited sales on specialty and value-added product categories. For instance, the record demonstrates that Brazilian producers had no incentive to price aggressively to win sales and market share when selling under a restrictive quota; instead, Brazilian producers would likely seek to maximize profits on limited volumes. CSN and USIMINAS Joint Prehearing Br. at 22-23; fn. 86, PR 180, CR 223 (citing USIMINAS questionnaire response at III-6, CR 36). Defendant-Intervenors' representatives declared that "the limitations imposed by quota – particularly a quota as small as that imposed on imports of CRS from Brazil – also tends to force exporters to focus their sales on smaller volume and higher-priced specialty products." CSN and USIMINAS Joint Posthearing Br. at Exhibit 6, Delgado Declaration, and at Attachment I at 43; PR 220. CSN's witness further testified to the Commission that:

> The U.S. market is a managed quota and tariff system where the government is either blocking imports, limiting their quantity, or is determining on a case-by-case basis whether to allow products into the marketplace, and as with any managed quota system, this is forcing foreign suppliers to concentrate their limited sales in specialty and value-added product categories that justify the lower sales volume. That's where we see CSN playing in the market, if at all, for the foreseeable future.

Hearing Transcript at 180 (Richardson), PR 227.

The record clearly evidences Brazilian producers' shift toward smaller volume sales of value-added products in response to the quota, and this was clearly interwoven with, and a part of,

the Commission's articulated consideration of the impact of the absolute quota on the volume and nature of subject imports from Brazil in its cumulation decision.

2. **The ITC majority appears to rely on four pieces of evidence in its conditions-of competition analysis: (1) different constraints on Brazil's volume of imports than other subject import sources; (2) differences in export-orientation between Brazil and South Korea; (3) differences in production capacity between South Korea and Brazil; and (4) differences in market presence between Brazil and South Korea during the period of review. Views at 43–44. Where in the majority's cumulation reasoning is it explained how these factors cause Brazilian CRS to compete differently with subject imports of other countries?**

When the Commission evaluates conditions of competition and compares imports from different countries with respect to those conditions, the Commission is evaluating whether there are "conditions" (legal, economic, technological, etc.) that differ between sources of imports that bear differently upon or impact the ability and/or incentives for producers in the subject countries to compete in the U.S. market. By definition, conditions of competition demonstrate how products compete in a market, and differences in those conditions of competition show that products from different sources compete differently.

The Commission appropriately compared conditions of competition of imports from Brazil with conditions of competition of the other subject countries across multiple factors to find that imports from Brazil can be expected to compete differently than the other subject imports. Views at 41-45. The Commission began by explaining that "subject imports from Brazil would not be likely to compete under similar conditions of competition with subject imports from the remaining subject countries in the event of revocation given the distinguishing circumstances of the Section 232 measures with respect to CRS from Brazil" and then provides detailed explanation contrasting how imports from Brazil compete with imports from the other subject countries on the basis of several different conditions of competition. For example:

- The Commission compared the existence of the absolute quota for imports from Brazil, which is different than all other sources of subject imports but for imports from Korea,

3

- and restricts Brazil's ability to compete with larger volumes as compared with other subject sources of imports. Views at 42.

- The Commission compared imports from producers from other subject countries which "are in a position to compete for much larger volumes of sales than any of the subject producers in Brazil which must share the quota limit," Views at 44, and in contrast to Brazilian producers "each of these subject countries has shown a demonstrated interest and incentive to compete in the U.S. market, an ability to compete in the U.S. market in large volumes given their significant production capacity and nature of section 232 measures, and export substantial volumes of cold-rolled steel." Views at 45.

- The Commission compared the very small cap for imports from Brazil under the absolute quota with the larger cap for imports from Korea by contrasting specific import data going back to 2018. Views at 42-3.

- The Commission compared the import volumes from Korea with the import volumes from Brazil as a percentage of the fill of the quota and in terms of their past presence in the U.S. market. *Id.*

- The Commission compared the export orientation of the Brazilian and Korean industries, citing the relevant comparison data. Views at 43, fn.307.

- The Commission compared Brazilian production with the higher Korean production: "the Brazilian industry has substantially less production than the South Korean industry." *Id.*

3. **Defendant-Intervenors argue that the ITC may avoid the circularity problem if the same factors are analyzed in the cumulation analysis as in the likely material injury analysis, provided the factors are analyzed for different purposes. See Def.-Inters.' Br. at 10 (citing Neenah Foundry Co. v. United States, 25 CIT 702, 711, 155 F. Supp. 2d 766, 774 (2001)). Assuming Plaintiffs are correct in asserting that the ITC relied solely on absolute likely volumes in comparing Brazil to India, China, Japan, and the U.K., what difference is there between the purpose served by absolute likely volume in the cumulation analysis and the purpose served later in the likely material injury analysis?**

The Commission relied upon the absolute quota on imports from Brazil and its effects for different purposes in (1) its cumulation determination and then, subsequently, (2) in its injury determination for Brazil. This stems from the fact that the Commission's cumulation analysis is governed by a different legal standard than the Commission's injury analysis.

For purposes of ***cumulation***, the Commission conducts a ***comparative analysis*** to assess differences (if any) in conditions of competition between different subject country sources of imports that are likely to impact the ability and/or incentives for subject exporters to compete in the market if the orders are revoked.

The presence, nature, and size of quota measures under Section 232, and the other factors considered by the Commission majority, are clearly such conditions of competition. These factors demonstrate differences that support the Commission's decision not to cumulate imports from Brazil.

In contrast, for purposes of the likely injury analysis, the Commission assesses the ***potential impact caused by*** subject imports on the U.S. market and domestic industry. In that separate context and for that specific purpose, the likely tiny volume and high pricing of the decumulated imports from Brazil were evaluated for their likely impact on domestic prices and domestic producer performance.

Consistently, the *Neenah* court explains that the same factor can be used for one purpose in the cumulation analysis and a different purpose in the injury analysis and therefore is not impermissibly circular:

> While import trends will therefore play a role in both causation and cumulation analyses in sunset reviews, ***such trends are considered for different purposes, and, despite plaintiffs' arguments to the contrary, the problem of circularity is avoided***. For example, in a discretionary cumulation inquiry, the ITC examines ***differences*** in current or likely volume or market-share trends between exporting countries, which would justify a decision not to exercise such discretion according to the aforementioned caselaw. However, in the likelihood determination, the ITC must then use trends to consider whether the likely volume of imports of the subject merchandise would be significant if the order is revoked or the suspended investigation is terminated, either in absolute terms or relative to production or consumption in the United States.

5

> ***The consideration of trends in re cumulation is not the equivalent of an injury analysis thereof***. For example, in a case where exports from only one country are likely to exhibit increased volume and price effects in the event of revocation, but trends for imports from each of the other countries under an ITA order are likely to be negligible, the ITC would be justified in deciding not to cumulate imports from the first country with those from the others. However, cumulation of imports from the countries with relatively-small likely volume and price impact would not only be appropriate, a refusal to do so without some additional justification could constitute an abuse of discretion. Thus, ***a comparison of trends does not, as the plaintiffs assert, ask the ultimate, individual-country causation question as a predicate to cumulation "in a way that precludes consideration of this question on a cumulative basis***.

*Neenah,* 155 F. Supp. 2d at 774 (emphases added). *See also Allegheny* at 1378-9 (citing favorably to *Neenah*) ("where there was an overlap in the trend analyses used, the ITC utilized the information for different purposes in accordance with the standard articulated in *Neenah*.")

In the current case the Commission also compared the conditions of competition for imports from Brazil with imports from other countries in its cumulation analysis, and then after appropriately decumulating imports from Brazil, analyzed whether imports from Brazil would be likely to cause injury. After several pages of analysis, the Commission concluded on volume effects that several factors would cause imports from Brazil not to be significant upon revocation, the small expected volumes likely will not have negative price effects for reasons not limited to the quota, and that because the domestic industry is not in a vulnerable condition, together with the negative findings on volume and price, that imports from Brazil would not likely cause a significant impact on the domestic industry. Views at 73.

On these bases, the Commission's separate analyses for cumulation and injury for Brazil fall squarely within the *Neenah* court's explanation.

4. **Do the parties disagree on the scope of discretion afforded to the ITC in cumulation analysis under 19 U.S.C. § 1675a(a)(7)? See Def.'s Br. at 9–10. If so, does Chevron doctrine apply to the ITC's interpretation?**

There is no valid basis for disagreement among the parties on the scope of the broad discretion afforded to the Commission on cumulation in sunset reviews. This Court has stated that "{t}he cumulation statute does not require that the Commission consider any particular factors . . . in determining whether it will exercise its discretion to cumulate" and "precedent affirms that the ITC 'has wide latitude in selecting the types of factors it considers relevant in undertaking its cumulation analysis.'" *Nucor Corp. v. United States*, 594 F. Supp. 2d 1320, at 1350-51 (CIT 2008). The Federal Circuit confirmed that the Commission could consider differing conditions of competition in its decision not to cumulate under a reasonable interpretation of the statute, reaching the second step in the Chevron analysis. *Nucor Corp. v. United States*, 601 F.3d 1291, 1293 (Fed. Cir. 2010).

Plaintiffs and the Commission agree that the governing statute grants the Commission wide discretion to determine whether to cumulate in sunset reviews. *See, e.g.,* Defendant's Br. at 9-10, Plaintiffs' Br. at 19. The statute does not enumerate what factors the Commission should consider. *Usinor Industrial, S.A. v. United States*, 26 CIT 467, 476 (2002). Plaintiffs specifically acknowledge that the Commission may address differences in product mix, volume, price, and other trends when exercising this discretion. Plaintiff's Reply Brief at 3.

While a *Chevron* analysis is unnecessary in this case, if the Court engages in one, the Commission should be granted wide deference in its interpretation of the statute in the cumulation analysis. *See Allegheny* 1370, 1375 (stating that in reviewing any agency's construction of a statute, the court applies the *Chevron* two-prong analysis and the agency's construction need not be the only reasonable interpretation or even the most reasonable interpretation). Under *Chevron*, the agency's interpretation is owed deference because Congress has not directly spoken to the

precise question. *See, e.g., Dongbu Steel Co., Ltd. v. United States*, 635 F.3d 1363, 1369 (Fed. Circ. 2012). *Chevron* asks only "whether the agency responsible for filling a gap in the statute has rendered an interpretation that 'is based on a permissible construction of the statute.'" *Id. (citing Chevron)*. This question is evaluated on a standard of "arbitrary, capricious, or manifestly contrary to the statute." *Chevron,* 467 U.S. at 844, 104 S.Ct. 2778.

5. **Defendant-Intervenors argue that the prohibition on circularity opposed by Plaintiffs "is itself dubious." Def.-Inters.' Br. at 8. How do Defendant-Intervenors respond to the argument that, although the ITC's decisions were not overturned in Allegheny, Nucor, and Neenah, all three cases affirmed the existence of the prohibition by holding that the ITC had not run afoul of it?**

    a. **How do Defendant-Intervenors respond to the argument that this court's prohibition on circularity predates the addition of sunset reviews to the Trade Agreements Act in 1994? See, e.g., USX Corp. v. United States, 11 CIT 82, 87–88, 655 F. Supp. 487, 493 (1987) (reversing the ITC in part due to the reliance of two Commissioners on "a process of circular reasoning that renders cumulation a vestigial part of the causation analysis"); see also Neenah, 25 CIT at 709, 155 F. Supp. 2d at 771 (recounting legislative history and prior treatment by courts).**

Plaintiffs ask this Court to apply a broad "circularity" test that does not exist in the statue, the legislative history, or in any case. For the Commission to make an impermissibly circular determination, it must conflate the cumulation and injury determinations. *See Allegheny* at 1379 ("the Commission did not consider ***identical factors*** in making the two determinations . . .") (emphasis added). As explained above, nothing of the sort happened here.

The findings of the *USX* court, and the Commission determination in that case, further support that the type of "circularity" that was of concern in prior cases is highly particular and rarely encountered – i.e., a situation where there is no separate evaluation of the factors for purposes of cumulation and likelihood of injury. In that case, the Commission went through its injury and threat of injury analysis, and made its injury and threat of injury determination, ***prior to***

making its cursory and summary determination on cumulation. The findings on cumulation in that case were utterly conclusory:

> We have determined that cumulation of imports is not appropriate in this investigation. Therefore, based on the information discussed above, we find that although the domestic industry continues to suffer injury, no material injury has been caused or is threatened by the LTFV imports from Argentina whose import penetration is relatively small and stable.

*See* USITC Pub. 1637, Jan. 1985 at 8.

The *USX* court explains that the Commission cannot "create{} a process of circular reasoning that renders cumulation a vestigial part of the causation analysis" and that it cannot find "independent causation of material injury to be demonstrated before cumulation may be used to analyze causation." *See USX v. United States*, 655 F.Supp.487, 493 Ct. Int'l. Trade (February 9, 1987). The *USX* court on appeal after remand again addressed the issue of circularity: "A decision to cumulate cannot be predicated on a determination that imports from a particular source are by themselves a cause of material injury." *See USX v. United States*, 682 F.Supp.60, 73, Ct. Int'l. Trade (March 15, 1988) (citing to *Fundicao Tupy S.A., et al. v. United States,* 12 CIT ——, Slip Op. 88–3, at 7 (Jan. 12, 1988)). In other words, the Court explained that cumulation determinations must be made first, and separately, from the injury findings. The *Neenah* court recounts these cases, and legislative history, to explain that the Commission cannot "rely on coincident reasoning in declining to cumulate while reaching a negative material-injury determination . . . ," *See Neenah* at 771, and that Congressional intent is thwarted when the Commission made a finding of "independent causation of material injury ***before*** any consideration of cumulation." *See Neenah* at 772 (emphasis added).

That is not what happened here. The Commission ***first*** made its findings on cumulation on a comparative basis, supported by several pages of factual analysis, of how imports from Brazil

9

to compete under different conditions of competition than imports from the other five subject countries. Only after making its determination not to cumulate imports from Brazil, did the Commission *then* assess these and other factors in relation to the possibility of a continuation or recurrence of material injury on the U.S. industry caused by imports from Brazil alone. In doing so, the Commission conducted several pages of additional factual analysis, which was again appropriately separate and distinct from its cumulation analysis, and made a negative determination on the basis of several factors. The Commission did not in any way conflate the cumulation and injury analyses in a manner that "renders cumulation a vestigial part of the causation analysis."

6. **What authorities best support your overall argument?**

- 19 U.S.C. § 1675a(a)(7), which grants the Commission discretion to determine cumulation.

- The three primary cases relied upon by Plaintiffs all reaffirm the Commission's broad discretion. *See Nucor* at 1369; *Neenah* at 774; *Allegheny* at 1379.

- Additional case law confirming the Commission's discretion and dismissing challenges to its exercising of its authority:

    - *U.S. Steel Corp. v. United States*, 36 CIT 1172, 1174-78, 856 F. Supp. 2d 1318, 1322-24 (2012);

    - *U.S. Steel Corp. v. United States,* 32 CIT 832, 572 F. Supp. 2d 1334 (2008);

    - *Domestic Uranium Producers*, 25 CIT at 1014, 162 F. Supp. 2d at 654;

    - *US Magnesium LLC v. United States,* 36 CIT 690, 694-96 (2012);

    - *Olin Corporation-Brass Group v. United States,* 28 CIT 29, 33-34 (2004).

7. **Are there any recent or pending Federal Circuit or CIT cases that may affect the court's analysis?**

Defendant-Intervenors reviewed all recent and pending cases from this Court and the Federal Circuit and did not find any in which the Court overturned the Commission's discretion to decumulate in a sunset review on the basis of "not in accordance with law". Other than the two

cases brought by Plaintiff involving hot-rolled steel (22-355) and CTL plate (23-050), there are six ongoing cases (23-157, 23-158, 23-002, 22-346, 21-562, 21-288) from this Court reviewing a Commission decision involving cumulation, but none of them involve a decision not to cumulate.

Plaintiffs have not pointed to any case where the Commission exceeded its discretion to decumulate in a sunset review on the basis of "not in accordance with law."

Respectfully submitted,

| | |
|---|---|
| */s/ Craig A. Lewis* | */s/* **Lian Yang** |
| Craig A. Lewis | Lian Yang |
| Michael G. Jacobson | Lucas A. Queiroz Pires |
| | |
| HOGAN LOVELLS US LLP | ALSTON & BIRD LLP |
| Columbia Square | The Atlantic Building |
| 555 Thirteenth Street, NW | 950 F Street, NW |
| Washington, DC 20004 | Washington, DC 20004 |
| 202-637-5600 | 202-239-3300 |
| | |
| *Counsel to Companhia Siderúrgica Nacional S.A.* | *Counsel to USIMINAS* |

Dated: November 6, 2023

# CERTIFICATE OF COMPLIANCE

The undersigned counsel certify that this brief includes 2,997 words, exclusive of the Court's questions and the exempted portions, as provided in paragraph 2(B)(1) of the Court's Standard Chambers Procedures. In preparing this certificate, the undersigned has relied upon the word count feature of the word-processing system used to prepare the submission.

Dated: November 6, 2023

| | |
|---|---|
| */s/* Craig A. Lewis | */s/* Lian Yang |
| Craig A. Lewis | Lian Yang |
| Michael G. Jacobson | Lucas A. Queiroz Pires |
| | |
| HOGAN LOVELLS US LLP | ALSTON & BIRD LLP |
| Columbia Square | The Atlantic Building |
| 555 Thirteenth Street, NW | 950 F Street, NW |
| Washington, DC  20004 | Washington, DC 20004 |
| 202-637-5600 | 202-239-3300 |
| | |
| *Counsel to Companhia Siderúrgica Nacional S.A.* | *Counsel to USIMINAS* |