# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| **CLEVELAND-CLIFFS INC.** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Court No. 22-00257 |
| ) | |
| **UNITED STATES,** ) | |
| ) | |
| Defendant. ) | |
| ) | |

## RESPONSE TO THE COURT'S QUESTIONS
## FOR ORAL ARGUMENT

Stephen P. Vaughn, Esq.
Neal J. Reynolds, Esq.
Nicholas Paster, Esq.
**KING & SPALDING LLP**
1700 Pennsylvania Ave., NW
Washington, DC 20006
(202) 737-0500

*Counsel to Cleveland-Cliffs Inc.*

Alan H. Price, Esq.
Christopher B. Weld, Esq.
**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Nucor Corporation*

November 6, 2023

Roger B. Schagrin, Esq.
Jeffrey D. Gerrish, Esq.
**SCHAGRIN ASSOCIATES**
900 Seventh Street, NW
Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel to Steel Dynamics, Inc.*

Thomas M. Beline, Esq.
Sarah E. Shulman, Esq.
**CASSIDY LEVY KENT (USA) LLP**
900 19th Street, NW
Suite 400
Washington, DC 20006
(202) 567-2316

*Counsel to United States Steel Corporation*

**Questions for Plaintiffs[1]**

1. **What is the meaning and significance of "circularity?"  What is "circular" about the ITC's consideration of likely absolute volume in both its conditions of competition analysis and its injury determination? What authority renders this circularity impermissible?**

**Response:**   The Court of International Trade has used the term "circularity" to describe a legal error that renders impermissible the Commission's decision not to cumulate certain subject imports in a sunset review.  The Court has explained that this legal error occurs when the Commission incorrectly chooses to treat a factor that properly belongs in its likely injury analysis (such as a finding that subject imports from a specific country are likely to be sold in small volumes) as a condition of competition that distinguishes these subject imports from the other subject imports and warrants their de-cumulation.  *See, e.g., Neenah Foundry Co. v. United States,* 25 CIT 702, 155 F. Supp. 2d 766, 772 (2001).

According to the Court, this type of analysis constitutes legal error because it conflicts with the policy underlying the statute's cumulation provisions.  *Id*.  As Congress has explained, cumulation is designed to address a situation in which imports from multiple countries combine to "ha{ve} a 'hammering effect' on the domestic industry...'"  H.R. Rep. No. 100-40, part 1, at 130 (1987).  Accordingly, Congress has authorized the Commission to cumulate "{i}mports from various countries *that each account individually for a very small percentage of total market penetration, but when combined may cause material injury*."  H.R. Rep. No. 98-725, p. 37 (1984) (emphasis added).

Given these statements, the Court has explained that, when the Commission exercises its discretion not to cumulate the subject imports in a sunset review, it may not "rely{}on the same factors for {a} refusal to cumulate as for an ultimate negative injury determination."  *Neenah*

---

[1] We refer to Plaintiffs and Plaintiff-Intervenors throughout these responses as "Plaintiffs."

*Foundry,* 155 F. Supp. 2d at 772; *see also Allegheny Ludlum Corp. v. United States*, 30 C.I.T. 1995, 475 F. Supp. 2d 1370, 1376 (Ct. Int'l Trade 2006); *Nucor Corp. v. United States*, 33 CIT 57, 605 F. Supp. 2d 1361, 1369-70 (Ct. Int'l Trade 2009). According to the Court, this type of approach is "impermissibly circular" because it requires petitioners to show a "demonstrated, independent causation of material injury {by imports from an individual country} before any consideration of cumulation," thereby "render{ing} cumulation a vestigial part of the causation analysis." *Neenah Foundry*, 155 F. Supp. 2d at 772 (citation omitted). Accordingly, the Court has stated that the Commission may not rely solely on the likely volume or market share of the subject imports when assessing whether to exercise its discretion to cumulate imports. *Id.*; *Allegheny Ludlum*, 475 F. Supp. 2d at 1376; *Nucor*, 605 F. Supp. 2d at 1369-70.

Importantly, the Commission has plainly acknowledged that it may not perform this type of "circular" cumulation analysis. In *Polyethylene Retail Carrier Bags from China, Malaysia, and Thailand*, the Commission stated that its "reviewing courts have rejected the notion that the Commission may engage in a 'circular analysis, relying on the same factors to refuse to cumulate {in a sunset review} as for an ultimate negative injury determination,' *such as volume or market share alone*."[2] In other words, the Commission itself has conceded that it may not rely solely on likely volumes or market share when assessing whether to cumulate certain imports.

Unfortunately, in the underlying review, the Commission performed the very type of "circular" analysis that this Court has found to be impermissible. As explained in our briefs, when deciding that Brazil should not be cumulated with the other subject imports, the Commission relied on differences in the likely volumes and market share between Brazil and the

---

[2] *Polyethylene Retail Carrier Bags from China, Malaysia, and Thailand*, Inv. Nos. 731-TA-1043-1045, USITC Pub. 4160 (June 2010) (Review) at 18, n. 109 (emphasis added) (citing *Neenah*, *Allegheny Ludlum*, and *Nucor*).

other subject countries as the determining factor in its analysis. Plaintiffs' Brief at 25-31; Plaintiffs Reply Brief at 6-13. The Commission's analysis clearly violated the principles articulated in *Neenah*, *Allegheny Ludlum,* and *Nucor* and should be remanded for reconsideration.

2. **Plaintiffs argue that Korea and Brazil both have production capacity to amply increase their exports of cold-rolled steel ("CRS") to the United States in the event of revocation. Pls.' Br. at 30, Mar. 16, 2023, ECF No. 44. Why does evidence of production capacity compel a finding of "incentive" as well as "ability" in Brazil— particularly considering the ITC's reasoning that the low-volume quota on Brazil has uniquely impacted its incentive to compete in the domestic market? See Cold- Rolled Steel Flat Products from Brazil, China, India, Japan, South Korea, and the United Kingdom at 71–74, Inv. Nos. 701-TA-540-543 & 731-TA-1283-1287 (Review), USITC Pub. 5339 (Aug. 2022), P.R. 300 ("Views").**

**Response:** The production process for cold-rolled steel is a [


]³ Accordingly, steel producers must operate at high rates of capacity utilization to keep their per-unit costs at sustainable levels. This incentive to maintain high rates of capacity utilization encourages subject producers of cold-rolled steel - including the Brazilian producers - to produce and ship as much cold-rolled steel as they can so that they can maintain high capacity utilization rates and reduce their fixed unit costs.

During the period of review, the Brazilian producers had [              ] unused capacity that could have been used to increase their U.S. shipments. The Brazilian producers had a total capacity of [            ] short tons in 2021 but operated at [   ] capacity utilization rates throughout the period of review, with their capacity utilization rates ranging from [  ]

---

³ *Views* at Table III-24 (showing that the domestic industry had $6.92 billion in assets in 2021).

percent in 2016 to [  ] percent in 2021. In 2021, for example the Brazilian industry had [                              ] unused capacity.[4]

The existence of this [              ] unused capacity provides the Brazilian industry with an incentive to produce and ship additional volumes of cold-rolled steel to the U.S. market upon revocation of the Brazilian order so they can fill the existing quota on the Brazilian imports. The Brazilian order has kept the Brazilian imports at low volumes since 2016 and revocation of the order would allow Brazil to use its excess capacity to fill the quota. Indeed, the Commission's Final Staff Report states that "producers of cold-rolled steel from Brazil have the ability to respond to changes in demand with at least moderate-to-large changes in the quantity of shipments to the U.S. market," even with the Brazilian quota in place.[5]

3. **Assume that the ITC's cumulation analysis could be broken into two parts: (1) Brazil compared to India, China, Japan, and the U.K.; (2) Brazil compared to South Korea. Does reliance on absolute likely volumes in one part but not the other render the entire determination not in accordance with law under the prohibition against circularity?**

**Response:** Yes. In both parts of its analysis, the Commission relied on the likely volumes of the subject imports from Brazil and the other subject countries as the determining factor in its cumulation analysis. The Court should therefore remand the Commission's entire analysis to the Commission so that it can reconsider its decision and perform a legally sound analysis.

It is possible that, in theory, the Court could affirm one part of the Commission's analysis (such as the part addressing the imports from Brazil and imports from China, India, Japan, and the United Kingdom) but remand the other part (the part addressing Brazilian and Korean

---

[4] Confidential Report at Table IV-12, CJA Tab 3.
[5] *Views* at II-12-13.

imports) for reconsideration. Such an approach would, in our view, be unwarranted because the Commission's entire analysis is flawed as a matter of law.

4. **Do the parties disagree on the scope of discretion afforded to the ITC in cumulation analysis under 19 U.S.C. § 1675a(a)(7)? See Def.'s Br. at 9–10, June 13, 2023, ECF No. 46.  If so, does Chevron doctrine apply to the ITC's interpretation?**

**Response:**   Yes, the parties disagree about the degree of deference to be afforded the Commission's analysis.  As Plaintiffs explained in our briefs, the Court has stated that the Commission has "wide latitude" when deciding whether to exercise its discretion to cumulate the subject imports in a sunset review.  *Allegheny Ludlum* 475 F. Supp. 2d at 1380.  Importantly, though, the Court has stated that this discretion is "*not unfettered, and the Commission's exercise of discretion must be predicated upon a judgment anchored in the language and spirit of the relevant statutes and regulations*."  *Allegheny Ludlum*, 475 F. Supp. 2d at 1376.

We accurately described these basic principles in our briefs.  Nonetheless, the Commission asserts that "the statute and case law provide the Commission *far more discretion* in determining whether to cumulate subject imports in a five-year review *than Plaintiffs contend*." Defendant's Brief at 12.  Because our description of the level of deference afforded the Commission's analysis accurately reflects the Court's statements, the Commission has no basis for claiming that it has "far more discretion" than we described.  Similarly, Defendant-Intervenors assert that the statute provides the Commission with "*very* wide latitude" with respect to its cumulation analysis. Defendant-Intervenors' Brief at 1-2.  While the Courts have stated that the Commission has "wide latitude" with respect to the exercise of its discretion, the Courts have not stated that the Commission has "*very* wide latitude" with respect to its cumulation analysis.

NON-CONFIDENTIAL

The Court should reject the attempts by the Commission and the Defendant-Intervenors to expand the deference that the Commission is owed by the Court. Instead, the Court should apply the proper level of deference set forth in *Neenah Foundry*, *Allegheny Ludlum,* and *Nucor,* and assess whether the Commission's analysis was consistent with the principles outlined in those cases.

Finally, we note that the Court's decisions in *Neenah Foundry*, *Allegheny Ludlum*, and *Nucor* are consistent with the principles set forth in *Chevron USA, Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842-843 (1984). Under *Chevron*, when reviewing an agency's interpretation of a statute that it administers, the Court must first assess whether "Congress has directly spoke to the precise question at issue." If so, it "must give effect to the unambiguously expressed intent of Congress." *Id*. If Congress has not spoken directly on the issue presented, the Court must then assess whether the agency's interpretation "is based on a permissible construction of the statute." *Id*. In *Neenah*, the Court began its analysis by citing *Chevron*'s two-step analysis, making clear that its analysis of the "circularity" issue was founded on the principles articulated by the Supreme Court in *Chevron*. Given this, the Court's statements in *Neenah* (and its subsequent holdings in *Allegheny* and *Nucor*) are fully consistent with the principles outlined in *Chevron*.

5. **Plaintiffs argue that the ITC's treatment of Section 232 measures in its instant decision is a departure from an alleged pattern of practice, in which the ITC has consistently found that Section 232 trade restrictions would likely not deter unfairly traded imports from entering the domestic market in a manner that would impact the industry. Why do the ITC's prior findings suggest a general legal principle, as opposed to representing the results of case-specific factual inquiries?**

    a. **The ITC points out that not all the prior ITC determinations to which Plaintiffs cite involve the same kind of Section 232 measures. See, e.g., Non-Oriented Electrical Steel from China, Germany, Japan, Korea, Sweden, and Taiwan, Inv. Nos. 701-TA-506, -508 & 731-TA-1238-1243 (Review), USITC**

6

> Pub. 5140 (Dec. 2020) (involving Section 232 tariffs, not quotas).  How do Plaintiffs respond?

**Response:**  Before issuing its decision for Brazil in the underlying reviews, the Commission found in several prior sunset reviews that the Section 232 measures -- whether in the form of a quota, a tariff-rate quota or a tariff -- would not prevent the subject merchandise from entering the U.S. market after revocation.  In these cases, the Commission had consistently found that the U.S. market was "sufficiently attractive" that it would encourage the subject producers to export significant quantities of the subject merchandise to the U.S. market after revocation, even with the Section 232 measures in place.  Plaintiffs' Reply Brief at 20-21.

Given these consistent prior findings, the Commission should have explained why it chose to depart from them in the underlying review.  As this Court has stated, "'the Commission may not disregard previous findings of a general nature that bear directly upon the current review,'" and "if there are distinguishing factors between the prior determinations in question and the instant case, the burden is on the Commission to reasonably address them." *DAK Americas LLC,* 456 F. Supp. 3d 1340, 1354 (Ct. Int'l Trade 2020) (citations omitted).  Nonetheless, the Commission failed to explain why it took a different approach in its cumulation decision for Brazil.  This failure warrants remand.

> b. How do Plaintiffs respond to the concern that requiring the ITC to justify deviation from prior judgments on the attractiveness of a market relative to Section 232 trade restrictions will result in the ossification of its ability to judge in future scenarios that market conditions have changed?

**Response:**   We are not arguing that the Commission may not depart from an established practice when performing its likely injury analysis.  Instead, we are arguing that, because the Commission departed from a consistent prior practice when assessing the impact of Section 232 measures on the subject imports, the Commission was obligated to explain its departure from that practice.  That basic principle has certainly been recognized by this Court.  *See DAK*

*Americas LLC,* 456 F. Supp. 3d at 1354 (the Commission may not depart from its prior findings without explanation).

      **c. Did the dissenting Commissioners adhere to the agency practice that Plaintiffs assert?  Did their analysis treat the insufficient deterrent effect of the Section 232 measures as a general legal principle or as the result of a case-specific factual inquiry?**

    **Response:**   Yes, the Dissenting Commissioners adhered to the Commission practice relating to the Section 232 measures.  In their views, the Dissenting Commissioners found that, even with the Section 232 measures in place, the Brazilian producers and the other subject producers would all increase their exports to the United States after revocation in a similar manner.  *Id*. at 1 & 3-4.  Obviously, these findings are fully consistent with the Commission's prior decisions addressing the impact of the Section 232 measures on the subject imports after revocation.  Moreover, as discussed below, the Dissenting Commissioners made clear that they believed that their analysis was, unlike the Commission Majority's analysis, consistent with the Commission's prior approach on this issue.

    **6.  How do Plaintiffs respond to the contention that the ITC substantively responded to relevant arguments regarding the continued existence of Section 232 measures on Brazil as required under 19 U.S.C. § 1677f(i)(3)(B) by acknowledging the disagreement between parties and outlining the evidence on which it relied in reaching a contrary conclusion? See Views at 72 & n.487.**

    **Response:**   During the underlying proceeding, Plaintiffs provided the Commission with detailed evidence establishing that the Biden Administration was unlikely to keep the Brazilian quota in place.  Specifically, Plaintiffs showed that the Government of Brazil was putting pressure on the Administration to revise the quotas imposed on Brazilian imports under Section 232 and the Administration had liberalized the Section 232 measures on imports from the

European Union, the United Kingdom, and Japan.[6]  In its opinion, the Commission Majority failed to address this evidence.   Instead, the Commission Majority merely stated that there was "nothing in the record" to suggest that the Brazilian quota would be terminated or revised in the reasonably foreseeable future.[7]  Obviously, this finding is incorrect.  Indeed, Plaintiffs had provided the Commission with ample evidence showing that continuation of the Brazilian quota could not be taken for granted.

Given the probative nature of the evidence submitted by Plaintiffs, the Commission had an obligation to explain why that evidence did not suggest that Brazilian quota would be modified in the foreseeable future.  By not directly discussing this evidence and our arguments on this issue, the Commission failed to address a relevant argument of the parties, as the statute requires it to do.[8]  As this Court has explained, "it does not matter if the arguments of the parties are easily dispensed with or require closer examination, if the Commission does not make its thinking clear.  The Court can only review the reasoning that the Commission expresses."[9]

**7.  Is it Plaintiffs' contention that the ITC had an obligation to address the dissent's analysis and the ITC erred by failing to do so?  See Pls.' Br. at 35. Or is it Plaintiffs' contention that the court ought to look at the dissent as demonstrative of the "type of legally sound analysis that is required"? See Pls.' Reply at 19.**

**Response:**  We are making the latter point.  In their views, the Dissenting Commissioners performed a robust and detailed analysis of the factors that were likely to affect conditions of competition for the Brazilian and other imports after revocation, and correctly concluded that there were no significant differences in the conditions of competition among the subject imports.

---

[6] Post-Hearing Brief of Cleveland-Cliffs at 11-12, & Exhibits 4, 5, 8, 9, 11 and 12, JA Tab 2.
[7] *Views* at 56.
[8] 19 U.S.C. § 1677f(i)(3)(B).
[9] *Altx, Inc. v. United States*, 26 C.I.T. 1425, 1426 (2002) (Ct. Int'l Trade 2002).

The Dissenting Commissioners' analysis provides an example of the type of analysis that the Commission majority should have undertaken but did not.

> **a. Plaintiffs state that the dissent "observed that the Commission majority had committed legal and analytical error in reaching its determination relating to Brazil." Pls.' Reply at 18, July 31, 2023, ECF No. 52 (emphasis added). Is the dissent observing "legal . . . error," or is it merely stating a difference of opinion on what is relevant for a conditions-of-competition analysis?**

**Response:**   In their views, the Dissenting Commissioners did not simply state that they had chosen to rely on a different set of factors than the Commission Majority or weighed the evidence in a different manner.  Instead, they went out of their way to emphasize that they fundamentally disagreed with the entire legal approach taken by the Majority.  Specifically, in their views, they stated that:

> We disagree with the Majority's view that the difference in quota levels between Brazil and Korea constitutes a likely different condition of competition…While one may argue that the difference in quota levels may ultimately have a different impact on the domestic industry (and that is debatable), the difference in quota levels does not lead to the subject imports from Brazil competing differently in the U.S. market than subject imports from South Korea or any other subject country.

Dissent at 4.   Moreover, the Dissenting Commissioners added that:

> The fact that certain imports may be subject to quotas while others may be subject to tariffs or tariff-rate quotas does not affect the conditions of competition facing these imports in the U.S. market, nor does it suggest that the imports would not compete with each other and with the domestic product if the orders were to be revoked…The different measures do not affect the types of products that may be sold in the U.S. market, nor do they affect the locations or channels of distribution through which the imports may be sold. Simply put, any differences in these Section 232 measures will not result in the imports from different subject countries competing differently in the marketplace.[10]

In our view, these pointed criticisms of the Commission Majority's approach – which are unusual in a Commission dissent – do not merely reflect the fact that the Dissenting

---

[10] Dissenting Views at 4-5.

Commissioners weighed the evidence in a different manner than the Majority. Instead, they demonstrate that the Dissent fundamentally disapproved of the approach taken by the Commission Majority with respect to their conditions of competition analysis.

**8. What authorities best support your overall argument?**

**Response:** The authorities that best support our overall argument in this appeal are:

- *Neenah Foundry*, *Allegheny Ludlum*, and *Nucor*. These decisions establish the principle that the Commission may not rely solely on the volume or market share of the subject imports when assessing whether to exercise its discretion not to cumulate subject imports from an individual country in a sunset review.

- *DAK Americas LLC,* 456 F. Supp. 3d 1340, 1354 (Ct. Int'l Trade 2020). *DAK* stands for the proposition that "the Commission may not disregard previous findings of a general nature that bear directly upon the current review" and that the Commission must explain any departure from these findings.

- *Altx*, *Inc. v. United States*, 26 C.I.T. 1425, 1426 (2002) (Ct. Int'l Trade 2002). *Altx* states that the Commission must provide a reasoned analysis of its thinking on an issue. As the Court stated in *Altx,* "it does not matter if the arguments of the parties are easily dispensed with or require closer examination, if the Commission does not make its thinking clear." *Id*.

**9. Are there any recent or pending Federal Circuit or CIT cases that may affect the court's analysis?**

**Response:** To the best of our knowledge, there are no recent or pending Federal Circuit or CIT cases that would directly affect the Court's analysis.

CERTIFICATE OF COMPLIANCE
WITH WORD COUNT LIMITATIONS

Pursuant to the Court's instructions, the undersigned certifies that the responses to the Court's questions in the attached document comply with the word count limitations set forth in the Court's letter dated October 24, 2023. The responses in the attached document contain 2,857 words. In preparing this certificate, the undersigned has relied upon the word count feature of the word-processing system used to prepare the submission.

/s/ Neal J. Reynolds
Neal J. Reynolds
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW,
Washington, DC 20006
(202) 737-0500
*Counsel For Cleveland-Cliffs Inc.*

November 06, 2023