UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

Court No. 22-00257

CLEVELAND-CLIFFS INC.,

*Plaintiff*,

NUCOR CORPORATION, STEEL DYNAMICS, INC.,
UNITED STATES STEEL CORPORATION,

*Plaintiff-Intervenors*,

v.

UNITED STATES,

*Defendant*,

and

COMPANHIA SIDERURGICA NACIONAL S.A., COMPANHIA SIDERURGICA NACIONAL, LLC, USINAS SIDERURGICAS DE MINAS GERAIS S.A. USIMINAS,

*Defendant-Intervenors*.

**DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S ANSWERS TO QUESTIONS FOR ORAL ARGUMENT**

| | |
|---|---|
| **JOHN D. HENDERSON** | **DOMINIC L. BIANCHI** |
| Attorney for Defendant | General Counsel |
| Office of the General Counsel | Telephone (202) 205-3061 |
| U.S. International Trade Commission | |
| 500 E Street, SW | **ANDREA C. CASSON** |
| Washington, DC  20436 | Assistant General |
| Telephone (202) 205-2130 |    Counsel for Litigation |
| Fax (202) 205-3111 | Telephone (202) 205-3105 |

**DATED:  November 6, 2023**

**Questions for Defendant the International Trade Commission ("ITC")**

**Question 1.** *The ITC majority appears to rely on four pieces of evidence in its conditions-of-competition analysis: (1) different constraints on Brazil's volume of imports than other subject import sources; (2) differences in export-orientation between Brazil and South Korea; (3) differences in production capacity between South Korea and Brazil; and (4) differences in market presence between Brazil and South Korea during the period of review. Views at 43–44. Where in the majority's cumulation reasoning is it explained how these factors cause Brazilian CRS to compete differently with subject imports of other countries?*

In finding that each of the four undisputed factors listed above indicated subject imports from Brazil would likely compete under conditions of competition different from other subject imports, the Commission cited multiple evidentiary sources (*e.g.*, questionnaire data, import data, export statistics, industry data supplied by domestic interested parties).

First, the Commission found and explained why the absolute quota on imports from Brazil is a relevant likely condition of competition affecting Brazilian producers' ability to supply and compete in the U.S. market." Nonconfidential Views ("Views") at 41-42 n.298. The Commission discussed the differences it found pertinent in the specifics of the Section 232 measures with respect to imports from each country -- Brazil (absolute quota limit on imports); South Korea (much higher absolute quota limit on imports), China and India (25 percent *ad valorem* tariffs with no quota limits) and Japan and the UK (tariff rate quotas with no absolute cap on the volume of imports). It explained that, unlike all of the other subject countries except South Korea, there was an "absolute cap" on imports from Brazil because of its quota under Section 232. *Id.* at 42.

"{G}iven the distinguishing circumstances of the Section 232 measures with respect to CRS from Brazil," the Commission found and explained why subject imports from Brazil would not be likely to compete under similar conditions of competition with subject imports from all five remaining subject countries, including South Korea. *Id.* In addressing how these differences in Section 232 measures would result in different likely conditions of competition,

1

the Commission explained that subject imports from the other five subject countries were "in a position to compete for much larger volumes of sales than any of the subject producers in Brazil which must share the quota limits," indicating that the low cap on total imports from Brazil would affect the ability of each subject Brazilian producer to compete with imports from the other subject countries. *Id.* at 43-44. The Commission further observed that this quota limit on imports from Brazil (if filled) "would amount to the equivalent of only 0.2 percent of apparent U.S. consumption in 2021." *Id.* at 44.

In addition to discussing the four subject countries without hard cap quotas (China, India, Japan and the UK), the Commission explained why imports from Brazil also would not be likely to compete under similar conditions of competition with imports from South Korea. That is, the quota under Section 232 for imports from South Korea was much higher than the low absolute quota for Brazil, and therefore would permit subject imports from South Korea to compete for much larger volumes of sales than subject imports from Brazil. *Id.* at 43-44.

The Commission additionally explained that several other differences in conditions of competition between the two subject industries further supported the conclusion that subject imports from South Korea would be able to compete for much larger volumes of imports than subject imports from Brazil. Thus, the absolute annual quota on imports from South Korea was almost three times higher than the absolute quota on imports from Brazil, *id.* at 42, and there were significant differences in South Korea's presence in the U.S. market compared to that of Brazil during the period of review, indicative of differences in the ways the products competed. Specifically, the Commission explained that subject imports from South Korea approached their quota limit and maintained a substantial presence in the market, while subject imports from Brazil remained well below their quota limit and were virtually absent from the U.S. market. *Id.*

at 43.  Additionally, the record indicated that the Brazilian industry was less export-oriented than the South Korean industry, and that the Brazilian industry had substantially lower production of CRS during the period of review than the South Korean industry.  *Id.* at 43 n.307.

**Question 2**. *The ITC argues that Plaintiffs have failed to establish a basis for purported agency practice, relying in part on factual distinctions between the prior determinations cited by Plaintiffs and the instant case. At least one case, however, has held that the ITC may not disregard prior "findings of a general nature" without explanation, despite the sui generis nature of ITC reviews. DAK Americas LLC v. United States, 44 CIT __, __, 456 F. Supp. 3d 1340, 1355 (2020). Does the practice that Plaintiffs purport to identify constitute such a general finding?*

Plaintiffs fail to identify any agency practice or finding of a general nature that the Commission supposedly departed from in these reviews.  A Commission action becomes an "agency practice" only when "a uniform and established procedure exists that would lead a party, in the absence of notification of change, reasonably to expect adherence to the established practice or procedure.  *Ranchers-Cattlemen Action Legal Foundation v. United States,* 74 F. Supp. 2d 1353, 1374 (CIT 1999).  Neither Commission determinations in general nor sunset reviews in particular are precedential in nature.  "{T}here is limited precedential value in sunset reviews since each case presents unique interactions of the economic variables the Commission considers."  *Ugine-Savoie Imphy v. United States*, 248 F. Supp.2d 1208, 1220 (CIT 2002).

Plaintiffs (Br. at 37-41) suggest the Commission departed from an alleged prior practice or general finding to the effect that the existence of any section 232 measure, irrespective of the specifics of the measure and the industry affected, would preclude the Commission from finding that the covered imports were non-injurious or would likely compete differently from imports from other countries subject to different measures. The Commission has conducted a limited number of sunset reviews addressing Section 232

3

measures, all of which were imposed during or after 2018, and the Commission's analysis in each of such reviews has depended on the specific products, industries, and countries at issue, the other conditions of competition in those industries, the specifics of the measures, and the arguments made by the parties. The Commission has established no practice or general finding remotely like that advanced by plaintiffs.

As Plaintiffs admit (Br. at 40), in one of the two prior cases they cite involving the Section 232 quota on imports from Brazil, the Commission in fact did not cumulate subject imports from Brazil. In that review (*Stainless Steel Bar*), the Commission did not cumulate imports from Brazil after finding no likely discernible adverse impact in light of the low import levels of the Brazilian product allowed under the Section 232 measure and a related decline in Brazilian market share. Plaintiffs go to great lengths to distinguish the facts in *Stainless Steel Bar* from those in the instant case (*id.*), but their argument only goes to support the conclusion that Commission review determinations are *sui generis*.

Of the other sunset review determinations relied upon by Plaintiffs, two are not relevant because they involved only one country and therefore cumulation was not at issue.[1] Plaintiffs cite two sunset determinations in which the Commission cumulated imports from all subject countries, including South Korea, which was subject to an absolute quota under Section 232 (but a much higher quota than that for Brazil), but in which Brazil was *not* one of the subject countries at issue. *Non-Oriented Electrical Steel*;[2] *Certain Corrosion-Resistant Steel Products* (ReplyBr. at 21). However, the results in those two reviews are consistent with those

---

[1] *Clad Steel Plate from Japan*; *Tin- and Chromium-Coated Steel Sheet from Japan* (cited *in* DefBr. at 32 n.16).
[2] We incorrectly suggested in our brief (at 32) that the *NOES* review did not involve any section 232 absolute quotas. Actually, South Korea, subject to an absolute quota (albeit one much higher than that for Brazil), was a subject country in that review.

in the instant case; in this case, apart from Brazil, the Commission likewise cumulated imports from South Korea with imports from all other subject countries.

Plaintiffs' argument that the Commission departed from a prior practice rests solely on one review, in which the Commission cumulated subject imports from Brazil with the other subject imports notwithstanding the Section 232 quota on imports from Brazil. *Carbon and Certain Alloy Steel Wire Rod* (PlBr. at 39). As we explained (DefBr. at 32), that review concerned a different domestic like product, different domestic industry, different subject countries, and different likely conditions of competition from those the Commission relied on in the instant case.

Notwithstanding Plaintiffs' argument, one case *(Steel Wire Rod)* does not establish a Commission practice, and the opposite result in the *Stainless Steel Bar* review shows there was no Commission practice or finding with respect to the Section 232 quota on imports from Brazil that the Commission departed from in the instant case. Moreover, the Commission in two other recent sunset reviews similarly declined to cumulate imports from Brazil with those from other subject countries, in part because of the absolute quota under Section 232 on imports from Brazil.[3]

Also, this Court rejected a similar argument to that of Plaintiffs regarding "past practice" in *Allegheny Ludlum Corp. v. United States,* 475 F. Supp. 2d 1370, observing that "{e}ach individual sunset determination does not bind the Commission to use those same factors in other determinations," and noting that the plaintiff in that case had only cited "two prior reviews" in support of its unsuccessful argument that the Commission had a "past practice." *Id*. at 1380-81.

---

[3] *Carbon and Alloy Steel Cut-to-Length Plate; Hot-Rolled Steel* (cited *in* DefBr. at 33 n.18).

**Question 3.** *The ITC suggests that it is not required to further explain the relevance of the factors for cumulation analysis that it has selected. See Def.'s Br. at 26–27. How does this assertion square with the requirement that the ITC's decision must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (emphasis added) (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962)).*

As discussed in response to Question 1, the Commission did cogently explain its findings, setting out the supporting evidence and how the factors it examined showed differences between subject imports from Brazil and the other subject imports so as to lead to the conclusion that subject imports from Brazil would likely compete under different conditions of competition than imports from the other subject countries. The Commission's decision thus amply satisfies its obligations under *State Farm*, and stands in sharp contrast to the agency action addressed in *Burlington*, where "[t]here {were} no findings and no analysis ... to justify the choice made, no indication of the basis on which the {Interstate Commerce} Commission exercised its expert discretion." 371 U.S. at 167.

Plaintiffs appear to be arguing that the Commission has an obligation beyond *State Farm* to even "further" explain each individual factor it has examined (ReplyBr. at 11-13), a purported obligation not supported by any case law, and contrary to the many court decisions affirming the Commission in relying on precisely the same kinds of factors in exercising its discretion not to cumulate subject imports from Brazil, including differences in trade restrictive measures, market presence, export-orientation, and production. These decisions (cited on page 17 of our brief) rebut the notion that the Commission cannot rely on such factors without providing the "further" explanation now proposed by Plaintiffs: *Nucor* (differences in market presence and export-orientation); *U.S. Steel* (differences in market presence and export-orientation); *Nucor* (differences in market presence, export-orientation, and production); *U.S. Steel*

6

(differences in market presence and production capabilities; *Nucor* (differences in tariff barriers); *Allegheny Ludlum* (differences in market presence and production capacity); *Domestic Uranium Producers* (differences in trade restricting measures, market presence, and production capacity); *Neenah Foundry* (differences in market presence).  By contrast, Plaintiffs have cited no cases where a court remanded a Commission determination on the basis that the Commission's reliance on these factors required further explanation, and there is no new element in the instant case that would warrant a departure from these past court decisions.

**Question 4.**  *Do the parties disagree on the scope of discretion afforded to the ITC in cumulation analysis under 19 U.S.C. § 1675a(a)(7)? See Def.'s Br. at 9–10. If so, does Chevron doctrine apply to the ITC's interpretation?*

Based on statements in Plaintiffs' opening brief (at 19-21), it appears the parties agree on several basic points with respect to the scope of the Commission's discretion in its cumulation analysis.  Plaintiffs acknowledge that the Commission's determination as to whether to cumulate subject imports from the countries in a five-year review is discretionary.  They acknowledge that in assessing whether to exercise its discretion to cumulate, the Commission assesses whether the subject imports from each of the countries subject to review would likely compete under similar or different conditions of competition.  They acknowledge that the Commission has "wide latitude" in choosing the factors to examine in its conditions of competition analysis.  We agree with these statements.

Whether or not the *Chevron* doctrine applies to the Commission's interpretation, the Commission's interpretation of its discretion in its cumulation analysis in sunset reviews has frequently been upheld by its reviewing courts, including the Federal Circuit, as reasonable, as indicated in the cases cited in our brief.

In *Nucor Corp. v United States*, 601 F.3d 1291, 1295-97 (Fed. Cir. 2010), the Federal Circuit applied the second step in *Chevron* in finding that it was a reasonable and permissible

interpretation of the statute for the Commission to consider the likely differing conditions of competition in exercising its discretion regarding cumulation of the subject imports in a sunset review. The Court upheld the Commission's analysis of the likely differing conditions of competition under the discretionary cumulation provision to choose not to cumulate certain imports,

Similar to Plaintiffs here (PlBr. at 21-22), appellants in *Nucor* argued that capturing the "hammering effect" of imports from different subject countries was the purpose of the discretionary cumulation provision. In response, the Federal Circuit emphasized that "the difference between a mandatory provision and a discretionary provision is very significant," and that the statutory language suggests that the statute "does not intend the same application and the same justification to apply in both mandatory and discretionary settings," but "endows the Commission with discretion to determine cumulative impacts." *Nucor,* 601 F. 3d at 1296-97. The Court stated that "{a}lthough capturing the hammering effects may reflect one rationale for the discretionary cumulation provision, it does not mandate that the ITC cumulate all subject imports even when all statutory elements are present." *Id.* at 1297. The Court further explained that the Commission's analysis of whether imports from different subject sources appeared likely to compete in similar or different ways "responds to the potential for a combined injurious effect from the subject imports while reducing the risk that overbroad cumulation may unreasonably assign culpability to imports that are not likely to contribute to a continuation or recurrence of material injury." *Id.* at 1296.

**Question 5.** *How does the ITC respond to the argument that its conditions-of-competition analysis of Brazil and China, India, Japan, and the U.K. is functionally a comparison of absolute likely volumes of imports? Is it reasonably discernible from the ITC's decision that the purpose of differentiating Brazil based on a quota that caps its volume of imports was not to compare likely absolute volumes among subject importers?*

The Commission's comparison in its "likely conditions of competition" analysis of the different types of Section 232 measures applicable to the subject countries is in no way a comparison of the absolute likely volumes of imports from these countries. Nowhere in the Commission's "likely conditions of competition" analysis does it estimate, much less compare, the likely absolute volumes of imports from any of these subject countries. Its comparison of the respective Section 232 quotas on imports from Brazil and South Korea is a comparison of import *ceilings,* not likely imports, since future imports may not reach those ceilings. The Section 232 measures on imports from China, India, Japan and the UK did not include any hard caps on imports, so there was no ceiling at all on those imports to compare with the Brazil quota. Without question, the absence of a ceiling does not indicate any particular likely volume.

Unlike the Commission's "likely conditions of competition" analysis, which did not address likely volumes, the Commission's earlier "no discernible adverse impact" analysis of all six countries addressed in detail the data regarding the likely volumes of imports from each subject country, devoting several pages to each country before finding that imports from none of the countries would likely have no discernible impact on the domestic industry in the event of revocation. Views at 20-36. Similarly, the Commission's later analyses of the likely volume of subject imports from Brazil (*id.* at 93-99) and the likely cumulated volume of subject imports from the five other countries (*id.* at 78-82) addressed the extensive data on the relevant "likely volume" factors.

By contrast, the Commission's "likely conditions of competition" analysis focused not on the likely volume, but simply on the comparison under Section 232 of the very low ceiling on imports from Brazil, the much higher ceiling on imports from South Korea, and the absence of any ceiling on imports from China, India, Japan, and the UK. It reasonably found that these

9

substantial differences indicated that subject imports from the other sources, but not subject producers in Brazil, would be able to compete for much larger volumes of sales, and that subject imports from Brazil would accordingly compete under different likely conditions of competition. Again, a comparison of how the different Section 232 measures affect the volume of sales that different subject countries are eligible to compete for is not the same as an estimate or comparison of their likely volumes, and it can easily be discerned that that the Commission's purpose in comparing these Section 232 measures was not to compare likely volumes.

As noted (DefBr. at 17), the Commission frequently considers differences in trade restrictions in its analysis of likely conditions of competition, and the courts have upheld it in doing so. *Nucor* (differences in tariff barriers); *Domestic Uranium Producers* (differences in trade restricting measures); *see also Cut-to-Length Carbon Steel Plate* (difference in safeguard measure exemption) (*see* Views at 41-42 n.298). Plaintiffs cite no case in which a court has found that the Commission's consideration of differences in trade restriction was improper or "circular." Moreover, while the Commission must avoid circularity in its analysis, even the cases relied upon by Plaintiffs demonstrate that the Commission may properly consider relevant factors affecting likely volumes in its analysis of whether imports from different countries are likely to compete under different conditions of competition. *See* DefBr at 24-26.

**Question 6**. *What authorities best support your overall argument?*

The Commission refers the Court to the statute itself, including the SAA, and to the cases cited in response to Questions 3 and 4.

**Question 7.** *Are there any recent or pending Federal Circuit or CIT cases that may affect the court's analysis?*

The Commission is unaware of any such cases.[4]

                         Respectfully submitted,

                         Dominic L. Bianchi
                         General Counsel

                         */s/ Andrea C. Casson*
                         Andrea C. Casson
                         Assistant General Counsel for Litigation

                         */s/ John D. Henderson*
                         John D. Henderson
                         Attorney-Advisor
                         Office of the General Counsel
                         U.S. International Trade Commission
                         500 E Street, SW
                         Washington, DC 20436
                         Telephone: (202) 205-2130
                         john.henderson@usitc.gov

                         *Counsel for Defendant United States International Trade Commission*

Dated: November 6, 2023

---

[4] There are two other unbriefed cases pending in this Court that may be affected by the decision in this case. In those cases, Cleveland Cliffs is also challenging the Commission's declination to cumulate imports from Brazil in a five-year review. Court Nos. 22-355 (Hot Rolled Steel) and 23-050 (CTL Plate).

## CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedures 2(B)(1)(c) and 2, and the Court's letter of October 24, 2023, I hereby certify that the attached **DEFENDANT'S RESPONSES TO QUESTIONS FOR ORAL ARGUMENT** contains 2,882 words (exclusive of the questions that are repeated in this document for ease of reading), according to the word-count function of the word processing system used to prepare this motion and memorandum (Microsoft Office 365 ProPlus).

                                                                                    */s/John D. Henderson*
                                                                                     John D. Henderson
                                                                                     Attorney-Advisor
                                                                                     Office of the General Counsel
                                                                                     U.S. International Trade Commission
                                                                                     500 E Street, SW
                                                                                     Washington, DC 20436
                                                                                     Telephone: (202) 205-2130
                                                                                     john.henderson@usitc.gov

Dated: November 6, 2023