Slip Op. 24-34

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **CLEVELAND-CLIFFS INC.,** | |
| **Plaintiff,** | |
| **and** | |
| **NUCOR CORPORATION, STEEL DYNAMICS, INC., and UNITED STATES STEEL CORPORATION,** | |
| **Plaintiff-Intervenors,** | |
| **v.** | **Before: Gary S. Katzmann, Judge** |
| **UNITED STATES,** | **Court No. 22-00257** |
| **Defendant,** | |
| **and** | |
| **COMPANHIA SIDERÚRGICA NACIONAL S.A., COMPANHIA SIDERÚRGICA NACIONAL, LLC, and USINAS SIDERURGICAS DE MINAS GERAIS S.A. USIMINAS,** | |
| **Defendant-Intervenors.** | |

## <u>OPINION</u>

[ The court denies Plaintiffs' Motion for Judgment on the Agency Record. ]

Dated: <u>March 20, 2024</u>

<u>Neal J. Reynolds</u>, King & Spalding, LLP, of New York, N.Y. and Washington, D.C., argued for Plaintiff Cleveland-Cliffs Inc. With him on the briefs were <u>Stephen P. Vaughn</u>, <u>Barbara Medrado</u> and <u>Nicholas Paster</u>.

<u>Roger B. Schagrin</u> and <u>Jeffrey D. Gerrish</u>, Schagrin Associates, of Washington, D.C., for Plaintiff-Intervenor Steel Dynamics, Inc.

Court No. 22-00257                                                                                      Page 2

Alan H. Price and Christopher B. Weld, Wiley Rein LLP, of Washington, D.C., for Plaintiff-Intervenor Nucor Corporation.

Thomas M. Beline and Sarah E. Shulman, Cassidy Levy Kent (USA) LLP, of Washington, D.C., for Plaintiff-Intervenor United States Steel Corporation.

John D. Henderson, Attorney-Advisor, Office of the General Counsel, International Trade Commission, of Washington, D.C., argued for Defendant United States.  With him on the briefs were Dominic L. Bianchi, General Counsel, Andrea C. Casson, Assistant General Counsel, and David A. Goldfine.

Michael G. Jacobson, Hogan & Lovells US, LLP, of Washington, D.C., argued for Defendant-Intervenors Companhia Siderúrgica Nacional S.A. and Companhia Siderúrgica Nacional, LLC. With him on the brief was Craig A. Lewis.

Chunlian Yang and Lucas A. Queiroz Pires, Alston & Bird, LLP, of Washington, D.C., for Defendant-Intervenor Usinas Siderurgicas De Minas Gerais S.A. Usiminas.

Katzmann, Judge:  This case involves the confluence of two channels through which the Executive Branch implements the trade law of the United States.  One is the U.S. International Trade Commission's ("Commission") five-year "sunset" review of antidumping and countervailing duty orders.  The other is the President's imposition by proclamation of trade restrictions under section 232 of the Trade Expansion Act of 1962, Pub. L. No. 87-794, 76 Stat. 872, 877 (codified as amended at 19 U.S.C. § 1862).  In the five-year review underlying this case, the Commission referenced the market effects of certain section 232 restrictions.  The central question before the court is whether that reference was proper.

Plaintiff Cleveland-Cliffs Inc. ("Cleveland-Cliffs") and Plaintiff-Intervenors Steel Dynamics, Inc., Nucor Corporation, and United States Steel Corporation (collectively, "Plaintiffs") are U.S.-based steel producers.  In their Motion for Judgment on the Agency Record, Plaintiffs challenge the Commission's determination not to cumulatively assess Brazilian imports in conducting its five-year review of antidumping and countervailing duty orders on Brazilian

imports of cold-rolled steel flat products ("CRS").  <u>See</u> Pls.' and Pl.-Inters.' Mot. for J. on Agency R. at 1, Mar. 16, 2023, ECF No 43 ("Pls.' Br."); <u>see also</u> <u>Cold-Rolled Steel Flat Products from Brazil, China, India, Japan, South Korea, and the United Kingdom</u>, 87 Fed. Reg. 49886 (ITC Aug. 12, 2022), P.R. 298 ("<u>Five-Year Review Determination</u>").

Plaintiffs contend (1) that the Commission's decision not to cumulate Brazil's subject imports relied on an impermissibly "circular" analysis, rendering it not in accordance with law, (2) that the Commission deviated from its hitherto consistent treatment of section 232 measures in prior determinations without explanation, rendering this determination not in accordance with law, and (3) that the Commission failed to adequately explain certain other elements of its cumulation determination.  <u>See</u> Compl. ¶¶ 17–28, Oct. 5, 2022, ECF No. 9.  Plaintiffs request that the court remand the Commission's final determination for Brazil as "unsupported by substantial evidence and otherwise not in accordance with law."  Pls.' Br at 1–2.  Defendant the United States opposes Plaintiffs' motion, as do Defendant-Intervenors Companhia Siderúrgica Nacional S.A., Companhia Siderúrgica Nacional LLC, and Usinas Siderúrgicas de Minas Gerais S.A. – USIMINAS ("USIMINAS").  Companhia Siderúrgica Nacional S.A. and USIMINAS are Brazilian producers of CRS; Companhia Siderúrgica Nacional LLC is a U.S. importer of CRS from Brazil.

The court concludes that the Commission's cumulation determination with respect to Brazil—which is the sole aspect of the Commission's five-year review that Plaintiffs challenge—is supported by substantial evidence and in accordance with law.  The court accordingly enters Judgment on the Agency Record for Defendant and Defendant-Intervenors.

## BACKGROUND

### I.     *Legal and Regulatory Framework*

#### A.     *Sunset Reviews*

The Tariff Act of 1930, as amended, requires the U.S. Department of Commerce ("Commerce") to order the imposition of countervailing duties on imported merchandise upon finding that "the government of a country or any public entity within the territory of a country is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of" that merchandise.  19 U.S.C. § 1671(a)(1); see also id. § 1671e. Commerce is also required to order the imposition of antidumping duties on imported merchandise that "is being, or is likely to be, sold in the United States at less than its fair value."  Id. § 1673(1); see also id. § 1673e.  Commerce cannot impose either type of duty, however, unless the Commission separately determines (as relevant here) that "an industry in the United States (i) is materially injured, or (ii) is threatened with material injury . . . by reason of imports of that merchandise or by reason of sales (or the likelihood of sales) of [the subject] merchandise for importation."  Id. §§ 1671(a)(2), 1673(2).

Every five years after the publication of an antidumping or countervailing duty order, the Commission is required to conduct a "sunset" review of that order.  Id. § 1675(c)(1); Nucor Corp. v. United States, 32 CIT 1380, 1385, 594 F. Supp. 2d 1320, 1333 (2008), aff'd, 601 F.3d 1291 (Fed. Cir. 2010).  The Commission's task in conducting this review is to determine whether "revocation of [the] order would be likely to lead to a continuation or recurrence of material injury within a reasonably foreseeable time."  19 U.S.C. § 1675a(a)(1).  In doing so, the Commission is to consider the "likely volume, price effect, and impact of imports of the subject merchandise on the industry if the order is revoked or the suspended investigation is terminated."  Id.  If the

Commission determines that revocation would likely lead to continued or recurrent material injury,

Commerce cannot revoke the subject order.  Id. § 1675(d)(2).  If the Commission concludes that

revocation would not have this effect, Commerce must revoke the subject order if Commerce does

not separately determine "that dumping or a countervailable subsidy, as the case may be, would

be likely to continue or recur."  Id. § 1675(d)(2)(A).  The Commission's material-injury analysis

is thus a critical determinant of whether an antidumping or countervailing duty order will remain

in effect after the five-year sunset review.

        In conducting its likely-material-injury analysis, the Commission "may cumulatively

assess the volume and effect of imports" from multiple source countries—as long as those imports

satisfy certain threshold criteria.  19 U.S.C. § 1675a(a)(7).  The imports must be (1) "likely to

compete with each other and with domestic like products in the domestic market" and (2) not be

"likely to have no discernible adverse impact on the domestic industry."  Id.  If these criteria are

satisfied, the Commission "may cumulatively assess the volume and effect of imports of the

subject merchandise from all countries" subject to review.  Id.[1]  But as the word "may" indicates,

the Commission retains discretion not to make a cumulative assessment (i.e., "cumulate") even

---

[1] The statute's reference to "all countries" may be read to offer the Commission an all-or-nothing choice: it may either exercise its discretion to cumulate imports from all countries that import subject merchandise, or it may analyze imports from each source country individually.  But the Commission, in this case and in others before it, has impliedly adopted a reading of § 1675a(a)(7) whereby "all countries" allows the Commission to choose which countries' imports to analyze cumulatively and which to analyze individually.  See, e.g., USX Corp. v. United States, 11 CIT 82, 87, 655 F. Supp. 487, 491 (describing the Commission's decision "not to cumulate Argentine imports with those from Brazil, Korea, South Africa and Spain"); Allegheny Ludlum v. United States, 30 CIT 1995, 1996–97, 475 F. Supp. 2d 1370, 1374–75 (2006) (describing the Commission's decision not to cumulate imports from France and the United Kingdom despite cumulating imports from Germany, Italy, Japan, Korea, Mexico, and Taiwan).  This practice of making country-specific cumulation determinations creates the possibility that concurrent country-specific material-injury and cumulation determinations will rest on overlapping reasoning.

where the statutory criteria are satisfied.  19 U.S.C. § 1675a(a)(7); <u>Nucor</u>, 601 F.3d at 1293.  If the Commission declines to cumulate imports from a source country, it proceeds to a likely-material-injury analysis for the decumulated imports on an independent, country-specific basis.  <u>See</u> 19 U.S.C. § 1675a(a)(2).

Section 1675a does not delineate any factors that the Commission must consider in determining whether to cumulate a country's imports.  <u>See</u> <u>Nucor</u>, 601 F.3d at 1295; <u>Neenah Foundry Co. v. United States</u>, 25 CIT 702, 709, 155 F. Supp. 2d 766, 772 (2001).  The Commission accordingly enjoys "wide latitude" in identifying relevant factors for cumulation in sunset reviews. <u>Allegheny Ludlum</u>, 30 CIT at 2002, 475 F. Supp. 2d at 1380 (2006).  At the same time, however, the Commission's discretion "must be predicated upon a judgment anchored in the language and spirit of the relevant statutes and regulations."  <u>Freeport Mins. Co. v. United States</u>, 766 F.2d 1029, 1032 (Fed. Cir. 1985).

### B.    *Presidential Action Under Section 232*

Section 232 of the Trade Expansion Act of 1962 "empowers and directs the President to act to alleviate threats to national security from imports" by implementing actions "'to adjust the imports'" of certain goods.  <u>Transpacific Steel LLC v. United States</u>, 4 F.4th 1306, 1311 (Fed. Cir. 2021) (quoting 19 U.S.C. § 1862(c)(1)(A)).  The President may so act when the Secretary of Commerce finds that foreign goods are "being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security."  19 U.S.C. § 1862(c)(1)(A).  These actions may include quotas or duties, and "[t]he President's discretion is broad enough to encompass the choice of whether a duty is to be imposed on top of the amounts of antidumping duties that would be due without the duty or, instead, is to partly or wholly substitute for such duties."  <u>Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States</u>,

63 F.4th 25, 34 (Fed. Cir. 2023). The President may impose or rescind section 232 measures on a country-by-country basis: "there is no applicable federal-law prohibition on different treatment of the imports of articles from different countries." Transpacific Steel, 4 F.4th at 1335.

## II.    History of Relevant Administrative Proceedings

In July and September 2016, the Commission determined in a pair of decisions that the U.S. CRS industry was materially injured or threatened with material injury by certain imports of CRS from Brazil, China, India, Japan, Korea, and the United Kingdom. See Cold-Rolled Steel Flat Products from China and Japan, Inv. Nos. 701-TA-541 & 731-TA-1284, 1286 (Final), USITC Pub. 4619 (July 2016); Cold-Rolled Steel Flat Products from Brazil, India, Korea, Russia, and the United Kingdom, Inv. Nos. 701-TA-540, 542–44 & 731-TA-1283, 1285, 1287, 1289–90, USITC Pub. 4637 (Sept. 2016).

In conjunction with these material-injury determinations, Commerce issued a series of antidumping and countervailing duty orders on imports of CRS from Brazil, China, India, Japan, South Korea, and the United Kingdom. See Certain Cold-Rolled Steel Flat Products from Japan and the People's Republic of China: Antidumping Duty Orders, 81 Fed. Reg. 45956 (Dep't Com. July 14, 2016); Certain Cold-Rolled Steel Flat Products from the People's Republic of China: Countervailing Duty Order, 81 Fed. Reg. 45960 (Dep't Com. July 14, 2016); Certain Cold-Rolled Steel Flat Products from Brazil, India, the Republic of Korea, and the United Kingdom: Amended Final Affirmative Antidumping Determinations for Brazil and the United Kingdom and Antidumping Duty Orders, 81 Fed. Reg. 64432 (Dep't Com. Sept. 20, 2016); Certain Cold-Rolled Steel Flat Products from Brazil, India, and the Republic of Korea: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order (the Republic of Korea) and

Countervailing Duty Orders (Brazil and India), 81 Fed. Reg. 64436 (Dep't Com. Sept. 20, 2016)

(collectively, "Commerce's Orders").[2]

Five years after the publication of Commerce's Orders, the Commission initiated full

reviews of those orders pursuant to 19 U.S.C. § 1675(c).  See Cold-Rolled Steel Flat Products from

Brazil, China, India, Japan, Korea, and the United Kingdom; Institution of Five-Year Reviews, 86

Fed. Reg. 29286 (ITC June 1, 2021); Cold-Rolled Steel Flat Products from Brazil, China, India,

Japan, Korea, and the United Kingdom; Notice of Commission Determination to Conduct Full

Five-Year Reviews, 86 Fed. Reg. 52180 (ITC Sept. 20, 2021).

After conducting these reviews, the Commission determined that revoking Commerce's

Orders on CRS from China, India, Japan, and South Korea, and the United Kingdom "would be

likely to lead to continuation or recurrence of material injury to an industry in the United States

within a reasonably foreseeable time."  Five-Year Review Determination at 49886.  However, the

Commission also determined that revoking Commerce's Orders on CRS imports from Brazil

"would not be likely to lead to continuation or recurrence of material injury to an industry in the

United States within a reasonably foreseeable time."  Id. (emphasis added).  The Commission

explained its views in a separate published document.  See Cold-Rolled Steel Flat Products from

Brazil, China, India, Japan, South Korea, and the United Kingdom, Inv. Nos. 701-TA-540-543 &

731-TA-1283-1287 & 1290 (Review), USITC Pub. 5339 (Aug. 17, 2022), P.R. 300 ("Views").

This document explains that in the five-year review, the Commission cumulatively

assessed CRS imports from China, India, Japan, South Korea, and the United Kingdom.  See id.

---

[2] Commerce issued antidumping duty orders on CRS imports from Brazil, China, India, Japan, South Korea, and the United Kingdom.  Commerce issued countervailing duty orders on CRS imports from Brazil, China, India, and South Korea.  See generally Commerce's Orders.

at 16, 19, 44 (citing 19 U.S.C. § 1675a(a)(7)).  But the Commission declined to cumulatively assess

CRS imports from Brazil.  Id. at 45.  Although the Commission concluded that Brazilian CRS

imports "would not likely have no discernable adverse impact on the U.S. industry," thus satisfying

one of § 1675a(a)(7)'s two prerequisites for cumulation, the Commission concluded that Brazilian

CRS imports did not satisfy the other prerequisite: that "such imports would be likely to compete

with each other and with domestic like products in the United States market."  Id. at 16, 23, 45

(quoting § 1675a(a)(7)).

The Commission split its analysis of this prerequisite into two subordinate analyses[3]: the

Commission considered "whether there is a likelihood of a reasonable overlap of competition

among subject imports from the subject countries and the domestic like product," and "whether

subject imports are likely to compete in the U.S. market under different conditions of competition."

Views at 19.  It was on the basis of this second "Likely Conditions of Competition" analysis that

the Commission determined not to cumulate Brazilian CRS imports.  Id. at 41.[4]  The Commission's

analysis proceeded in two steps.

The Commission first compared imports of subject CRS from Brazil to those from China,

India, Japan, and the United Kingdom—that is, all other reviewed source countries besides South

---

[3] Plaintiffs do not challenge the Commission's practice of conducing separate "Likelihood of a
Reasonable Overlap of Competition" and "Likely Conditions of Competition" analyses as a means
of carrying out the statutory directive to consider whether certain countries' imports would be
"likely to compete with each other and with domestic like products."  19 U.S.C. § 1675a(a)(7).

[4] The cumulation provision permits the Commission to cumulate subject imports if they "would
be likely to compete with each other and with domestic like products."  19 U.S.C. § 1675a(a)(7)
(emphasis added).  The conditions-of-competition analysis thus allows the Commission to
"consider the likely differing conditions of competition to predict the domestic market for the
subject merchandise in event of revocation."  Nucor, 601 F.3d at 1296.

Korea. The Commission noted that unlike those comparator imports, Brazilian CRS imports were subject to a maximum quota imposed by the President pursuant to section 232 of the Trade Expansion Act of 1962. See Views at 44; 19 U.S.C. § 1862. While most of the other subject nations' imports were subject to other types of section 232 measures, those imports were not subject to volume-capping quotas. Id. at 42 (noting that subject imports from China and India were subject to 25 percent ad valorem tariffs and that subject imports from Japan and the United Kingdom were subject only to tariff rate quotas ("TRQs"), which permitted "unlimited volumes of subject imports from each of [the] subject countries to enter the United States with 25 percent section 232 duty rates applied for any volumes in excess of the TRQ limits").

The Commission then compared CRS imports from Brazil to those from South Korea, which were also subject to a section 232 maximum quota. The Commission reasoned that despite this surface-level similarity, there remained "significant differences between the level of South Korea's quota and presence in the U.S. market relative to those for Brazil." Views at 43. South Korea's quota level was almost three times larger than that imposed on Brazil, and South Korean CRS imports had come closer to fulfilling their quota limit than their Brazilian counterparts during the period of review. Id. The Commission further noted that, unlike South Korean subject imports, subject imports from Brazil "were virtually absent from the U.S. market" during the period of review." Id. In a footnote, the Commission added that "[t]he Brazilian industry is also less export-oriented than the South Korean industry" and that "[i]nformation available also indicates that the Brazilian industry has substantially less production than the South Korean industry." Id. at 43 n.307.

The Commission concluded that the "absolute cap on the annual volume of subject imports from Brazil" meant that "unlike subject imports from Brazil, subject imports from other countries are in a position to compete for much larger volumes of sales than any of the subject producers in Brazil which must share the quota limits." Id. at 42, 44. In the ensuing likely-material-injury determination, the Commission accordingly considered Brazilian imports on a decumulated basis and reached a negative material-injury determination. Id. at 69.

The Commission rendered its cumulation determination as to Brazil over the dissent of two commissioners. Commissioners Rhonda K. Schmidtlein and Randolph J. Stayin explained that they were "not persuaded by . . . argument[s] that subject imports from Brazil are likely to compete under different conditions of competition than other subject imports." Separate and Dissenting Views of Commissioners Schmidtlein and Stayin, Views at 75 ("Dissent"). In particular, the dissenting Commissioners found that there was no reason to conclude that "any difference in the applicable section 232 measures constitute different conditions of competition," as "[t]he different measures do not affect the types of products that may be sold in the U.S. market, nor do they affect the locations or channels of distribution through which the imports may be sold." Id. at 77–78.

### III.    *Procedural History*

On October 5, 2022, Cleveland-Cliffs filed a complaint with the U.S. Court of International Trade ("CIT") seeking review of the Commission's final negative sunset review determination for Brazil. See Compl. After the complaint was filed, Companhia Siderúrgica Nacional S.A. and Companhia Siderúrgica Nacional LLC and Usinas Siderúrgicas de Minas Gerais S.A. each moved, with Plaintiff's consent, to intervene under USCIT Rule 24 as Defendant-Intervenors. See Mot. to Intervene, Oct. 12, 2022, ECF No. 11; Mot. to Intervene. as Def.-Inter., Oct. 26, 2022, ECF No. 16. The court granted both motions. See Order, Oct. 12, 2022, ECF No. 15; Order, Oct. 28, 2022,

ECF No. 21.  Nucor, Steel Dynamics, and U.S. Steel then moved to intervene as Plaintiff-Intervenors.  <u>See</u> Mot. to Intervene as Pl.-Inter., Oct. 28, 2022, ECF No. 21; Mot. to Intervene as Pl.-Inter., Nov. 2, 2022, ECF No. 27; Mot. to Intervene as Pl.-Inter., Nov. 2, 2022, ECF No. 32. The court granted these motions as well.  <u>See</u> Order, Oct. 28, 2022, ECF No. 25; Order, Nov. 2, 2022, ECF No. 31; Order, Nov 2, 2022, ECF No. 36.

On March 16, 2023, Cleveland-Cliffs filed its Motion for Judgment on the Agency Record under USCIT Rule 56.2.  <u>See</u> Pls.' Br.  Defendant and Defendant-Intervenors filed their response briefs on June 13 and June 27, 2023, respectively.  <u>See</u> Def.'s Mem. in Opp'n. to Pls.' Mot. for J. on the Agency R., June 13, 2023, ECF No. 46; Br. of Def.-Inters. to Pl.'s Mot. for J. on the Agency R., June 27, 2023, ECF No. 49.  Plaintiff and Plaintiff-Intervenors filed a reply on July 31, 2023. See Pl. and Pl.-Inters.' Reply Br., July 31, 2023, ECF No. 52 ("Pls.' Reply").  On August 21, 2023, Plaintiff and Plaintiff-Intervenors moved for oral argument on the Motion for Judgement on the Agency Record, <u>see</u> Mot. for Oral Arg., Aug. 21, 2023, ECF No. 56, which the court granted, <u>see</u> Order, Aug. 22, 2023, ECF No. 57.  In advance of oral argument, the court issued questions to the parties and requested written responses.  <u>See</u> Letter re: Qs. for Oral Arg., Oct. 24, 2023, ECF No. 60.  The parties timely responded.  <u>See</u> Def.-Inters.' Resp. to Ct.'s Qs. for Oral Arg., Nov. 6, 2023; Pls.' Resp. to Ct.'s Qs. for Oral Arg., Nov. 6, 2023, ECF No. 63; Def.'s Resp. to Ct.'s Qs. for Oral Arg., Nov. 6, 2023, ECF No. 65.

At oral argument on November 9, 2023, the court invited the parties to file additional submissions; the parties did so, <u>see</u> Pls.' Post-Oral Arg. Subm., Nov. 20, 2023, ECF No. 69 ("Pls.' Post-Oral Arg. Subm."); Def.-Inters.' Post-Oral Arg. Subm., Nov. 20, 2023, ECF No. 70; Def.'s Post-Oral Arg. Subm., Nov. 20, 2023, ECF No. 71 ("Def.'s Post-Oral Arg. Subm.").

## JURISDICTION AND STANDARD OF REVIEW

Jurisdiction lies under 28 U.S.C. § 1581(c).  The standard of review in this action is set forth in 19 U.S.C. § 1516a(b)(1)(B)(i), which states that "[t]he court shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Broadcom Corp. v. Int'l Trade Comm'n, 28 F.4th 240, 249 (Fed. Cir. 2022).  To be supported by substantial evidence, a determination must account for "whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn."  Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 487–88 (1951)).

## DISCUSSION

As noted above, Plaintiffs argue that (1) the Commission's determination not to cumulate Brazil's subject imports rested on an impermissibly circular analysis, rendering it not in accordance with law; that (2) the Commission deviated from its consistent treatment of section 232 measures in prior cases without explanation, rendering its cumulation determination not in accordance with law; and that (3) other aspects of the Commission's cumulation determination are unsupported by substantial evidence and not in accordance with law because they lack adequate explanation.[5]  The court concludes that (1) the Commission's reasoning underlying its

---

[5] Underlying Plaintiffs' argument is an assertion that because the Commission's cumulation determination is "not supported by substantial evidence and not otherwise in accordance with law," neither is "the Commission's negative likely injury determination for Brazil."  Compl. ¶¶ 27–28.

determination not to cumulate subject imports from Brazil is not unlawfully circular; that (2) the Commission's treatment of section 232 measures in this case is not inconsistent with its decisions in prior sunset reviews; and that (3) the Commission adequately explained—and supported with substantial evidence—its determination not to cumulate subject imports from Brazil.  The court accordingly affirms the Commission's determination and enters judgment on the agency record for Defendants.

**I.    The Commission Did Not Engage in Unlawfully Circular Reasoning in Declining to Cumulate Subject Imports from Brazil**

Relying on the court's decisions in <u>Neenah Foundry</u>, <u>Allegheny Ludlum</u>, and <u>Nucor</u>, Plaintiffs contend that the Commission's reasoning in its determination not to cumulate subject imports from Brazil is not in accordance with law.  Compl. ¶¶ 18–19.  Plaintiffs assert that the Commission relied on likely absolute volume as the sole factor in both its cumulation analysis and its ultimate injury determination, thus prematurely requiring a demonstration of an "independent causation of material injury" by Brazilian imports of CRS at the cumulation stage.  Pls.' Br. at 22 (quoting <u>Neenah</u>, 25 CIT at 709, 155 F. Supp. 2d at 772).  This, according to Plaintiffs, rendered "cumulation a vestigial part of the causation analysis."  <u>Id.</u>  (quoting <u>Allegheny Ludlum</u>, 30 CIT at 2002–03, 475 F. Supp. at 1378–79).  Plaintiffs argue that this approach constituted "impermissible circular analysis" and that the resulting determination is not in accordance with law.  <u>Id.</u> at 25.

The court has noted that a cumulation determination may not be in accordance with law when the Commission poses "the ultimate, individual-country causation question as a predicate to

---

Because the court sustains the Commission's cumulation determination, the court does not consider the merits of this assertion.

cumulation in a way that precludes consideration of this question on a cumulative basis." Neenah Foundry, 25 CIT at 711, 155 F. Supp. 2d at 774. Plaintiffs describe this as a problem of "circularity," or "circular analysis." Pls.' Reply at 6; Pls.' Br. at 25.[6]

But the Commission's cumulation determination as to Brazil in this sunset review does not rest on a prohibited category of reasoning, however termed. Plaintiffs argue as follows:

> [A]t no point in its conditions of competition analysis for these countries did the Commission majority compare the volume or pricing trends for imports from these countries, or analyze any other, non-likely volume factor to justify its finding that the Brazilian imports and imports from China, India, Japan, and the United Kingdom would compete under different conditions of competition upon revocation. Instead, the Commission relied solely and exclusively on an impermissible comparison of the likely volumes of the subject imports from Brazil, China, India, Japan, and the United Kingdom in its conditions of competition analysis for these countries . . . . Clearly, the Commission majority's analysis represents the very type of "circular" likely volume analysis that is, in this Court's view, "impermissible" under the statute.

---

[6] Despite its scattered appearances in prior decisions of the court on matters involving cumulation determinations, the term "circular" does not precisely describe the potential problem that Plaintiffs employ it to identify. True "circularity" would describe a scenario where the outcome of one determination ("Determination A") depends on the outcome of another ("Determination B"), and the outcome of Determination B in turn depends on that of Determination A: an infinite loop in which neither determination is moored to external circumstances. See, e.g., Williams v. State of N.C., 325 U.S. 226, 234 (1945) (Frankfurter, J.) (describing as "circular reasoning" a proposition whereby "a court's record would establish its power and the power would be proved by the record").

What the court broadly termed a "circular analysis" in Neenah Foundry could be more precisely described for these purposes, with no loss to accuracy, as a cascading analysis: "[R]elying on the same factors for refusal to cumulate as for an ultimate negative injury determination," the court opined in Neenah Foundry, "thwarted congressional intent in that it demanded demonstrated, independent causation of material injury before any consideration of cumulation." 155 F. Supp. 2d at 772. In other words, the problem the court identified in Neenah Foundry was not that the outcome of Determination A depended on the outcome of Determination B, and vice versa. It was that the outcome of Determination A—itself an independent inquiry—determined the outcome of Determination B, rendering Determination B "vestigial." Id. at 771 (quoting USX Corp., 11 CIT at 88, 655 F. Supp. at 493).

Pls.' Br. at 27 (citations omitted).

Plaintiffs do not directly argue that the Commission's likely-material-injury analysis determined the outcome of the cumulation determination, let alone that the likely-material-injury analysis rendered the cumulation determination "vestigial."  Instead, they argue that considering the absolute volume of imports as a factor in both the cumulation and material-injury determinations was "circular" because this court has previously found cumulation determinations to be "circular" where they are predicated on analyses of likely absolute volume.  See Pls.' Br. at 22 ("[The CIT] has stated that the Commission should not rely on the likely volumes or pricing levels of the subject imports because these considerations properly belong in its analysis of the likely injury presented by the subject imports." (citing Neenah Foundry, 155 F. Supp. 2d at 772)).

Plaintiffs' suggested approach is straightforward: if the Commission considers likely absolute volume as an element of its conditions-of-competition analysis, any resulting negative cumulation determination will bear the dreaded mark of circular reasoning.  This approach, however, is insensitive to why the court has previously disfavored the Commission's consideration of likely absolute volume.  The court does not impose a reflexive taboo on analyses of likely absolute volume at the cumulation stage.  Instead, the court looks to whether the Commission complied with its statutory mandates by conducting independent analyses for both cumulation and the ultimate material-injury determination.  See 19 U.S.C. § 1675a(a)(1), (7).  If the Commission bases its cumulation determination on likely import volumes and proceeds to base its material-injury determination on that very cumulation analysis, the Commission has likely failed to independently examine the "likely to compete" and "no discernible adverse impact" elements of the cumulation determination.  Id. § 1675a(a)(7).  But the potential problem is not intrinsic to likely

import volumes as a factor—it is that the Commission has effectively performed the same analysis twice.  The Commission cannot lawfully make only one determination where the statute demands two.

Even where the Commission considers the same factor for its cumulation and likely-material-injury determinations, the Commission can avoid an impermissible cascading problem by ensuring that the two determinations are independent—that is, by ensuring that the material injury–stage analysis of the factor is not a mere echo of the cumulation-stage analysis.  See, e.g., Neenah Foundry, 25 CIT at 711, 155 F. Supp. 2d at 774 (finding "the problem of circularity" to be avoided where "the Commission analyzed import volume trends in the cumulation analysis for a different purpose than its analysis of import volume trends to determine the likelihood of increased volume effects in the event of revocation"); see also Allegheny, 30 CIT at 2003, 475 F. Supp. 2d at 1379 (concluding that an "overlap" of factors relied upon in cumulation and likely injury analyses was permissible because the Commission "utilized the information for different purposes in accordance with the standard articulated in Neenah" (citations omitted)).

The Commission has avoided the "problem" here, conducting independent cumulation and material-injury determinations with respect to Brazil in this sunset review.  The Commission's stated reasoning in the conditions-of-competition prong of its cumulation analysis, while succinct, clarifies that establishing a likelihood of material injury to domestic industry by Brazil's subject imports was not a required predicate to the decision to cumulate.  Views at 42–44.  While the conditions-of-competition and material injury analyses may overlap in a superficial sense,[7] further

---

[7] The parties disagree as to whether the Commission, in comparing the section 232 quota cap on Brazil to non-quota restrictions on other subject import nations and, in the case of South Korea, to quota caps of differing volumes, effectively compared likely absolute volumes.  Compare Pls.'

examination reveals the Commission analyzed the likely volume factor for different purposes in
each analysis.

In its conditions-of-competition analysis, the Commission explained that "[u]nlike all but
one of the other subject countries, CRS imports from Brazil are subject to an absolute quota limit
imposed under Section 232." Views at 42. The Commission noted the "absence of any absolute
quota on imports from [most] other subject countries," which meant that "unlike subject imports
from Brazil, subject imports from other countries are in a position to compete for much larger
volumes of sales than any of the subject producers in Brazil which must share the quota limits."
Id. at 43–44. The Commission found that "subject imports from Brazil would likely compete
under different conditions of competition from the other subject countries if the orders were
revoked" and declined to cumulate Brazilian imports on this basis. Id. at 44.

In its likely-material-injury analysis, the Commission examined each of the considerations
outlined in 19 U.S.C. § 1675a(a)(1)—namely, likely volume, price effect, and impact of imports—
in determining that "revocation of the antidumping and countervailing duty orders on CRS from
Brazil would not be likely to lead to continuation or recurrence of material injury to an industry in
the United States within a reasonably foreseeable time." Views at 74. More specifically, on the
likely volume consideration,[8] the Commission explained that "Brazilian industry has little

_____

Post-Oral Arg. Subm. at 3 ("These 'ceilings' are volume-related caps, and the Commission's
analysis discussing these quotas makes clear that this factor is significant to its analysis because it
reflects import volumes."), with Def.'s Post-Oral Arg. Subm. at 2–3 ("The Commission's
conclusion . . . addresses [the subject nations'] abilities to compete in light of the Section 232
restrictions, not how successful any of the competing subject industries would likely be in actually
gaining any particular volume of sales."). The court declines to reach this question. In either case,
the Commission analyzed the factor for a different purpose.

[8] Elsewhere in its determination, the Commission concluded that the restrictive quota on Brazilian
producers had triggered a shift of focus to limited sales of specialty and value-added products,

incentive or ability to export significant volumes of CRS to the U.S. market if the order were revoked." Views at 73.

These two analyses—the conditions-of-competition prong of the cumulation determination and the likely-volume prong of the likely-material-injury determination—overlap in the sense that each relied on similar input data.[9]  But the Commission, in each analysis, analyzed the common input data in starkly different ways.  In the conditions-of-competition analysis, the Commission considered the President's continued imposition of a section 232 quota on Brazil as a factor that distinguished Brazilian CRS imports from those of other countries subject to the sunset review. See Views at 42.   In the likely-volume analysis, by contrast, the Commission considered the quota—notably, alongside several other factors—as a factor supporting a finding that import volumes would be low in absolute terms.  Views at 72–73.

The conditions-of-competition analysis thus did not control the outcome of the likely-volume analysis; nor, indeed, did the ultimate cumulation determination control the outcome of the likely-material-injury determination.  In the context of a likely-volume analysis, absolute likely volume cuts only one way—high likely volume cuts towards material injury, and low likely volume cuts against material injury.  But in a conditions-of-competition analysis, similarity prevails.   Absolute likely volume may cut in either direction, away from similarity: the Commission could have hypothetically declined to cumulate Brazilian imports on the basis of

---

rather than pricing competitively for relatively small market-shares.  See id. (noting that Brazilian producers are "likely to continue focusing on higher-value CRS products in their limited exports to the United States to maximize profits").

[9] In its discussion of likely volume, the Commission indeed referred to "conditions of competition that are distinctive to the domestic industry that also inform our determinations with respect to subject imports from Brazil."  Views at 69 n.465.

differing conditions of competition for the reason that the likely absolute volumes of Brazilian imports were significantly <u>higher</u> than those of cumulated countries.

The possibility of such a hypothetical scenario—wherein high likely volume cuts against cumulation but supports a positive material injury determination—underscores that the Commission's analyses in the sunset review underlying this case were not reduplicative. The court therefore concludes that the Commission's determination not to cumulate Brazil's subject imports was not impermissibly circular and is in accordance with law.

## II.     *The Commission's Treatment of Section 232 Measures in This Sunset Review Is Consistent with Its Decisions in Prior Sunset Reviews*

Plaintiffs argue that the Commission's treatment of section 232 measures in its determination not to cumulate Brazil's imports in this case amounts to an unlawful departure from prior agency practice. Pls.' Br. at 37. They outline five prior Commission determinations that assertedly demonstrate the Commission's consistent finding that "the existence of Section 232 relief would not prevent unfairly traded imports from entering the U.S. market in a manner that would impact the domestic industry." Id. at 38. Plaintiffs argue that because the Commission found otherwise in this case, the determination not to cumulate Brazilian CRS imports is not in accordance with law. Id. at 37, 41.

"[I]t is well-established that an agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently." SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (internal quotation marks and citation omitted). Because "consistency has long been a core interest of administrative law, and inconsistent treatment is inherently significant," the Commission must as a general matter avoid "depart[ing] from applicable findings of a general nature from prior determinations without reasonably

distinguishing them or justifying the departure." <u>DAK Ams. LLC v. United States</u>, 44 CIT __, __,

456 F. Supp. 3d 1340, 1355–56 (2020), <u>aff'd</u>, 829 F. App'x 529 (Fed. Cir. 2020). Past sunset

reviews, however, are of "limited precedential value" in ascertaining the existence of an agency

practice. <u>Ugine-Savoie Imphy v. United States</u>, 26 CIT 851, 863, 248 F. Supp. 2d 1208, 1220

(2002). Each such review "presents unique interactions of the economic variables the Commission

considers," and "[t]he presence of a specific factor in a prior sunset review is not dispositive of

how a factor is interpreted in the current sunset review." <u>Id.</u> at 863, 248 F. Supp. 2d at 1220, 1223.

　　　　Plaintiffs' argument conflates two distinct determinations within a sunset review. The

established practice they attribute to the Commission relates to material injury determinations, not

cumulation determinations—but Plaintiffs challenge only the Commission's cumulation

determination in this section of their brief. Recall that in making a cumulation determination, the

Commission looks to whether imports from a given source are "likely to have <u>no discernible</u>

<u>adverse impact</u> on the domestic industry." 19 U.S.C. § 1675a(a)(7) (emphasis added). For the

material-injury determination, the Commission is instead required to consider the "likely volume,

price effect, and <u>impact of imports of the subject merchandise on the industry</u> if the order is

revoked or the suspended investigation is terminated." <u>Id.</u> § 1675a(a)(1) (emphasis added). These

are two different inquiries: while a positive material-injury determination requires the Commission

to perform a holistic analysis of the impact of subject imports in absolute terms, satisfying the "no

discernible adverse impact" element of the cumulation determination merely requires a finding

that a set of imports clears a baseline discernability threshold for adverse impact. <u>Nippon Steel</u>

<u>Corp. v. U.S. Int'l Trade Comm'n</u>, 494 F.3d 1371, 1379 n.6 (Fed. Cir. 2007) ("The 'discernible

adverse impact' presents a relatively low threshold. It is not the same as finding a negative adverse

impact, however, which is part of the ultimate analysis of whether the domestic industry is likely to be materially injured." (citing <u>Neenah Foundry</u>, 155 F. Supp. 2d at 774)).

To support their argument that the Commission erred in cumulating imports from Brazil, Plaintiffs cite five of the Commission's prior material-injury determinations. Two of the reviews that Plaintiffs cite involved imports from only one country and accordingly did not involve cumulation at all. <u>See</u> Clad Steel Plate from Japan, Inv. No. 731-TA-739 (Fourth Review), USITC Pub. 4851 (Dec. 2018); Tin- and Chromium-Coated Steel Sheet from Japan, Inv. No. 731-TA-860 (Third Review), USITC Pub. 4795 (June 2018) ("Tin- and Chromium-Coated Steel Sheet"). The other three reviews did involve cumulation determinations. <u>See</u> Certain Corrosion-Resistant Steel Products from China, India, Italy, South Korea and Taiwan, Inv. Nos. 701-TA-534-537 & 731-TA-1274-1278 (Review), USITC Pub. 5337 (Aug. 2022) ("Corrosion-Resistant Steel"); Non-Oriented Electrical Steel from China, Germany, Japan, Korea, Sweden, and Taiwan, Inv. Nos. 701-TA-506, 508 & 731-TA-1238-1243 (Review), USITC Pub. 5140 (Dec. 2020) ("Electrical Steel"); Carbon and Certain Alloy Steel Wire Rod from Brazil, Indonesia, Mexico, Moldova, and Trinidad and Tobago, Inv. Nos. 701-TA-417 & 731-TA-953, 957-959, 961 (Third Review), USITC Pub. 5100 (Aug. 2020) ("Steel Wire Rod"). However, the sections of these reviews that Plaintiffs cite in their opening brief are all discussions of the "Likely Volume of Subject Imports" element of the material-injury determination. <u>See</u> Pls.' Br. at 38–39; Corrosion-Resistant Steel at 51, Electrical Steel at 33 n.189; Steel Wire Rod at 46 n.298.

By relying exclusively on examples drawn from a type of statutorily mandated determination that is distinct from the one that Plaintiffs challenge, Plaintiffs have not identified an agency practice that in this case "would lead a party, in the absence of notification of change,

reasonably to expect adherence to the established practice or procedure." Ranchers-Cattlemen

Action Legal Found. v. United States, 23 CIT 861, 884–85, 74 F. Supp. 2d 1353, 1374 (1999).  A

party could not reasonably expect that five past material-injury determinations would require the

Commission to make a certain finding in a different type of determination.[10]  This is instead a case

where "prior determinations are inapposite" such that the Commission's determination "is not in

fact a departure at all."  DAK Ams., 44 CIT at __, 456 F. Supp. at 1356.  The court accordingly

denies this element of Plaintiffs' motion.

### III.    *The Commission Adequately Explained Its Conditions-of-Competition Analysis*

Plaintiffs argue that the Commission failed to explain three aspects of its finding, under 19

U.S.C. § 1675a(a)(7), that "subject imports from Brazil would not be likely to compete under

similar conditions of competition with subject imports from the remaining subject countries in the

---

[10] Because the court concludes that the established practice that Plaintiffs purport to identify is irrelevant to this case, it is unnecessary to dwell on whether that practice exists at all.  However, the court notes that the nature of sunset reviews in 19 U.S.C. § 1675(c) demands a fact-bound, case-by-case approach, especially with regard to the discretionary act of cumulation.  See Ugine-Savoie, 248 F. Supp. 2d at 1223.

The past reviews that Plaintiffs cite are limited to their own facts.  In Electrical Steel, for example, the Commission determined that section 232 trade tariffs alone were unlikely to discourage subject import producers in part because the Japanese "subject producers currently maintain ties with the United States, including headquarters of affiliates and business support offices in [various U.S. cities]" and "prices are generally higher in the U.S. market than in other Japanese export markets." Electrical Steel at 19.  In Tin- and Chromium-Coated Steel Sheet, the Commission reached the same ultimate conclusion after reasoning that U.S. tariffs on Japanese imports were insufficient to overcome the attractiveness of the U.S. market, considering that the "U.S. market [for the subject import] is among the largest and highest-priced . . . markets . . . in the world."  Tin- and Chromium-Coated Steel Sheet at 21.  And in Corrosion-Resistant Steel, the Commission also considered case-specific factors in finding that section 232 measures would likely not prevent increased volumes of subject imports, including that producers had continued to export "substantial volumes of [the product], and subject imports from each source have maintained a presence in the U.S. market throughout the [period of review], demonstrating a continued interest in supplying U.S. purchasers."  Corrosion-Resistant Steel at 36.

event of revocation." Views at 42; see also Pls.' Br. at 29–37. Plaintiffs first argue that the

Commission failed to adequately explain why differences between Brazil and Korea's production

and export levels indicate that CRS imports from the two countries would compete under different

conditions of competition upon revocation of the Orders. Pls.' Br. at 29–31. Second, they contend

that the Commission failed to explain how differing section 232 measures imposed on non-

Brazilian importers of subject merchandise would translate to different conditions of competition.

Id. at 32–36. Third, Plaintiffs assert that the Commission "simply ignored" evidence on the record

that: (a) Brazil was pressuring the Biden Administration to revise the section 232 quotas on Brazil;

and (b) the Biden Administration had already revised section 232 trade restrictions and had

otherwise liberalized measures on imports from other significant trading partners, such as the

United Kingdom, Japan, and members of the European Union. Pls.' Br. at 36–37. According to

Plaintiffs, the Commission's failure to explain its reasoning in these three instances warrants

remand. The court does not agree. The Commission has adequately explained its reasoning on

each of the issues that Plaintiffs raise. These explanations, moreover, are supported by substantial

evidence.

The Commission has a general duty to explain the reasoning underlying its determinations

in a sunset review. See 19 U.S.C. § 1677f(i)(3)(B) (requiring the Commission, in reviews pursuant

to 19 U.S.C. § 1675, to provide "an explanation of the basis for its determination that addresses

relevant arguments that are made by interested parties who are parties to the investigation or

review"); see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463

U.S. 29, 43 (1983) (holding that agency "must examine the relevant data and articulate a

satisfactory explanation for its action including a rational connection between the facts found and

the choice made") (internal quotation marks and citation omitted); <u>Timken U.S. Corp. v. United States</u>, 421 F.3d 1350, 1357 (Fed. Cir. 2005) (holding that § 1677f(i) codifies the <u>State Farm</u> standard). And while the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," <u>State Farm</u>, 463 U.S. at 43 (quoting <u>Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.</u>, 419 U.S. 281, 286 (1974)), the Commission's explanation "must reasonably tie the determination under review to the governing statutory standard and to the record evidence by indicating . . . what facts the agency is finding," <u>CS Wind Viet. Co. v. United States</u>, 832 F.3d 1367, 1376 (Fed. Cir. 2016).

In each part of the Commission's conditions-of-competition analysis that Plaintiffs challenge, the Commission's reasoning satisfies this standard. First, regarding the differences between Brazil and South Korea's production and export levels, the Commission explained that "[t]he Brazilian industry is also less export-oriented than the South Korean industry." Views at 43 n.307. To support this proposition, the Commission cited tables in an internal staff report that detail country-by-country export metrics for CRS. <u>Id.</u> (citing Confidential Staff Report, Cold-Rolled Steel Flat Products from Brazil, China, India, Japan, South Korea, and the United Kingdom, Inv. Nos. 701-TA-540-543 & 731-TA-1283-1287 & 1290 (Review), Tables IV-12, IV-31, IV-35, IV-49 (ITC June 23, 2022), P.R. 300, C.R. 240). These tables allow for a comparison between, <u>inter alia</u>, Korean and Brazilian CRS producers' home-market shipments as a fraction of their respective U.S.-bound and total exports. <u>Id.</u> The Commission did not rely on this data to make the elementary point that Brazilian production and exports of CRS are low and that South Korea's are high, but rather that aspects of South Korea's CRS industry would likely impose constraints

on U.S.-bound exports that differ from those imposed by Brazil's industry.[11]  This is a standard

inquiry in the context of conditions-of-competition analysis.   See, e.g., U.S. Steel Corp. v. United

States, 36 CIT 1172, 1175–68, 856 F. Supp. 2d 1318, 1322–24 (2012) (upholding the

Commission's identification of "potential differences in conditions of competition relating to

export orientation" as supported by substantial evidence); Nucor Corp., 32 CIT at 1412–15, 594

F. Supp. 2d at 1354–56 (upholding the Commission's consideration of export-orientation in its

conditions-of-competition analysis as supported by substantial evidence), aff'd, 601 F.3d at 1294–

97.

        Plaintiffs' contention that "the differences between the production and export levels of the

two countries do not demonstrate, in any way, that imports from Brazil and South Korea would

compete differently in the United States upon revocation" thus misconstrues the Commission's

explanation of its rationale.  Pls.' Br. at 29.  The Commission could have more clearly explained

the connection between the country-related data it cited and the broader point that the South

Korean and Brazilian CRS industries differ in their export orientation.  Nevertheless, "ideal

clarity" is not the relevant standard.  State Farm, 463 U.S. at 43.

        Second, the court concludes that the Commission's reference to section 232 quota levels

as relevant conditions of competition is both adequately explained and supported by substantial

evidence.  Plaintiffs characterize the Commission's discussion on this point as constituting "only

a brief justification of [the Commission's] reliance on the differences in the Section 232 measures

---

[11] The Commission further explained the relevance of section 232 measures to the conditions-of-competition analysis, noting questionnaire responses by Brazilian producers and exporters that state that the restrictive section 232 quota inhibits competition for large-volume sales.  Views at 42–43 n.308.

between the subject imports in its analysis." Pls.' Br. at 32. This statement is correct—the

Commission's discussion, after all, is both brief and a justification. But Plaintiffs' implication that

this justification is insufficient misses the mark. The Commission explained as follows:

> Given the absolute quota applicable to subject imports from Brazil, even if imports
> from Brazil reached that level, the substantially larger quota for South Korea and
> the absence of any absolute quota on imports from other subject countries means
> that, unlike subject imports from Brazil, subject imports from other countries are in
> a position to compete for much larger volumes of sales than any of the subject
> producers in Brazil which must share the quota limits. As stated above, if imports
> from Brazil reached their section 232 quota—57,251 short tons—it would amount
> to the equivalent of only 0.2 percent of apparent U.S. consumption in 2021.
> Therefore, we find that subject imports from Brazil would likely compete under
> different conditions of competition from the other subject countries if the orders
> were revoked.

Views at 43–44 (footnotes omitted). In other words, the fact that Brazilian imports face a lower

quota than South Korean imports—while expressed in terms of numerical limits—amounts to a

qualitative difference in the receptiveness of the U.S. market to CRS imports from each country.

While this is a contestable proposition—and indeed a contested one, see Dissent at 77–78—it is

nevertheless a reasonable explanation for why section 232 quota levels are relevant to a conditions-

of-competition analysis. See Siemens Energy v. United States, 806 F. 3d 1367, 1372 (Fed. Cir.

2015) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not

prevent an administrative agency's findings from being supported by substantial evidence.").[12]

---

[12] A conclusion that the Commissioner's determination is supported by substantial evidence need
not involve the rejection of dissenting Commissioners' arguments. Certainly, "[t]he possibility of
drawing two inconsistent conclusions from the evidence does not prevent an administrative
agency's findings from being supported by substantial evidence." Siemens Energy, 806 F. 3d at
1372. The court does not review the views of dissenting Commissioners as an alternative to the
majority's findings. Instead, the court may find dissenting views as means of illuminating flaws
in the majority's analysis. See, e.g., Swiff-Train v. United States, 37 CIT 394, 402–05, 904 F.
Supp. 2d 1336, 1343–47 (2013) (remanding the Commission's findings on price suppression and
impact, approvingly citing the findings of dissenting Commissioners); Nippon Steel Corp. v.

The Commission's explanation "reasonably tie[s] the determination under review to the governing

statutory standard and to the record evidence." CS Wind Viet, 832 F.3d at 1376.

   Plaintiffs also seem to overlook the Commission's statement that its reference to section

232 quotas stems in part from "prior Commission decisions in five-year-reviews identifying trade

restricting measures as a relevant condition of competition . . . affecting [a subject nation's] ability

to supply and compete in the U.S. market."  Views at 42 n.298.  As indicated by the Commission,

see id., these decisions reflect a practice of treating extraordinarily imposed import restrictions as

generative of differences in conditions of competition.  For example, in Cut-to-Length Carbon

Steel Plate from China, Russia, South Africa, and Ukraine, the Commission declined to cumulate

subject imports from South Africa where a proclamation by President Bush imposed safeguard

duties on subject merchandise imported from cumulated countries, but not from South Africa

(which was exempted).  Inv. Nos. 731-TA-753–56 (Review) at 21, USITC Pub. 3626 (Sept. 2003).

Reviewing courts have also affirmed the Commission's determinations where the Commission has

relied on trade restrictive measures as a factor in its cumulation analysis.  See Nucor Corp. v.

United States, 32 CIT 751, 764–65, 569 F. Supp. 2d 1328, 1342 (2008) (analyzing the downstream

impact of third-country tariff barriers on conditions of competition in the U.S. market); see also

Ad Hoc Committee of Domestic Uranium Producers v. United States, 25 CIT 1010, 1013, 162 F.

Supp. 2d 649, 652 (2001) (upholding a negative cumulation determination that was based in part

on the Commission's finding that "trade restrictions in the United States and Europe affected

exports of uranium from the successor countries to the former Soviet Union and resulted in a two-

_____

United States, 29 CIT 695, 391, F. Supp. 2d 1258, 1279–80 (2005) (remanding the Commission's
likely-volume findings, citing the dissent as an illustration of the flaws in the majority's approach).

tier pricing structure"). The court accordingly concludes that the Commission's reference to section 232 measures as a factor in its conditions-of-competition analysis is both adequately explained and supported by substantial evidence.

Plaintiffs finally argue that the Commission's determination not to cumulate Brazil's subject imports is not in accordance with law because the determination failed to address the likelihood that the President would lift the quota on Brazilian CRS imports. See Pls.' Br. at 36–37. Plaintiffs assert the following:

> Domestic Industry provided evidence to the Commission demonstrating that the government of Brazil was putting pressure on the Administration to revise the quotas imposed under Section 232 on Brazilian imports to allow more Brazilian imports into the United States. The Domestic Industry also provided evidence to the Commission demonstrating that the Administration had already revised the Section 232 tariffs and liberalized the measures on imports from other significant U.S. trading partners, including the members of the European Union, the United Kingdom, and Japan.

Id. at 36 (citation omitted). Plaintiffs argue that the Commission "simply ignored this evidence," and that "the Commission's statement that there []was [']nothing in the record' to demonstrate that the Brazilian Section 232 quota might be revoked or modified is clearly wrong given that the Domestic Industry had provided the Commission with significant evidence to the contrary." Id. at 37 (quoting Views at 56). Accordingly, Plaintiffs argue, the Commission "should not, and could not, have concluded—as it did—that the quota on the Brazilian imports would remain in place in its existing form for the reasonably foreseeable future." Pls.' Reply at 15–16. In Plaintiffs' view, this conclusion renders the Commission's determination not in accordance with law—that is, with 19 U.S.C. § 1677(f)(i)(3)(B)'s requirement that the Commission explain the reasoning underlying its determinations. See Pls.' Br. at 37.

Contrary to Plaintiffs' assertions, however, Commission did provide an adequate explanation on this score.  After noting that "parties disagree" on the future imposition of section 232 measures, the Commission discussed evidence supporting a finding that section 232 measures on Brazilian CRS imports were likely to remain stable and in place for the reasonably foreseeable future.  Views at 56, 72 (citing Proclamation No. 9759, 83 Fed. Reg. 25857, 25858 (May 31, 2018) ("Proclamation")).  This included evidence that (1) the Proclamation's text indicated long-term imposition, that (2) the quota on Brazil had been in place for more than four years at the time of the sunset review at the time of the <u>Five-Year Review Determination</u>'s publication, and that (3) the Biden Administration had not announced or otherwise directly indicated that a change to that quota was forthcoming.  <u>Id.</u> at 72 (citing Proclamation, 83 Fed. Reg. at 25858).

At minimum, the Commission's "path may reasonably be discerned" from this discussion.  <u>State Farm</u>, 463 U.S. at 43.  The Commission reasonably relied on the text of the implementing Proclamation in assessing the likelihood that the section 232 quota on Brazilian imports would be lifted.  <u>See</u> Proclamation, 83 Fed. Reg. at 25858 ("In my judgment, these measures will provide effective, long-term alternative means to address these countries' contribution to the threatened impairment to our national security by restraining steel articles exports to the United States from each of them.").  In determining the likelihood that the President would maintain the Brazil quota as a long-term measure, the Commission's approach conformed with the principle that "[t]he language of the proclamation is the principal source for determining the President's intent."  <u>Atl. Richfield Co. v. United States</u>, 7 CIT 275, 276, 588 F. Supp. 1427, 1429 (1984), <u>aff'd</u>, 764 F.2d

837 (Fed. Cir. 1985).[13]

The Commission also reasonably relied on the absence of direct evidence that the current President intends to modify or revoke that text.  Contrary to Plaintiffs' suggestion, see Pls.' Br. at 36, the fact that a foreign government has been applying "pressure" on the United States to perform a certain action does not compel a conclusion that the United States is likely to yield in the near future.  If anything, that fact might tend to establish the United States' resistance to the alluded-to lobbying efforts.   Nor do revisions of section 232 restrictions on other countries' imports necessarily compel a conclusion that similar revisions are forthcoming with respect to Brazil's. Plaintiffs imply, but do not establish, that the President revises section 232 restrictions in a country-by-country sequence, with each sequential revision moving Brazil closer to the front of the line.

In sum, the court concludes that the Commission provided a sufficient "explanation of the basis for its determination" with respect to each of the issues that Plaintiffs raise.  19 U.S.C. § 1677f(i)(3)(B).

## CONCLUSION

The Commission's determination not to cumulate subject imports from Brazil is in

---

[13] Courts have used inferences of presidential intent to ascertain the continuing effect of presidential proclamations even when the proclaiming president no longer holds office.  See, e.g., Cappaert v. United States, 426 U.S. 128, 139–40 (1976) (holding that the text of a 1952 proclamation issued by President Truman indicated an intent to reserve certain groundwater rights to the United States, and therefore sustaining an injunction that the United States first sought in 1971 under the Nixon Administration); Trans-Border Customs Serv., Inc. v. United States, 76 F.3d 354, 357–58 (Fed. Cir. 1996) (considering the "purpose" of a proclamation issued by President Reagan in determining the post–Reagan Administration effect of that proclamation on the terms of the Harmonized Tariff Schedule of the United States); see also Benjamin B. Wilhelm, Cong. Rsch. Serv., IF11358, Presidential Directives: An Introduction 1 (Nov. 13, 2019) ("Presidential directives with ongoing effect remain in force across presidential transitions . . . . When researching an executive order, therefore, it is important to determine its current status.").

Court No. 22-00257                                                                                        Page 32

accordance with law and supported by substantial evidence.  The court concludes that the

Commission's cumulation analysis did not engage in impermissibly "circular" reasoning, that the

Commission's treatment of section 232 trade restrictions did not unexplainedly depart from an

established practice, and that the Commission adequately explained its reasoning for determining

not to cumulate Brazilian imports.

      The Commission's final determination is sustained.  Judgment on the agency record will

enter for Defendant and Defendant-Intervenors accordingly.

                    /s/     *Gary S. Katzmann*  
                    Gary S. Katzmann, Judge

Dated: <u>March 20, 2024</u>
      New York, New York